UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

KARL F. THOMPSON, JR.,

                    Defendant.

No. CR-09-88-FVS

ORDER DENYING THE
DEFENDANT'S MOTION TO
DISMISS THE INDICTMENT,
OR, IN THE ALTERNATIVE,
GRANT A NEW TRIAL

**THIS MATTER** came before the Court on August 31, 2012, for oral argument based upon the defendant's "Motion to Dismiss the Indictment with Prejudice; or Alternatively, Motion for a New Trial" (ECF No. 907).  The defendant was represented by Carl J. Oreskovich, Courtney A. Garcea, and Stephen M. Lamberson.  The United States was represented by Aine Ahmed, Joseph H. Harrington, and Timothy M. Durkin.

**BACKGROUND**

The defendant was a City of Spokane Police Officer.  On March 18, 2006, he received information from a dispatcher indicating a man had approached and frightened a young woman who was withdrawing money from an ATM while sitting in her car.  The young woman left the ATM without cancelling the transaction that was in progress.  She suspected the man stole money from her bank account.  She said he ran down the street and entered a convenience store.  The defendant confronted the

Order - 1

man in the store.

The owner of the convenience store had installed security cameras in order to deter shoplifters.  Each camera points in a different direction.  The cameras take pictures in sequence.  First camera one takes a picture, then camera two, then camera three, then camera four -- and then a new cycle begins again.  The cameras complete approximately four cycles each second.

The man who frightened the young woman was named Otto Zehm.  Mr. Zehm entered the convenience store at 18:25:59 on the clock that is utilized by the store's camera system.  The time 18:25:59 is "military time" for 6:25 p.m. plus 59 seconds, *i.e.*, almost 6:26 p.m.  The store's cameras were taking pictures as he entered.  Together, the four cameras recorded approximately 16 frames per second.  As each picture was taken, it was electronically stamped with a time, *e.g.*, 18:26:59.  Since each camera took three or four pictures per second, each of the three or four pictures taken by that camera during a particular second may bear the same time stamp.

The time stamps require further explanation.  The store's camera system has an internal clock.  The clock runs two minutes and three seconds faster than Pacific Standard Time.  Thus, when one looks at a time stamp, one must determine whether it refers to "convenience store time" or Pacific Standard Time.  If the latter, one must add two minutes and three seconds in order to compare it to the equivalent time on the convenience store clock.

The defendant entered the store approximately ten seconds after

Mr. Zehm.  The defendant walked briskly toward the section of the store where Mr. Zehm was standing.  As the defendant did so, he withdrew his baton from its holder on his belt.  There is an image of him holding his baton in front of him.  The image is stamped 18:26:11. At 18:26:12, Mr. Zehm turned and faced the rapidly approaching defendant.  Mr. Zehm was holding a two-liter pop bottle in front of himself.  One hand was on the neck of the bottle; the other on its base.  A complex encounter began.  Greatly simplified, the record reflects the following:  Mr. Zehm backed away as the defendant pressed forward.  The defendant struck Mr. Zehm with his baton.  After the first or second blow, Mr. Zehm fell backwards to the floor.  The defendant continued to strike Mr. Zehm with his baton as Mr. Zehm attempted to wriggle away from him along the floor.  The defendant tried to immobilize Mr. Zehm with electric shocks from his Taser.  He was unsuccessful.  A second police officer arrived and began assisting the defendant.  Other officers joined them.  The defendant withdrew from the struggle.  Eventually, the other officers restrained Mr. Zehm.  He stopped breathing.  Paramedics attempted to resuscitate him. Their efforts were partially successful.  They transported him to a local hospital, where treatment continued.  However, his  brain had been damaged, and the damage could not be undone.  He was pronounced dead a few days later.

City and county authorities began an inquiry.  Investigators interviewed the defendant on March 22, 2006.  They offered him an opportunity to watch the video recordings of the confrontation before

giving a statement.  He declined the offer.  He proceeded to give a statement to the investigators.

The interview was recorded with some type of audio recorder and the audio recording was transcribed.  The defendant reviewed the transcript and approved it.  The transcript is over 34 pages long. The defendant described the opening seconds of the confrontation.  He said he was holding his baton when he approached Mr. Zehm.  (Statement of Karl Thompson at 17-18.)  Mr. Zehm turned to face him.  Mr. Zehm was holding a two-liter pop bottle in a manner the defendant described as "tense":

> We were both staring at each other.  When I came to a stop,
> I immediately told him, I ordered him, in a, in a forceful
> voice, drop it.  He immediately replied, and during this
> short discourse, we both did not break eye contact.  His
> eyes were wide.  He was looking straight at me.
> . . . .
> And I was in full uniform.  . . . he said "why?"  It was a
> forceful response.  Uh, it, he didn't break eye contact and
> my first impression was, here I am in full uniform.  I'm
> displaying a baton in a manner that shows I'm prepared to
> strike.  I'm ordering him to drop the bottle which he's
> holding at chest level in both hands and I he, he tells me
> why.  And I immediately I said "drop it now."  I said it
> twice as loud and he said "no."  It was again looking
> straight at me, clearly without any provocation, that was
> his response.  In my mind at that point, in our proximity,
> my belief was that he was preparing to assault me.  When he
> turned around and saw me entering, he, he did not
> immediately flee.  He picked up an object and it was held in
> a manner that I realized was in a position that he could use
> it as a significant weapon against me.

Order - 4

*Id.* at 18.

Besides taking a statement from the defendant, investigators considered the video recordings of the confrontation that were taken by the four security cameras.  Many of the events that are relevant to this case occurred between 6:20 p.m. and 7:00 p.m.  The security cameras were whirring throughout that 40-minute period.  Experts have separated the frames so each image may be viewed separately.  There are hundreds of separate frames that are potentially relevant to this case.  Each frame has a number.  One way to identify a frame is to examine its frame number and the number of the camera that recorded it.  Another way to identify a frame is to examine the time that's "stamped" on the frame.

The frames are stored in a format that is sometimes referred to as Motion JPEG or M-JPEG.  (The acronym "JPEG" stands for Joint Photographic Experts Group.)  The M-JPEG format has advantages and disadvantages.  A disadvantage is it reduces the size of each image it stores by eliminating information.  The compression of data may distort the image the viewer observes.  The viewer may see things in the image that really weren't present in the scene that was recorded.  Such distortions are sometimes referred to as "compression artifacts."  Given the existence of compression artifacts, discernment is required in interpreting images that are stored in the M-JPEG format.

Grant Fredericks is an expert in interpreting M-JPEG images.  During the summer of 2006, he was hired to interpret the images that were recorded by the security cameras in the convenience store in

which the confrontation occurred.  He completed a written report
during September.  Near the end of the report, he summarized his
findings.  Among other things, he concluded the video recording shows
the defendant struggling with Mr. Zehm for approximately one minute
thirteen seconds before one can see him use his baton.  At that point,
one can see him swing his baton eight times in six seconds.

By the fall of 2006, a federal investigation of the confrontation
was underway.  An Assistant United States Attorney ("AUSA") and an
Federal Bureau of Investigation ("FBI") Special Agent led the federal
investigation.  They read the defendant's statement, and they read the
statements of persons who had observed the confrontation.  They
examined the security camera recordings, and they read Mr. Fredericks'
report.  They were very skeptical of his conclusions.  Consequently,
they interviewed him on March 8, 2007.  He brought a laptop computer
to the meeting.  He used a software package to display images of the
confrontation between the defendant and Mr. Zehm.  The AUSA and the
FBI Special Agent challenged Mr. Fredericks' interpretation of a
number of images, especially images that had been recorded at the
beginning of the confrontation.

Following the March 8th meeting, the FBI Special Agent prepared a
report.  On page three, she describes Mr. Fredericks' comments
concerning the opening seconds of the confrontation between the
defendant and Mr. Zehm:

> Frames 18:26:10 through 18:26:18 . . . were reviewed in
> detail.  [I] . . . reviewed frames with Frederick [sic] who
> agreed that [the defendant] moved the baton from his left

hand to his right hand as he walked down the aisle of the
store.

    [I] . . . then showed Fredericks frame by frame in
18:26:14 . . . where [the defendant] appeared to hold his
baton upright in his right hand and then subsequently swing
his baton down toward Zehm in a forward motion.  Fredericks
initially advised that the image may be something other than
a baton such as a shadow or a video artifact.  Upon further
review of the frames however, Fredericks agreed that the
images depicted in 18:26:14 and 18:26:15 were consistent
with a baton strike(s) and agreed that [the defendant]
appeared to be using his baton in a forward striking motion
on at least two occasions prior to the images depicting Zehm
on his back holding the Pepsi bottle.  Fredericks admitted
that he appeared to have missed these images during his
initial review of the video.

(ECF No. 915.)

    The FBI Special Agent and the Assistant United States Attorney
next met with Mr. Fredericks on August 3, 2007.  One of the purposes
of the meeting was to discuss "still" images of the confrontation that
Mr. Fredericks had prepared at the FBI Special Agent's request.  Some
time during the August meeting, Mr. Fredericks offered to prepare a
supplemental report clarifying his position.  The AUSA and the FBI
Special Agent accepted his offer.  Mr. Fredericks completed his
supplemental report during September.

    Mr. Fredericks' supplemental report analyzed a number of images
that capture the initial seconds of the confrontation between the
defendant and Mr. Zehm.  Mr. Fredericks used Pacific Standard Time
("PST") in his report.  As explained earlier, one must add two minutes

Order - 7

and three seconds to PST in order to convert it to convenience store time. Mr. Fredericks opined that the defendant's baton is not visible in an image which is stamped 18:24:11 PST (18:26:14 on the convenience store clock), but that it is visible in images which are stamped 18:24:12 PST (18:26:15 on the convenience store clock) and 18:24:13 PST (18:26:16 on the convenience store clock). Although Mr. Fredericks identified certain images in which the defendant's baton is visible, he said nothing about the images being consistent with a swinging motion.

Mr. Fredericks was not the only expert who was helping the United States interpret the video recordings. Another was Richard Gill, Ph.D., an expert in human factors engineering. Dr. Gill completed a report on January 31, 2008. He concluded the first baton strike occurred at 18:26:14, and it is depicted in frames 68-70. (Report Re: Otto Zehm Investigation at 21-22.) The image Dr. Gill referred to as "frame 69" is one of the images Mr. Fredericks discussed at length with the Assistant United States Attorney and the FBI Special Agent during the course of their meetings in March and August of 2007. Dr. Gill's report strongly implies, if it does not actually state, he thought he could see the defendant's hand, arm, and baton in frame 69. *Id.* at 21, 22, 25, 26. Dr. Gill's determination concerning the timing of the first baton strike had significant implications. Mr. Zehm turned to face the defendant at about 18:26:12. The defendant said he stopped and issued two commands to Mr. Zehm, both of which Zehm allegedly defied, before he struck Zehm with his baton. If, as Dr.

Order - 8

Gill concluded, the first baton strike occurred at 18:26:14, then only two and 1/4 seconds elapsed between the time the defendant allegedly issued his commands and the time he allegedly struck Mr. Zehm.  Dr. Gill doubted the defendant had time to issue two commands, and Mr. Zehm had time to defy them, in such a brief period.  In other words, Dr. Gill's calculations undermined the credibility of the defendant's version of the opening seconds of the confrontation.

On May 13, 2009, Mr. Fredericks testified before a grand jury. He showed a number of images of the confrontation to the grand jurors, analyzing the images in response to questions from an Assistant United States Attorney.  When Mr. Fredericks reached images that are stamped 18:26:13 and 18:26:14, the AUSA asked, "And is the movement that we're seeing here and as you described, is that consistent with the movement of a forward overhand baton strike?"  Mr. Fredericks answered, "It is."  (Transcript of the Testimony of Grant Fredericks before the Grand Jury (ECF No. 916) at 30.)

The AUSA also asked questions about images that are stamped 18:26:15 and 18:26:16.  One of the images shows the defendant holding a baton in front of himself at roughly a 45° angle.  He is facing Mr. Zehm in the south aisle of the store.  The AUSA asked Mr. Fredericks a question that reflected Dr. Gill's interpretation of this image:

Q.    And we know from reviewing Camera Angle No. 1 that
      the baton is caught after the first baton strike,
      and it's caught in an upward strike position with
      forward movement by Officer Thompson at
      approximately 18:26:15; is that correct?

A.   Yes.  There's a number of images that show the
     baton in the air at that time, yes.

*Id.* at 38.

On May 22, 2009, Mr. Fredericks testified in a federal criminal trial in the State of New York.  He was cross examined by AUSA Anna Skotko about his analysis of the Thompson-Zehm video recordings:

Q.   Are you aware the FBI launched an investigation
     [into the death of Otto Zehm] and you changed your
     mind about what the video showed?
A.   No.  That's not true at all.
A.   No.
Q.   In your initial report that you gave to the
     Spokane Police Department, that was incorrect
     wasn't it?
A.   No.
Q.   It was not incorrect?
A.   No, not at all.  The FBI asked me if I would
     pursue specific focus on one specific area as
     opposed to multiple videos over a long period of
     time.  So they wanted me to focus on one area,
     flush [sic] that out.  But there's no
     inconsistency.
Q.   In that report you concluded that the officer did
     not hit the mentally disabled individual with the
     baton?
A.   Absolutely not, no.  No, I concluded the baton,
     the video did not show the baton striking the
     individual.  Significantly different than whether
     he hit him.

(Transcript of the Testimony of Grant Fredericks in *United States v. Simoes* (ECF No. 964) at 55-56.)

The defendant was indicted on June 19, 2009.  Count One alleged

Order - 10

he willfully deprived Mr. Zehm of his constitutional right to be free from unreasonable force.  18 U.S.C. § 242.  Count Two alleged he knowingly made a false entry in a record and document with the intent to impede, obstruct, or influence an investigation of a matter within the jurisdiction of the Federal Bureau of Investigation.  18 U.S.C. § 1519.  Following the indictment, the United States began providing discovery in accordance with Federal Rule of Criminal Procedure 16(a).  Between August of 2009 and March of 2010, the United States disclosed five documents that set forth or described Mr. Fredericks' opinions regarding the content of the video recordings.  Other documents may have referred to Mr. Fredericks, but the following documents appear to be the ones that set forth or described his opinions.

The first document the United States disclosed was Mr. Fredericks' 2006 report.  Disclosure was made on August 3, 2009.  The 2006 report is the one in which he opined the video recordings do not depict the defendant using his baton against Mr. Zehm until approximately one minute thirteen seconds into the confrontation.  The FBI Special Agent and the AUSA challenged this conclusion at the meeting that took place on March 8, 2007.

The second document the United States disclosed was a document that is entitled "United States' Addendum to First & Second Notice of Initial Disclosures of Expert Witnesses & Testimony" (hereinafter "Addendum") (ECF No. 56).  Disclosure was made on September 22, 2009.  The Addendum summarized the testimony the United States expected its experts to give at the defendant's trial.  The Addendum attributed a

Order - 11

number of opinions to Mr. Fredericks.  The following was one of them:

> Immediately after the Zip Trip security video shows Thompson appearing to strike Zehm with his baton for the first time, dispatch broadcasted that the complainant was not sure that Zehm had taken any of her money.  This dispatch occurred before Thompson strikes Zehm a second time with another overhand, up and down, baton strike.

(Addendum at 3.)  The Addendum refers to a broadcast from a dispatcher.  The broadcast began at 18:26:12 and ended at 18:26:16. Even knowing this, the Addendum is difficult to interpret.  It is susceptible of more than one interpretation.  For example, it could be read to indicate the United States expected Mr. Fredericks to testify the defendant twice struck Mr. Zehm with overhand, up and down, baton strikes before 18:26:16.

The third document the United States disclosed was Mr. Fredericks' 2007 report.  Disclosure was made on September 29, 2009. Mr. Fredericks prepared his 2007 report after meeting with the FBI Special Agent and the Assistant United States Attorney on August 3, 2007.  The 2007 report is the one in which Mr. Fredericks opined the defendant's baton is not visible in an image that is stamped 18:24:11 PST (18:26:14 on the convenience store clock).

The fourth document the United States disclosed was a transcript of Mr. Fredericks' grand jury testimony.  Disclosure was made during October of 2009.  While Mr. Fredericks was testifying before the grand jury, the AUSA asked him a number of questions concerning images that record the opening seconds of the confrontation, including images that

Order - 12

are stamped 18:26:13 and 18:26:14.  Mr. Fredericks answered affirmatively when the AUSA asked, "And is the movement that we're seeing here and as you described, is that consistent with the movement of a forward overhand baton strike?"

The fifth, and final, document the United States disclosed was a copy of the report the FBI Special Agent prepared after the meeting with Mr. Fredericks on March 8, 2007.  Disclosure was made on or about March 1, 2010.  This report was the one in which she said he agreed "the images depicted in 18:26:14 and 18:26:15 were consistent with a baton strike(s)," and the defendant "appeared to be using his baton in a forward striking motion on at least two occasions prior to the images depicting Zehm on his back holding the Pepsi bottle," and he, Fredericks, "appeared to have missed these images during his initial review of the video."  The United States did not provide a copy of Mr. Fredericks' 2009 New York testimony to the defendant.  This was the testimony in which he denied changing his mind "about what the video showed," and in which he denied his 2006 report was incorrect.

Trial was scheduled to begin during June.  As it turned out, the United States appealed one of the Court's pretrial rulings. Proceedings were stayed while the Ninth Circuit considered the appeal. During the spring of 2011, the stay was lifted.  Trial was scheduled to begin during October.

On September 23, 2011, the defendant notified the United States of his intent to call Michael Schott as an expert witness.  The defendant explained Mr. Schott disagreed with a number of opinions the

United States' experts were prepared to offer at trial.  The United States bitterly objected to Mr. Schott's proposed testimony.  The Court did not resolve the United States' objection prior to trial. Jury selection began on October 12, 2011.  At the end of the second day of trial, the parties presented arguments in support of and in opposition to the United States' objection to Mr. Schott's anticipated testimony.  During oral argument, an AUSA said:

> The response has been, well, there's no prejudice. Well actually there is, Your Honor.  My, my expert, Mr. Fredericks, has not even had the opportunity to review this.
>
> He's in town today for the first time.  I'm going to go meet with him in a couple hours here to review it for the first time.
>
> That's in addition to the presentation of his other testimony that we hope to complete tomorrow.  And he leaves the country for two weeks at noon tomorrow.

(Trial Transcript, Vol. 2, p. 168.)  The Court overruled the United States' objection at the beginning of the third day of trial.[1]

The United States did not call Mr. Fredericks as a witness. Instead, the United States relied upon other witnesses to interpret the video recordings of the confrontation.  One was Dr. Gill, the human-factors expert.  He used a "Baton/Taser Motion Reference Grid"

---

[1]The defendant alleges some of the AUSA's statements to the Court were materially inaccurate.  The United States has not responded to the allegation, much less attempted to rebut it. The Court need not determine whether the defendant is correct because, in the end, the Court overruled the United States' objection and allowed Mr. Schott to testify.

Order - 14

to help explain his opinions.  (ECF No. 973, Ex. 3.)  The exhibit had been prepared by an FBI Special Agent based, in part, upon work that Mr. Fredericks performed.  The grid lists 13 baton "motions."  At this juncture, the first two are the most important.  Dr. Gill said the first strike is depicted in frames 68-70.  (Trial Transcript, Vol. 5, p. 785.)  His interpretation of frame 69 was now more guarded.  "I don't know what the image is that you can see above Officer Thompson's head in 69," he said.  *Id.* at 811.  "I can't tell you it's his hand, but I know his hand is in that image, because of what happens in the next subsequent image."  *Id.*  Nevertheless, Dr. Gill insisted frames 68-70 depict the first baton strike.  He appears to have relied upon a number of considerations.  The defendant told investigators he struck Mr. Zehm shortly after confronting him.  Frame 68 is the first frame in which the defendant is close enough to Mr. Zehm to strike him.  In frame 69, the defendant's head appears to move forward and down.  *Id.* at 777-781.  Dr. Gill thinks the movement of the defendant's head is consistent with the movement that would occur during a baton strike.[2]

Dr. Gill testified the second strike is depicted in frames 74-76. *Id.* at 794-95.  In reaching that opinion, he again relied upon a

---

[2]In his 2008 report, Dr. Gill mentioned the observations of percipient witnesses.  They do not indicate Mr. Zehm fell when struck the first time.  (Report Re: Otto Zehm Investigation at 23.)  Their observations seem to indicate Mr. Zehm was struck at least twice before he fell down.  At trial, Dr. Gill mentioned the testimony of percipient witnesses, but he did not make this specific point.  (Trial Transcript, Vol. 5, p. 784.)

Order - 15

number of considerations.  He began with the defendant's account of
the confrontation.  Dr. Gill understood the defendant to say that
after the first strike, Mr. Zehm turned away from him and moved in an
easterly direction down the south aisle of the store.  *Id.* at 780-81.
In frame 71, one can see the defendant and Mr. Zehm facing each other
in the south aisle.  One can see the defendant's baton.  He is holding
it at a 45° angle in front of him.  Dr. Gill testified this was the
beginning of the second baton strike.  In his opinion, the baton was
coming up.  *Id.* at 781.  The baton is also visible in frame 75.  The
defendant is holding it in a horizontal position above his head.  This
frame is stamped 18:26:16.  *(See, e.g.*, Fredericks' Rule 16
Demonstrative Response at 128.)  Dr. Gill suggested the baton was
about to come down upon Mr. Zehm.  (Trial Transcript, Vol. 5, p. 781.)
In Dr. Gill's opinion, the second strike was completed in frame 76.
This frame is stamped 18:26:16.  *Id.* at 783.  According to Dr. Gill,
other frames show Mr. Zehm falling backward at 18:26:16.  *Id.* at 783-
84.

Another expert upon whom the United States relied to interpret
the video recordings was Robert Bragg.  He is an expert in the field
of police procedures and use of force.  He testified he had repeatedly
examined the still images and enhancements that were produced from the
security videos.  (Trial Transcript, Vol. 4, p. 444.)  He testified he
had been able to discern sufficient information from the security
videos in order to evaluate the defendant's conduct.  *Id.* at 445.  He
reached a number of conclusions that were unfavorable to the

Order - 16

defendant.  Among other things, he concluded:

> [The defendant] violated his training in the sense of
> applying what appears to be lethal force due to the video
> depiction of the high overhand strikes, that which I
> mentioned before in terms of zero propensity forehead
> contact, autopsy findings, witness statements, that lead me
> to believe or conclude that there was lethal force applied.

*Id.* at 462.  Mr. Bragg appears to have relied upon his own
interpretation of the video recordings in determining they depicted
"high overhand strikes."  He did not cite Dr. Gill as his authority
for his interpretation of the images in question.

Besides presenting images of the confrontation (together with the
interpretations of experts who had studied the images), the United
States also presented testimony from persons who had observed the
confrontation.  Russell Balow and his wife, Carrie Coyle-Balow were
outside the convenience store.  Mr. Balow said he saw the defendant
approach Mr. Zehm inside the store.  He said the defendant stopped
very briefly -- "[m]aybe a second . . . [m]aybe two" -- when he was
six to eight feet from Mr. Zehm; at which point the defendant's mouth
moved, as though he were speaking to Mr. Zehm, though Mr. Balow could
not hear what he said.  (Trial Transcript, Vol. 6, pp. 1155, 1159.)
Mr. Balow said he saw the defendant hit Mr. Zehm twice with his baton
shortly thereafter.  Both strokes were "over hand hits."  *Id.* at 1156.
The first stroke grazed the right side of Mr. Zehm's head and landed
on his right shoulder.  *Id.* at 1155.  The second stroke also landed on
his right shoulder.  *Id.* at 1156.  Ms. Coyle-Balow's testimony was

Order - 17

similar.  She, too, saw the defendant approach Mr. Zehm.  She saw the defendant stop momentarily:  "less than" two seconds.  *Id.* at 1171. After the defendant stopped, his mouth moved.  Ms. Coyle-Balow thought he said something, but she could not hear the words.  *Id.* at 1171-72. Shortly thereafter, the defendant struck Mr. Zehm with his baton.  *Id.* at 1172-74.  She did not see where the baton hit Mr. Zehm.  *Id.* at 1179.  She saw the defendant raise his baton a second time, and she saw it come down, but she did not see it hit Mr. Zehm.  *Id.* 1180.

Russell Balow and Carrie Coyle-Balow observed the confrontation from a vantage point outside the convenience store.  A number of persons observed the confrontation from vantage points inside the store.  One was Dustin Balam:

A.   I saw the officer run around and then clap Zehm on the shoulder and then Zehm turned around and then the officer struck Zehm once.[3]

Q.   Did you see what area he struck him?

A.   Looked like the shoulder.

Q.   And what did he strike him with?

A.   A baton.

Q.   And did you see the officer use the baton more than one time?

A.   I did.

Q.   How many times?

A.   Probably two to four times.

Q.   Can you describe for us exactly how he used the baton?

A.   Overhead strikes.  He hit him in the shoulder and

---

[3]By "clap Zehm on the shoulder," Mr. Balow meant touch him on the shoulder.  (Trial Transcript, Vol. 5, p. 877.)

Order - 18

```
                     then as Zehm was stumbling backwards, hit him like
                     in the side of the leg and then in the back again.
            Q.    Okay.  Did you ever hear the officer say anything?
            A.    Um, not until they were on the ground.  Where Zehm
                     was laying on his back and the officer was on top
                     of him.
            Q.    What did the officer say?
            A.    "Drop the pop bottle."
```

(Trial Transcript, Vol. 5, pp. 867-68.)

The United States presented testimony from other persons who observed the confrontation from vantage points inside the convenience store.  One of them was Michael Dahl.  State and federal investigators had interviewed Mr. Dahl on separate occasions during 2006.  On both occasions, he told investigators the defendant commanded Mr. Zehm to "drop the pop," and when Mr. Zehm failed to do so, the defendant struck him.  (Trial Transcript, Vol. 4, p. 602.)  The United States thought Mr. Dahl's initial statement was inaccurate because, in the United States' opinion, he had not seen the first baton strike.  An Assistant United States Attorney and an FBI Special Agent showed Mr. Dahl an image that, according to them, depicted the first baton strike.  *Id.* at 610.  The image is stamped 18:26:14.  After listening to the United States' interpretation of the image, Mr. Dahl decided he had not seen the first baton strike.  He decided Mr. Zehm must have been lying on the ground when he heard the defendant say, "Drop the pop."  *Id.* at 596.

During cross examination, one of the defendant's attorneys asked Mr. Dahl a number of questions about his revised recollection of the

Order - 19

confrontation.  The attorney showed Mr. Dahl the image the FBI Special
Agent and the AUSA had presented to him prior to trial:

> Q.    Is this what the Government told you was the first
>       baton strike you didn't see?
> A.    Yes.
> Q.    Did the Government ever tell you that they had
>       this and [sic] analyzed by the FBI forensic
>       laboratory?
> A.    No.
> Q.    Did they ever tell you that this was a potential
>       light that's in the window the Zip Trip?
> A.    Potential light?
> Q.    Yes.  That's not a baton strike at all.  They ever
>       tell you that?
> A.    They never told me.
> Q.    But that is, indeed, what the Government showed
>       you to convince you you didn't see the first baton
>       strike, isn't it?
> A.    Well, yes, I guess.

*Id.* at 610.

        After the United States rested, the defendant presented evidence
of his own.  One of the witnesses who testified for the defendant was
Michael Schott, an expert in interpreting M-JPEG images.  He discussed
an image that is stamped 18:26:14.  This is the image Dr. Gill
designated as frame 69.  Mr. Schott used a different numbering system,
but the image is the same.  Counsel for the defendant wanted to know
whether one can see the defendant's hand, arm, or baton in the image.
Mr. Schott explained why, in his opinion, one cannot see them.  (Trial
Transcript, Vol. 10, pp. 2178-93.)

        The methodology Mr. Schott used to form his opinion was different

than the methodology Dr. Gill used.  Dr. Gill's methodology had
deductive characteristics.  He studied the defendant's account of what
had occurred and the accounts of the percipient witnesses.  Based upon
the various accounts (especially the defendant's), he made assumptions
about what must have occurred.  He relied upon those assumptions to
interpret the content of video images.  (Trial Transcript, Vol. 5, p.
778-81.)  Mr. Schott used a different methodology.  Mr. Schott's
methodology had inductive characteristics.  Instead of relying upon
external information in order to determine the content of an image, he
began with the image itself.  Put somewhat differently, he used the
image to interpret the image rather than using external information to
interpret the image.

   Mr. Schott's inductive methodology guided his analysis of the
image that, in Dr. Gill's opinion, depicted the first baton strike.
This is the image Dr. Gill designated as frame 69.  There is a white
spot in the image.  Mr. Schott was asked to determine, if possible,
whether the spot depicts the defendant's hand.  Mr. Schott enlarged
the image to the point he could count individual pixels.  He
calculated the pixel size of the white spot (an unknown object), and
he compared it with the pixel size of the defendant's head (a known
object).  Based upon the comparison, Mr. Schott was able to determine
the white spot was two-thirds the size of the defendant's head.  If
the spot were a three-dimensional object, it would be "the size of a
cantaloupe or bigger."  (Trial Transcript, Vol. 10, pp. 2184-85.)  In
other words, it was too big to be a hand.  *Id.*

Order - 21

Mr. Schott also used his image-centered approach to challenge Dr. Gill's conclusion that the first baton strike is depicted in frame 69. Dr. Gill placed great weight upon the fact the defendant's head appears to move forward and down in frame 69. Mr. Schott testified frame 69 is deceptive; that the defendant didn't really move forward and down. He opined the movement one "sees" in the images is not real movement. It is a type of distortion that is inherent in time-lapse video recordings. (Trial Transcript, Vol. 10, pp. 2193-97.)

The defendant testified. During cross examination, an Assistant United States Attorney showed him a number of images. They included ones that, in Dr. Gill's opinion, depicted the first baton strike. Dr. Gill testified the first strike is depicted in frames 68-70. (Trial Transcript, Vol. 5, p. 738.) Each of those images has the time stamp 18:26:14. In Mr. Fredericks' opinion, one cannot see a baton in any of those frames. Frame 71 is stamped 18:26:15. Everyone agrees a baton is visible in that image. The defendant is holding it at a 45° in front on himself. The AUSA asked:

> Q.  From frame number 68 through frame number 71, does
>     that reflect the first baton strike that you
>     delivered at Mr. Zehm?  . . .
> A.  I believe frame 71 accurately depicts the first
>     strike.
> Q.  Delivery of the first strike.
> A.  Yes.
> Q.  Correct?
> A.  I believe so.
> Q.  Impact of the first strike?
> A.  Yes.  Yes.

Order - 22

1        . . . .

2        . . . .

3        . . . .

    Q.  And that's [frame number 71] the first -- that's

4         the completion of your baton strike, which was at

5         the first quarter of the second 18:26:15, correct?

    A.  Well, the baton is in an upright position, so it's

6         not a completion of a strike.

7     Q.  Oh, you're saying that that's the delivery, where

        you have the still photograph of the baton?

8     A.  I can't give you that conclusion based on the

9         video.  This is one of the reasons I didn't watch

10        the video when I gave the statement.  It's

11        confusing.

    Q.  It's confusing?

12     A.  Yes, it's confusing.

13 (Trial Transcript, Vol. 12, pp. 2657-59.)

14     On October 31st, the Court read its final instructions to the

15 jury and counsel delivered their closing arguments.  The jury returned

16 verdicts of guilty on both counts on November 2nd.  Neither side had

17 proposed special interrogatories for the jury to complete during its

18 deliberations, so there is no way to determine which of the

19 defendant's acts the jury relied upon in finding him guilty.  It is

20 possible the verdicts were based, in whole or in part, upon Dr. Gill's

21 testimony concerning the first two baton strikes.

22     Approximately one month after the jury returned its verdicts, the

23 Court and counsel for the United States received a letter from an

24 attorney who had been retained by Mr. Fredericks.  The attorney

25 advised the Court that Mr. Fredericks had informed him the United

26

States' summary of his expected testimony misrepresented his opinions concerning the video recordings. A copy of the letter was provided to the defendant's attorneys. The letter set in motion an extended chain of events. Among other things, the parties jointly interviewed Mr. Fredericks, and then they took his deposition. The United States presented rebuttal evidence, and Mr. Fredericks responded to it.

Much of the focus of the post-trial discovery process has been upon the meetings that occurred during March and August of 2007. At the March meeting, Mr. Fredericks discussed a number of images with an Assistant United States Attorney and an FBI Special Agent. (Grant Fredericks' Proffer (ECF No. 1009) at 7-8.) In images that are stamped 18:26:12, 18:26:13, and 18:26:14, one can see a white spot and a dark line. Mr. Fredericks says the AUSA was convinced the white spot and dark line are the defendant's hand and baton. Mr. Fredericks told the AUSA he was mistaken. Mr. Fredericks says he explained the white spot was produced by a vehicle headlight and the dark line is a compression artifact. Indeed, according to Mr. Fredericks, one cannot see a baton in images that are stamped 18:26:12, 18:26:13, and 18:26:14. By contrast, a baton can be seen in an image that is stamped 18:26:15. However, the image of the baton is not blurred. Mr. Fredericks says he explained the phenomena of "motion blur" to the AUSA and to the FBI Special Agent. If an object is moving while it is being recorded, especially if it is moving quickly, the image of the object likely will appear blurred in the recording. Thus, a blurred object in a recording suggests the object was moving when it was

Order - 24

recorded.  Conversely, the absence of motion blur suggests the object
was not moving or was moving slowly when it was recorded.  According
to Mr. Fredericks, the baton one can see at 18:26:15 is not blurred by
movement.  In Mr. Fredericks' opinion, the absence of motion blur
suggests the baton was not moving quickly.

Mr. Fredericks says he repeatedly rejected the AUSA's assertion
that images which are stamped 18:26:14 and 18:26:15 show the defendant
striking Mr. Zehm with his baton.  At times, the meeting became
contentious.  Eventually, says Mr. Fredericks, the AUSA approached the
issue of baton strikes from a different direction.  "After some
discussion, . . .  [The AUSA] asked if I could state that Thompson did
not strike Zehm at 18:26:14 and 18:26:15."  (Fredericks' Proffer at
16.)  Mr. Fredericks says he responded in the negative.  "Not only can
the video not show forward motion of the baton, it clearly cannot be
used to prove that Thompson did not strike with the baton . . . ."
*Id.*  Mr. Fredericks says he conceded the defendant's movements, as
recorded in images at 18:26:14 and 18:26:15, are "'consistent with a
number of possibilities.'"  *Id.* at 21.  The possibilities include, but
are not necessarily limited to, "a 'swinging motion of a baton'."  *Id.*

As explained above, an FBI Special Agent prepared a written
report summarizing her perception of the discussion that occurred
during the March 7th meeting.  Mr. Fredericks has read her report.  He
says parts of it are inaccurate:

> And I tried to be clear that my testimony was only that a
> baton could not be seen, but that then, that one motion at
> 18:26:14 could be consistent with a swinging motion.

Order - 25

. . . .

. . . But not the subsequent images that we have here.

. . . .

And in fact I was very specific that there's no evidence of
motion with the baton because there's no motion blur.  He
could just as easily be holding the baton as he's moving
forward.

(Deposition of Grant Fredericks (ECF No. 911) at 127).

The next meeting took place on August 3, 2007.  Mr. Fredericks
says they again discussed the phenomena of motion blur:

. . . I believe it was the second meeting, where I offered
to do a reenactment.

. . . .

. . . where I asked [the AUSA] to stand up and take the
position of Mr. Zehm and I took the position of Officer
Thompson, and I demonstrated what the video shows the baton
position to be in.

. . . .

And that we cannot infer motion from that.  So all we can
say is that, here's the baton.  A number of things could be
happening.  Officer Thompson may be swinging it.

. . . .

But as I said, that swinging motion would have to be at the
kind of apex of the motion, if that's the correct word,
where the baton is back and as it's about to go forward,
where it's not in a swinging motion, because we would see
motion blur.

. . . .

So I said, it may be that he's swinging at him.  The video
doesn't, we can't use the video to say that and therefore
that is not my opinion.  My opinion is simply, that's the
baton and it's in the air.

(Fredericks' deposition at 46-47.)

Order - 26

**STANDARD**

The United States has a duty under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to provide favorable evidence to the defendant. *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir.2004). Not only must a prosecutor disclose favorable evidence of which he personally is aware, but also he must ask others who are involved in the prosecution whether they are aware of any favorable evidence. *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. In order to establish a due process violation, the defendant must prove three things: (1) the disputed evidence is favorable to him, either because it is exculpatory or because he could use it to impeach a witness; (2) the United States suppressed the evidence; and (3) he has suffered prejudice as a result. *See United States v. Kohring*, 637 F.3d 895, 901 (9th Cir.2011) (internal quotation marks and citations omitted).

**FINDINGS OF FACT**

Conflicting accounts of the two 2007 meetings have emerged. Mr. Fredericks' account is set forth in his deposition and in his proffer. The United States' account is set forth in two declarations that have been submitted by an FBI Special Agent. She maintains Mr. Fredericks admitted, during their first meeting, that some of the defendant's

movements during the opening seconds of the confrontation are consistent with baton strikes.  In addition, she maintains he admitted he did not accurately interpret images that record the opening seconds of the confrontation.  However, she does not categorically deny all of Mr. Fredericks' allegations.  In particular, she does not appear to deny he pointed out the presence of compression artifacts and explained their significance.  Nor does she appear to deny he discussed the phenomena of motion blur and explained its significance. Nor does she appear to deny he provided a demonstration suggesting certain frames depicting the defendant' baton may be interpreted in an exculpatory manner.

Having reviewed the record as a whole, the Court finds Mr. Fredericks expressed a number of opinions to the FBI Special Agent and to the Assistant United States Attorney at the March 8th meeting.  At a minimum, he said they had mistakenly interpreted a white spot and a dark line as the defendant's hand, arm, and baton.  He said he could not see a baton in images that are stamped 18:26:12, 18:26:13, and 18:26:14.  He said the images that are stamped 18:26:14 do not depict the defendant swinging his baton at Mr. Zehm, although he conceded the images in question are consistent with a swinging motion.  Finally, he explained the phenomena of motion blur.

The FBI Special Agent's report concerning the March 8th meeting does not contain all of the opinions Mr. Fredericks expressed.  The most persuasive explanation for the incompleteness of the FBI Special Agent's report is that it was the product of an innocent

misunderstanding.  Mr. Fredericks' opinions are nuanced.  He is willing to concede a number of the disputed images are consistent with a baton in motion.  Nevertheless, in his opinion, the fact an image is consistent with a moving baton does not mean the defendant was swinging the baton, much less striking Mr. Zehm.  A reasonable person could fail to appreciate the distinction drawn by Mr. Fredericks.

On August 3, 2007, Mr. Fredericks again met with an FBI Special Agent and an Assistant United States Attorney.  He provided a demonstration showing why, in his opinion, images of the defendant's baton which lack motion blur reasonably can be interpreted to indicate he was moving forward with the baton in his hand rather than swinging it.  The FBI Special Agent and the AUSA failed to note the exculpatory value of the demonstration.  It is possible Mr. Fredericks did not express himself clearly.  It is also possible the FBI Special Agent and the AUSA mentally "blocked out" those parts of his comments that were inconsistent with their theory of the confrontation between the defendant and Mr. Zehm.

On May 13, 2009, Mr. Fredericks testified before the grand jury.  Some of his answers were very subtle.  A reasonable person could miss the distinctions he made.  For example, an Assistant United States Attorney posed a question concerning frame 71 which reflected Dr. Gill's interpretation of that frame:

> Q.   And we know from reviewing Camera Angle No. 1 that
>      the baton is caught after the first baton strike,
>      and it's caught in an upward strike position with
>      forward movement by Officer Thompson at

Order - 29

approximately 18:26:15; is that correct?

A.    Yes.  There's a number of images that show the
       baton in the air at that time, yes.

Fredericks Grand Jury Testimony at 38.  Mr. Fredericks' answer
reflects the nuanced nature of his analysis.  He acknowledged there
are "images that show the baton in the air."  Nevertheless, he did not
ratify Dr. Gill's and the AUSA's interpretation of frame 71.  That is
to say, he declined to agree frame 71 depicts the defendant swinging
his baton at Mr. Zehm.

       On May 22, 2009, Mr. Fredericks testified in a federal criminal
case in the State of New York.  The questions that AUSA Skotko asked
suggest one of two things:  either she had a copy of the FBI Special
Agent's report concerning the March 2007 meeting with Mr. Fredericks,
or she had been apprised of the report's contents.  Otherwise, how
would she have known to assert, "[Y]ou changed your mind about what
the video showed?" and "[Y]our initial report that you gave to the
Spokane Police Department, that was incorrect, wasn't it?"  Those
questions reflect the United States' perception of Mr. Fredericks'
statements during the March 2007 meeting.

       During oral argument on August 31, 2012, one of the Assistant
United States Attorneys who was involved in the prosecution of Karl
Thompson acknowledged he was aware of Mr. Fredericks' New York
testimony.  The AUSA seemed to acknowledge he obtained a transcript of
Mr. Fredericks' New York testimony prior to Mr. Thompson's trial.
Presumably, then, the AUSA was aware of Mr. Fredericks' answers to
AUSA Skotko's questions.  When she accused Mr. Fredericks of changing

Order - 30

his mind about what the convenience store video showed, he said, "No. That's not true at all."  And when she asserted his 2006 report was incorrect, he said, "No.  . . .  No, not at all."  Those answers reflected Mr. Fredericks' thinking on May 22, 2009.  At least as of that date, he did not think he had changed his mind about what the video recordings showed.  Nor did he think his 2006 report was incorrect.  This was contrary to the views that were attributed to him in the report the FBI Special Agent prepared during March of 2007. Mr. Fredericks' answers in the New York trial put the United States on notice in the Thompson case that it had not fully understood him.

## ANALYSIS

### A. Favorable Evidence

The defendant must demonstrate he was deprived of favorable evidence.  *Kohring*, 637 F.3d at 901.  Evidence is favorable if it suggests he did not commit the crime with which he is charged, or if he can use the evidence to undermine the credibility of one of the United States' witnesses.  *See id.*  In order to determine whether Mr. Fredericks' opinions are favorable to the defendant in either sense of the word, it is necessary to consider the United States' theory of the case.  One of its allegations was the defendant abruptly attacked Mr. Zehm with his baton without having an objective basis to fear for his safety.  Another of its allegations was the defendant gave investigators a false account of his confrontation with Mr. Zehm.  The United States relied heavily, but by no means exclusively, upon its experts' interpretations of the security videos in order to prove

those two allegations.

Mr. Fredericks would have acted as a counterbalance to Dr. Gill had he testified.  It is useful to begin with frame 69.  This frame is stamped 18:26:14.  It is one of the images Mr. Fredericks discussed with an Assistant United States Attorney and an FBI Special Agent on March 8, 2007.  It is the image that shows the white spot and the dark line.  Dr. Gill mentions this frame on pages 21, 22, 25, and 26 of his report of January 31, 2008.  At the outset, Dr. Gill says, "When considered in light of all the evidence, Camera 1, jpg 69 shows Thompson at the western end of the entrance into the southern most aisle, with the baton in his right arm, with his right arm in a near vertical position."  (Gill report at 22.)  Dr. Gill qualified that statement to some extent.  "[O]ne cannot say with a high degree of probability," he wrote, "that the image captures Thompson's right arm holding the baton above his head."  *Id.*  And he added, "[T]he baton cannot be reliably seen in the single image of jpg 69."  *Id.*  Those were not the last comments in his report concerning the baton.  On page 25, he wrote, "Zehm continues to back away as Thompson raises his baton (Camera 1, jpg 69, 26:14 3/4.)"  And on page 26, he wrote, "In Camera 1, jpg 69, 26:14 3/4 Thompson has his arm fully elevated over his head with his baton in hand[.]"  At trial, Dr. Gill insisted his 2008 report does not say frame 69 depicts the defendant's hand.  His reading of the report is a permissible reading, but it is not the most natural one.  An objective reader easily could conclude that in 2008, Dr. Gill thought he could see the defendant's hand, arm, and baton in

Order - 32

frame 69.

Had the defendant's attorneys been aware of Mr. Fredericks'
interpretation of frame 69, they would have been able to contrast his
interpretation with Dr. Gill's.  Mr. Fredericks has consistently
denied one can see the defendant's hand, arm, or baton in frame 69.
In March of 2007, Mr. Fredericks said as much to an Assistant United
States Attorney and to an FBI Special Agent.  Mr. Fredericks'
interpretation of the white spot and dark line has not changed.  The
same cannot be said of Dr. Gill's interpretation of frame 69.  A
plausible argument, perhaps even a strong argument, can be made his
interpretation has changed; that between 2008 and 2011 it became more
like Mr. Fredericks, though the two experts still disagree with
respect to what can be seen in frames 69-70.  Mr. Fredericks adopted a
narrower interpretation; Mr. Gill a more expansive interpretation.
Which of them is correct?  The fact Dr. Gill appears to have moved in
Mr. Fredericks' direction tends to validate Mr. Fredericks' caution.

Evidence suggesting Dr. Gill misinterpreted frames 68-70 would
have helped the defendant.  Dr. Gill placed the first baton strike at
18:26:14.  Consequently, he opined the defendant did not have time to
give the commands he claimed to have given before the first strike.
This suggested the defendant lied about his conduct.  Mr. Fredericks
questioned Dr. Gill's interpretation of frames 69-70.  He thought Dr.
Gill was reading far more into them than was justified.  Had the
jurors heard Mr. Fredericks' views, they may have been less inclined
to accept Dr. Gill's opinion concerning the first baton strike.

Order - 33

Having considered frames 69-70, it is appropriate to turn to frames 71-76.  In frame 71, the defendant can be seen holding a baton at a 45° angle.  Dr. Gill testified he thought the baton was coming up in preparation for the second strike.  Dr. Gill reached this opinion despite the fact the image of the baton in frame 71 does not appear to be blurred.  Mr. Fredericks explained to an Assistant United States Attorney and an FBI Special Agent at their 2007 meetings that the absence of motion blur is significant.  It tends to suggest the baton was either motionless or moving slowly.  Furthermore, Mr. Fredericks provided a demonstration.  He showed that blur-less images of the baton may indicate the defendant was simply moving forward with the baton in his hand rather than swinging it.  Had the United States disclosed Mr. Fredericks' teaching concerning motion blur, especially the absence of motion blur, the defendant's attorneys would have been in a much better position to challenge Dr. Gill's interpretation of frame 71.  They plausibly could have argued that frame 71 was not the beginning of a baton strike.

Frame 71 played a significant role in the United States' cross examination of the defendant.  An AUSA attempted to get him to concede the first strike was completed in frame 70.  He refused to make that concession.  The AUSA then turned to frame 71.  This is the one in which the defendant can been seen holding his baton in front of him at a 45° angle.  Initially, the defendant said this frame depicted the delivery his first baton strike; then he said it depicted the impact of the first strike; and then, when he reexamined the frame and

Order - 34

realized it depicts him holding his baton in an upright position, he said he was unsure whether it depicted the first strike.  Mr. Fredericks would have explained why it was not unreasonable for the defendant to reject the United States' interpretation of frames 70 and 71.  Mr. Fredericks could have physically demonstrated to the jury why frame 71 may indicate the defendant was moving forward while holding his baton at a 45° angle rather than swinging his baton at Mr. Zehm. If that's what frame 71 depicts, then its possible the first baton strike did not occur until after frame 75.  The latter frame is stamped 18:26:16.  This would put the first strike two seconds later than Dr. Gill posited.  Two seconds may not seem like much, but in this case, two seconds is significant.

Frame 75 differs from frame 71 in important respects.  Frame 75 is stamped 18:26:16.  It depicts the defendant holding a baton in a horizontal position above his head.  The image of the baton is not blurred.  Still, the position of the baton has changed.  In 71, the position is consistent with a baton being held in the ready position by an officer who is moving forward.  In 75, the position is consistent with a baton that is about to be swung by an officer.  It is unlikely Mr. Fredericks' opinions would have dissuaded the jury from accepting Dr. Gill's opinion that frame 75 is the beginning of a baton strike.  (Whether it was the first strike or the second strike is a different matter).

It is difficult to assess the extent to which Mr. Fredericks would have served as a counterbalance to Mr. Bragg.  The United States

presented him as an expert in police practices and the use of force, not as an expert in image analysis. Nevertheless, it is clear he determined, based upon his own review of the video recordings, the defendant administered high, overhand baton strikes to Mr. Zehm. (Trial Transcript, Vol. 4, p. 462.) By contrast, it is unclear which images Mr. Bragg relied upon to form that opinion. Perhaps he based his opinion upon his interpretation of frames 68-70 and frames 74-76; perhaps not. Since it is unclear which frames he relied upon, the Court cannot say Mr. Fredericks would have served as a counterbalance to Mr. Bragg with respect to the period between 18:26:14 and 18:26:16.

B. Suppression

It is not enough for the defendant to demonstrate he was deprived of favorable evidence. He must show the United States suppressed it. *Kohring*, 637 F.3d at 901. The defendant points to the favorable opinions that were held by Mr. Fredericks; opinions that were never disclosed to him. For example, in Mr. Fredericks' opinion, the white spot and dark line in frame 69 are not the defendant's hand, arm and baton. In his opinion, the images that are stamped 18:26:12, 18:26:13, and 18:26:14 do not show the defendant's baton. In his opinion, blur-less images of the defendant's baton reasonably can be interpreted to indicate the defendant was moving forward with the baton in his hand rather than swinging it at Mr. Zehm.

The United States argues the defendant's attorneys should have inferred from the discovery materials that Mr. Fredericks held favorable opinions. The United States' argument has some merit, as

Order - 36

the defendant acknowledges.  However, he maintains there is more here than a mere failure to disclose favorable opinions.  According to the defendant, the United States knew or should have known the FBI Special Agent's report concerning the March 8th meeting was inaccurate.  The defendant alleges the United States failed to correct an inaccurate description of Mr. Fredericks' opinions.

In order to evaluate the competing arguments, one must return to the FBI Special Agent's report.  After reading it, an objective person likely would reach a number of conclusions:  An image that is stamped 18:26:14 depicts the defendant holding his baton.  Mr. Fredericks initially, but mistakenly, thought the baton was something other than a baton.  Mr. Fredericks agreed with the FBI Special Agent that images which are stamped 18:26:14 and 18:26:15 are consistent with baton strikes.  Mr. Fredericks agreed the defendant used his baton in "a forward striking motion" on at least two occasions prior to the point in time when Mr. Zehm can be seen on his back.  Finally, Mr. Fredericks admitted he had failed to appreciate the significance of a number of critical images during his initial review of the video.

The FBI Special Agent's description of Mr. Fredericks' analysis is devastating.  After reading her report, an objective person would be inclined to doubt Mr. Fredericks' competence.  The United States never attempted to correct or clarify the FBI Special Agent's account of the March 8th meeting.  None of the other materials the United States disclosed to the defendant prior to trial put him on notice her account might be inaccurate.  Instead, the United States let stand the

FBI Special Agent's report, even though the United States had reason, after Mr. Fredericks' testimony in New York, to question whether her report was entirely correct.

C. Prejudice

It is not enough for the defendant to prove he was deprived of favorable evidence. Nor is it enough for him to prove the United States suppressed it. He must also prove he suffered prejudice as a result. *Kohring*, 637 F.3d at 901. The suppression of evidence by a prosecutor is prejudicial when there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different. *Smith v. Cain*, --- U.S. ----, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012) (internal punctuation and citation omitted). "A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Id.* at ----, 132 S.Ct. at 630 (internal punctuation and citation omitted).

Prejudice cannot be assessed in a vacuum. To the contrary, it can be assessed only by considering what Mr. Fredericks would have said at trial in light of what the United States was alleging. There were two counts. Count One alleged, in essence, the defendant willfully employed objectively unreasonable force throughout the confrontation. Count Two alleged, in essence, the defendant made a number of false statements to investigators about the confrontation. The United States presented the jury with an enormous amount of

evidence, including the testimony of Dr. Gill.  He said the defendant struck Mr. Zehm multiple times, and he identified the images that, in his opinion, corresponded with each strike.  Dr. Gill and other witnesses questioned the veracity of a number of statements the defendant made to investigators on March 22, 2006.  Consequently, the jury could have relied upon any number of acts to find the defendant guilty of Count One (willful use of excessive force), and the jury could have relied upon any number of statements to find the defendant guilty of Count Two (false statement).  The problem is this:  The jury was not asked to specify which act(s) it relied upon to find the defendant guilty of Count One, nor was the jury asked to specify which statement(s) it relied upon to find the defendant guilty of Count Two.  Thus, the Court must assume the jury agreed the defendant administered all of the strikes identified by Dr. Gill, and the Court must assume the jury agreed each strike was unlawful.

At this juncture, only the first two strikes are at issue.  Dr. Gill testified the first strike is depicted in frames 68-70.  If Dr. Gill is correct, then it is unlikely the defendant had time to issue the warning commands he claimed to have issued before striking.  The United States is convinced Dr. Gill is correct and the defendant lied.  As the United States observes, the jury was presented with overwhelming evidence the defendant struck Mr. Zehm within seconds of approaching him.  The evidence included the defendant's admissions, the testimony of persons who observed the confrontation, the video recordings, and Dr. Gill's analysis of the relevant images.

Dr. Gill adopted an expansive interpretation of the images that record the opening seconds of the confrontation. It is likely the jury was influenced by his testimony. He is a well educated engineer with extensive experience, and he had a coherent basis for his interpretation. Furthermore, his interpretation of the disputed frames appears to the untrained observer to depict precisely what the observer thinks he's seeing. Nevertheless, Dr. Gill's interpretation of the disputed frames remained just that: his interpretation. And while his interpretation has strengths, it also has weaknesses. One weakness of his interpretation is the poor quality of the images. Do they actually reveal as much information as he claims? A second weakness of his interpretation is an apparent change of mind. In 2008, he arguably thought he saw the defendant's baton in frame 69. (He insists his statements in that regard were equivocal, but the text of his report expresses more confidence than he is presently willing to acknowledge.) By trial, he arguably had changed his mind. While on the stand, he testified he did not see the baton in frame 69. Can an objective observer have confidence in Dr. Gill's current interpretation of frame 69 if, as appears to be the case, he over-interpreted it when he first saw it? A third weakness of his interpretation is it discounts the observations of at least two, and possibly three, percipient witnesses. Russell Balow and Carrie Coyle-Balow both testified the defendant stopped briefly and appeared to speak before striking. Michael Dahl generally agreed with them until the United States persuaded him he had not seen the first strike.

Order - 40

Mr. Fredericks would have helped the defendant's attorneys illustrate the weaknesses of Dr. Gill's interpretation. Mr. Fredericks has consistently maintained frame 69 does not depict the defendant's hand, arm and baton. He has consistently maintained frame 69 does not show the defendant swinging his baton (though he is willing to concede the image is consistent with such a motion). He has consistently urged caution in interpreting frames 68-76. Had the jury accepted his testimony, the jury might have been willing to question whether the first baton strike occurred at 18:26:14. This was essential to a successful defense. The video is very powerful. It seems to show the defendant abruptly striking a retreating Mr. Zehm. The defendant's principal means of negating the impression created by the video was to persuade jurors the video does not tell the whole story. This was the precise point Mr. Fredericks repeatedly tried to make about the video, and there was external support for his contention. Mr. Balow and Ms. Coyle-Balow both testified the defendant paused as he approached Mr. Zehm and appeared to speak to Mr. Zehm before he struck him. However, they could not hear what the defendant said. Mr. Dahl did hear the defendant speak. Initially, he told both state and federal investigators, in separate interviews, the defendant commanded Mr. Zehm to "drop the pop" before striking. Mr. Dahl's initial statements to investigators tended to corroborate the observations of Mr. Balow and Ms. Coyle-Balow. Let us assume, then, they were correct. Let us assume the defendant really did pause and speak before striking. If so, then perhaps the opening seconds of the

Order - 41

confrontation between the defendant and Mr. Zehm were more complex than the video seems to suggest.  Perhaps more occurred during those seconds than Dr. Gill and the other plaintiff's experts were able to detect.  Perhaps the defendant's account of what occurred is not as farfetched as the United States claims.

The United States became convinced Mr. Dahl's initial statements to state and federal investigators were mistaken because, in the United States' opinion, he did not see the first baton strike.  Thus, according to the United States, the words he heard -- *i.e.*, "Drop the pop" -- must have occurred after the first baton strike.  The United States may be correct.  Let us assume a genuine issue exists with respect to whether Mr. Dahl saw the first baton strike.  Resolution of the issue was of critical importance to both the United States and to the defendant.  How was it resolved?  The United States took Mr. Dahl aside and showed him images of the opening seconds of the confrontation.  The United States provided a partisan interpretation of those images; convincing him he had not seen the first baton strike.  The defendant was not allowed to participate in the process. By the time Mr. Dahl testified at the defendant's trial, his change of mind was an accomplished fact.  Presumably, his brain had restructured its recollection of the confrontation so it now conformed to his new understanding of the event.

The United States' interaction with Mr. Dahl and its failure to disclose Mr. Fredericks' favorable opinions impaired the defendant's ability to challenge the United States' theory of the opening seconds

Order - 42

of the confrontation.  This placed the defendant at a disadvantage.
The disadvantage was mitigated, in part, by Michael Schott.  As
explained above, he disagreed with Dr. Gill's interpretation of the
images that are stamped 18:26:14 (*i.e.*, frames 68-70 using Dr. Gill's
numbering system).  He was available to help the defendant's attorneys
prepare their cross examination of Dr. Gill.  Beyond that, Mr. Schott
testified.  He explained why, in his opinion, the white spot and the
dark line in the disputed image do not depict the defendant's hand,
arm, and baton.  It appears Mr. Schott's testimony concerning frame 69
covered many of the points Mr. Fredericks would have made concerning
that frame.  Thus, Mr. Schott's testimony mitigated the harm the
defendant suffered as a result of the United States' failure to
disclose Mr. Fredericks' favorable opinions.

Besides the mitigating impact of Mr. Schott, there is another
important consideration; namely, the sheer weight of the evidence
presented by the United States.  Dr. Gill was an important part of its
case, but he was by no means the only part.  Numerous persons observed
the struggle between the defendant and Mr. Zehm.  At least three saw
the first baton strikes.  Although their testimony was inconsistent in
some respects, and although their testimony supported the defendant's
account in some respects, they generally agreed he struck shortly
after confronting Mr. Zehm and he struck in manner that risked
inflicting serious injury.  For example, Mr. Balow testified he saw
the defendant's first stroke graze the side of Mr. Zehm's head.  Mr.
Balow's observation was supported by medical evidence.  Then there are

the defendant's admissions.  Although he denies intentionally striking Mr. Zehm in the head, he has never denied intentionally and repeatedly striking other parts of Mr. Zehm's body.  To the contrary, he admitted as much when he was interviewed in 2006, and he admitted as much when he was cross examined by the United States at trial.  Finally, there is the assessment of police-practice experts.  The United States asked two of them to evaluate the defendant's conduct.  They were sharply critical of the decisions he made during the openings seconds of the confrontation and, indeed, of the decisions he made throughout his struggle with Mr. Zehm.

In sum, Dr. Gill's testimony was only one part of the United States' case, and the United States' case against the defendant was very strong.  As a result, proving prejudice is a formidable task.  The defendant must show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555.  Undoubtedly, Mr. Fredericks would have helped the defendant.  It is possible the verdicts would have been different.  Nevertheless, having considered the record as a whole, the Court concludes the likelihood of a different outcome is remote even assuming the defendant discredited Dr. Gill's interpretation of the opening seconds of the confrontation.

**RULING**

Some, but not all, of the 2006 confrontation between Karl Thompson and Otto Zehm was recorded by the convenience store's

security cameras.  Grant Fredericks is an expert in the interpretation
of time-lapse video recordings.  Mr. Fredericks adopted a cautious
interpretation of the images that were recorded by the store's
security cameras.  Some of his opinions are favorable to Mr. Thompson.
On at least two occasions, Mr. Fredericks discussed his opinions with
an FBI Special Agent and an Assistant United States Attorney.  The
conversations did not go well.  Perhaps Mr. Fredericks did not
communicate clearly; perhaps the Assistant United States Attorney and
the FBI Special Agent were not prepared to hear what he was saying.
In any event, a serious misunderstanding occurred.  The opinions that
the United States attributed to Mr. Fredericks were incomplete and, in
a few instances, inaccurate.  The defendant was misled by the United
States' description of Mr. Fredericks' opinions.  The United States
did not intentionally mislead the defendant, but he was misled
nonetheless.  This circumstance impaired his ability to rebut the
charges that are set forth in the Indictment.

The defendant alleges the United States deprived him of due
process of law in violation of the Fifth Amendment.  He urges the
Court to vacate the jury's verdicts and either dismiss the Indictment
or order a new trial.  He must prove three things in order to prevail:
(1) favorable evidence was withheld from him, (2) the United States
withheld it, and (3) he suffered prejudice as a result.  *See Kohring*,
637 F.3d at 901.  The defendant has proved two of the three things
that are necessary to establish a due process violation.  Favorable
evidence was withheld from him, and the United States withheld it.

Order - 45

The issue, then, is prejudice.  There is a possibility the verdicts would have been different had the defendant known Mr. Fredericks' opinions.  However, the United States presented substantial evidence in support of its allegations.  The possibility of a different outcome is not great enough to undermine confidence in the verdicts the jury rendered.  To the contrary, the verdicts are worthy of the public's confidence.  Consequently, the Court will not vacate the jury's verdicts.

**IT IS HEREBY ORDERED:**

The defendant's "Motion to Dismiss the Indictment with Prejudice; or Alternatively, Motion for a New Trial" (ECF No. **907**) is **denied.**

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

**DATED** this ___18th___ day of September, 2012.

        s/ Fred Van Sickle
        Fred Van Sickle
        Senior United States District Judge

Order - 46