1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF WASHINGTON

3   UNITED STATES OF AMERICA,      )
                                   )
4              Plaintiff,          )
                                   ) No. CR-09-00088-FVS
5   Versus                         ) March 2, 2012
                                   ) Spokane, Washington
6   KARL F. THOMPSON, JR.,         )
                                   ) Pages 1 - 175
7              Defendant.
    ─────────────────────────────────────────────

8
                DEPOSITION OF GRANT FREDERICKS
9   ─────────────────────────────────────────────

10

11          BE IT REMEMBERED that on the 2nd of March, 2012, at
    the hour of 12:18 p.m., the video taped deposition of GRANT

12  FREDERICKS was taken at the request of the Defendant, before

13  Mark A. Snover a notary public and court reporter, CSR No.

14  SN-OV-EM-A396DM at 920 W. Riverside Avenue, Spokane, Washington,

15  pursuant to Federal Rules of Criminal Procedure.

16

17

18

19

20

21

22

23

24

25

APPEARANCES:


For the Plaintiff:          U. S. ATTORNEY'S OFFICE
                                 BY:   Tim Durkin
                                       Attorney at Law
                            P. O. Box 1494
                            Spokane, WA  99210


For the Defendant:          ETTER, MCMAHON LAW FIRM
                                 BY:   Carl J. Oreskovich
                                       Courtney Garcia
                                       Attorneys at Law
                            618 W. Riverside Avenue
                            Spokane, WA  99201


For the Witness:            PHILLIP J. WETZEL, P.S.
                                 BY:  Phillip J. Wetzel
                                      Attorney at Law
                            901 N. Adams Street
                            Spokane, WA 99201


ALSO PRESENT:               Karl F. Thompson, Jr.
                            Lisa Jangaard

COURT REPORTER:     Mark A. Snover, RPR, CSR
                    P. O. Box 1633
                    Spokane, WA  99210-1633
                    (509) 458-3434
Proceedings recorded by mechanical stenography, transcript
produced by computer.

1                        **I N D E X**

2                                                    **PAGE**

3   **DEFENDANT'S WITNESS:**

4   **GRANT FREDERICKS**

5       Examination by Mr. Oreskovich          6
        Examination by Mr. Durkin              75
6       Further Examination by Mr. Oreskovich  169

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **E X H I B I T S**

2  <u>**NUMBER:**</u>                                              <u>**Marked**</u>

3  **1 (Statement of Fredericks)**                         **5**

4  **2        (Rule 16 Disclosure)**                       **5**

5  **3        (Report of Fredericks)**                     **5**

6  **4        (Supplemental Report of Fredericks)**        **5**

7  **5        (FBI 302)**                                  **5**

8  **6        (Grand Jury Testimony of Fredericks)**       **5**

9  **7        (DVD)**                                      **5**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Deposition started at 12:18 p.m.)

2          (Exhibits number 1 through 7 marked.)

3          THE VIDEOGRAPHER:  My name is Bonnie Hamada, NCRA

4     Certified Legal Video Specialist.  I am the videographer in the

5     pending matter.

6          It is Friday March 2, 2012.  The time is now 12:18

7     p.m.  We are at the Thomas Foley United States Courthouse, 920

8     West Riverside Avenue, Courtroom 902, Spokane, Washington.

9          We are here to take the deposition, both

12:19PM 10     stenographically and by videotape, of Grant Fredericks, filed in

11     the U.S. District Court, Eastern District of Washington, number

12     CR-09-88-FVS, entitled USA versus Karl Thompson, Junior.

13          Notice of this videotaped deposition was given by the

14     law office of Etter McMahon Lamberson Clary & Oreskovich.

15          In attendance today and present on behalf of the

16     plaintiff is Timothy Michael Durkin.

17          Present on behalf of the defendant is Carl J.

18     Oreskovich and Courtney A. Garcia.

19          Present on behalf of the witness is Phillip J. Wetzel.

12:19PM 20          Also in attendance is Karl Thompson and Lisa Jangaard.

21          Present to make the official record of the proceeding

22     is the Certified Court Reporter, Mark Snover, who will now swear

23     the witness.

24

25

1        WHEREUPON,

2                        GRANT FREDERICKS

3               having been first duly sworn

4                  testified as follows:

5

6

7                        EXAMINATION

8

9    BY MR. ORESKOVICH:

12:20PM 10   Q.    Mr. Fredericks, would you state your name and business

11   address, for the record, please.

12   A.    My name is Grant Fredericks.   Address 105 West Rolland

13   Avenue in Spokane.   99218.

14   Q.    Do you operate a business?

15   A.    Yes.

16   Q.    What is the name of the business?

17   A.    Forensic Video Solutions.

18   Q.    What does Forensic Video Solutions do?

19   A.    The company is involved in the analysis, examination and

12:20PM 20   reporting of video evidence for criminal cases, for the

21   prosecution and for defense; for civil cases; and we also do

22   instruction in forensic video analysis and consulting in that

23   arena.

24   Q.    Sir, how long have you been in the business that you just

25   described?

A.    I've been processing video for legal purposes for law

enforcement since 1984.

Q.    And tell me, do you work as an instructor anywhere?

A.    Yes.

Q.    Tell me, please, where you work as an instructor.

A.    I'm an instructor for the Law Enforcement and Emergency

Services Video Association, an organization called LEVA.  L E V

A.

          And we operate the National Digital Multimedia

Evidence Processing Lab at the University of Indianapolis.  I

teach about five to six courses a year in the lab.

          I teach for police agencies around the country,

including police agencies in Canada and in the United Kingdom.

          And I'm contract instructor at the FBI National

Academy.

          And that involves the, all the training programs that

we offer.

Q.    The FBI National Academy, is that in Quantico, Virginia?

A.    Yes.

Q.    And how long have you been an instructor there, please?

A.    I've been teaching for the National Academy for about 10

years.

Q.    What do you teach there in general terms?

A.    The National Academy hosts an 11 week session for police

administrators from around the world through, partly sponsored

1   through the Department of Justice and through the State

2   Department.

3           The majority of the students come from the

4   United States and they are senior executives from police

5   agencies.  They're there to learn about standardized law

6   enforcement practices and I am involved in the forensic area of

7   that program.

8           So I do sort of state of the art updated training for

9   those sections.  And I teach twice at each section.

12:22PM 10  Q.   And then you also testified that you teach at the

11  University of?

12  A.   Indianapolis.

13  Q.   Of Indianapolis.  And what do you teach there?

14  A.   Forensic video analysis.  There are four, one-week courses

15  that we teach about five to seven times a year really, it kind

16  of varies.  Each one is a 40-hour course and the first course is

17  a Level I introduction course.

18  Q.   Um-hum.

19  A.   The second course is a digital photographic or digital

12:23PM 20  multimedia evidence processing course that focuses on digital

21  video recording evidence.

22  Q.   Um-hum.

23  A.   And the third course is an advanced course.

24          The fourth course that I teach is a photographic video

25  comparison course.

1      And all of them are focused toward the process of

2 certification for the students.  And certification takes

3 anywhere from three to six or seven years to complete.

4 Q.   What is forensic video analysis?

5 A.   Forensic video analysis is the science of examination,

6 comparison and evaluation of video in legal matters.  And that's

7 the definition that is broadly used to describe the acquisition

8 of digital video, the interpretation of video, both digital and

9 analog, and the examination of artifacts of compression and the

12:24PM 10 interpretation of the meaning of video.

11      And then putting together a report for trial and

12 testifying, offering an opinion as to what the video means, to

13 assist a trier of fact usually.

14 Q.   And have you testified as an expert witness in terms of

15 forensic video analysis?

16 A.   Yes.

17 Q.   Just roughly, if you can, please, tell me about how many

18 times you've testified as an expert in that area.

19 A.   Over a hundred times.

12:24PM 20 Q.   I'm going to ask you some detailed questions as we move

21 along here, but in a summary form, if you could, please, tell me

22 how it was that you first became involved in this case.

23 A.   I made a presentation to the Washington Prosecutors

24 Association in Lake Chelan.  I believe in 2004 or 2005.

25      And the county prosecutor, Mr. Driscoll, was there.

He contacted me some time after this incident and told me that

he had been to a presentation and that there's video and would I

be available to examine the video.

Q.   Mr. Driscoll, is he with the Spokane County Prosecutor's

Office?

A.   At the time I wasn't sure whether it was the Prosecutor's

Office or the City Prosecutor.  I don't do work here in Spokane

very much, so I wasn't sure, but probably the Prosecutor's

Office.

Q.   All right.

A.   Or the County Prosecutor.

Q.   Did you then perform an analysis of the Zip Trip video and

other items in connection with the Otto Zehm incident?

A.   I did.

Q.   All right.  And then did you prepare a report of that

analysis?

A.   Yes.

Q.   And I have numerous documents in front of you.  If you

would look at exhibit 3, on your right side there, I hope that I

have copied the report in its entirety.

     Would you look at that and just tell me if that's a

copy of your original report, please.

A.   Yes, it appears to be.

Q.   All right, sir.  And just so that we're clear in this

regard, in terms of how you were paid, you charge a service for

1   this analysis, do you not?

2   A.   Yes.

3   Q.   All right.  And in this particular case, for the original

4   report, the original work that you had done, who were you paid

5   by, if you know.

6   A.   I believe it was the City of Spokane.

7   Q.   Yeah.

8   A.   I don't know what entity.

9   Q.   All right.

12:27PM 10        There is an attorney with the City of Spokane by the

11   name of Rocco Trepeddi or Rocky Trepeddi?

12   A.   Yes.

13   Q.   Did you have some contact with Mr. Trepeddi?

14   A.   Yes.

15   Q.   At some point?

16   A.   Yes.

17   Q.   Was that for the purpose of getting paid for the work that

18   you had done or do you know?

19   A.   I think I was bounced around a little bit.

12:27PM 20   Q.   Yeah.

21   A.   Initially the prosecutor was interested in seeing if I was

22   available for the work.

23   Q.   Right.

24   A.   Asked me roughly what it would cost.

25   Q.   Um-hum.

A.    And I've done cases like this in the past and I can give

them, I gave him a rough idea of the kind of costs involved,

based on the number of exhibits I would be asked to look at.

He didn't hire me right away, he said he'll get back

to me.  When he got back to me he said that the, this is still a

police investigation, so the city police are going to pay you.

But they would like to engage you and they would like to set up

a meeting.

Q.    Um-hum.

A.    So at that point the, somebody from the city police was

going to accept responsibility for paying me.

Eventually it went to somebody else in the city

government and I think back to the police and then back to

somebody else at city government.  So eventually I don't know

where the check came from, but --

Q.    Um-hum.

A.    -- but Mr. Trepeddi at one point was my point of contact

for pay.

Q.    Um-hum.

A.    And because of that he was my only contact I had after I

submitted my report.  And so six months later when I had to

contact somebody in the investigation again, I contacted him.

Q.    All right.

My question to you with respect to exhibit 3, which is

your original report, did you ever have any discussions with

1   Mr. Trepeddi concerning the contents of your original report?

2   A.   No.

3   Q.   At some point in time, sir, did you have some communication

4   with anyone from the Department of Justice, specifically from

5   the local FBI office?

6   A.   Yes.

7   Q.   Can you tell me what those circumstances were that led to

8   that contact?

9   A.   Approximately six months after I had filed the report I

12:29PM 10   received a phone message in my office from Special Agent Lisa

11   Jangaard.  Requesting a meeting to discuss my report.

12   Q.   Um-hum.

13   A.   So before answering her call, I contacted Mr. Trepeddi,

14   because he was my only point of contact at that point, and

15   advised that I had been requested to meet.

16       I believe it was Mr. Trepeddi who said, you know, go

17   ahead and meet and take your files.  I asked if he wanted to be

18   present and I wanted to know what dates he would be available

19   and he said he didn't need to be present, that I could just go

12:30PM 20   on my own.  And he agreed that he would cover the costs of my

21   time.

22   Q.   Um-hum.

23   A.   So I contacted Special Agent Jangaard and set up an

24   appointment.

25   Q.   And do you recall when it was approximately that that

1   appointment occurred?

2   A.    Around the end of the first week of March.

3   Q.    Of?

4   A.    7th or 8th, 2007.

5   Q.    Um-hum.

6         And when you met with Miss Jangaard, where did you

7   meet her at, sir?

8   A.    In the Federal Court Building.

9   Q.    And that's where we're at today, right?

12:31PM 10  A.    Correct.

11  Q.    Did you meet at the United States Attorney's Office on the

12  third floor?

13  A.    Yes.

14  Q.    And did you go into a conference room in the U.S.

15  Attorney's Office on the third floor?

16  A.    Yes.

17  Q.    While you were at the U.S. Attorney's Office on the first

18  week of March, did you tell me that was roughly March 8th of

19  2007?

12:31PM 20  A.    Yes.

21  Q.    Did you meet Mr. Durkin?

22  A.    Yes.

23  Q.    All right.  Did you have discussions with Miss Jangaard and

24  Mr. Durkin about the contents of your original report?

25  A.    Yes.

1    Q.    Tell us, if you would, generally, what the discussions

2    were.

3    A.    After the initial interview about background --

4    Q.    Um-hum.

5    A.    -- experience, we began to discuss the images and Mr.

6    Durkin asserted quite directly that, that I was wrong, that I

7    had missed a lot of information, and he pointed out to me his

8    interpretation of the video where Officer Thompson is seen

9    moving from the north to the south side of the west area of the

12:32PM 10   Zip Trip.  Past the west door.

11   Q.    Um-hum.

12   A.    And directed me to a number of areas saying, here, this is

13   him holding the baton over his head and here's where he turns

14   the corner and hits Zehm in the head with the baton.

15          And that wasn't my interpretation of the video and I

16   told Mr. Durkin that he has misinterpreted the video -- first of

17   all I said I don't see what you see and when he pointed out the

18   areas where he sees the baton, he had misinterpreted the baton

19   for actual artifacts, compression artifacts in the video.  These

12:33PM 20   are errors in the video that are very common to digital video.

21   Q.    Um-hum.

22   A.    And I attempted to educate him about compression artifacts

23   and that he had misinterpreted those objects as a baton, which

24   they weren't, they were the compression.

25          We also discussed where he said, here's where Officer

1    Thompson hits Mr. Zehm with the baton in the head.  I was

2    confused by that, because I didn't see that.

3         When we talked about it further it was evident to me

4    that clearly did not happen, in the video, and that our

5    discussion centered around the limitations of video.

6         My, I tried to explain to him that there's only about

7    three and a half to four images per second.  And we can't say

8    what happens between the refreshes of the images.

9         I didn't say that Officer Thompson did not swing the

12:34PM 10   baton, the video just does not support that.  And that his

11   assertions are not supportable by the video.  And that's why

12   they were not contained in my report.

13   Q.   So it was your opinion that what Mr. Durkin was telling you

14   is places where there were baton strikes were not supported by

15   the video evidence that you had analyzed; is that correct?

16   A.   Yeah, that's correct.

17   Q.   How long of a discussion did you have -- was Miss Durkin,

18   or, I'm sorry, not Miss Durkin, Miss Jangaard present during

19   this original meeting on March the 8th of 2007?

12:34PM 20   A.   Yes.

21   Q.   Roughly, if you can, or if you have a record of it, how

22   long did the meeting last?

23   A.   I have a record in my invoices.

24   Q.   Yes.

25   A.   My recollection is it was at least an hour, maybe more.

1    Q.    Um-hum.

2    A.    The particular discussion was quite extensive.  Regarding

3    the initial entry, rounding the corner, to the area where Mr.

4    Durkin was quite insistent that that was a baton strike or baton

5    strikes.

6    Q.    Um-hum.

7    A.    At one point, in addition to trying to explain what

8    compression is and the misinterpretation of the images, to the

9    limitations of refresh on the video, that a single image of a

12:35PM 10   baton without motion blur simply means that the baton is there

11   in the image and cannot suggest movement.

12   Q.    Um-hum.

13   A.    I recall demonstrating what motion blur was by going to an

14   image much further on, where there is clear motion blur by a

15   baton movement from the camera two position when Officer

16   Thompson is directly below the camera.  We can see the motion

17   blur.

18           At one point when I tried to explain that we can't say

19   that the baton is in motion, was not in a swinging motion, I

12:36PM 20   gave examples.  And I actually asked Mr. Durkin to stand up and

21   I stood up and, to do a re-enactment of how a baton would be

22   held by a police officer.

23           And in watching numerous videos of police using

24   batons, having been a police officer myself and using a baton,

25   and being trained to use a baton, there's a position called a

1  ready or a strike position where one holds a baton in the strike

2  position over a shoulder, giving directions to an individual.

3  It doesn't, I'm not swinging the baton when I'm doing that, I'm

4  saying get on the ground, if that's the direction.

5  Q.    Um-hum.

6  A.    The video would record the same thing.  So in other words,

7  the video in these two areas, I believe it was 18:26, 14 to 16

8  in that area where we see two images of a baton, one in a

9  parallel position over the head, that video would be consistent

12:37PM 10  with somebody holding the baton in a ready position and moving

11  forward, but not swinging it.

12  Q.    Um-hum.

13  A.    It could also be consistent with the swinging motion where

14  the baton is being pulled back and it just happens to refresh

15  before the baton goes forward again.  So it could be a swing,

16  but it's not proof of a swing.

17        Because there's no motion blur in it, there's no

18  suggestion that there is motion in a swinging motion by a baton.

19  Q.    Um-hum.

12:38PM 20  A.    In our discussion I agreed that clearly the baton is in

21  motion because it's in the officer's hand and he is in motion,

22  but it doesn't mean a swinging motion.

23        So we had a lot of discussion about the interpretation

24  of motion blur.  And I provided Mr. Durkin with the name of a

25  doctor, Doctor John Russ, who is a photogrammetry expert.

1          Who could, I thought possibly, be able to look at

2    images of objects in motion and determine the speed of the

3    motion.  But I couldn't do that.

4    Q.    Um-hum.

5    A.    But in these particular cases, the video that we're looking

6    at, there's no evidence of a blur, so he couldn't assist in that

7    particular case.

8          So to answer your question, it was a fairly lengthy

9    exercise of educating them about compression, motion blur,

12:39PM 10    artifacts, and the limitations of the video.

11          MR. DURKIN:  Okay, I'm just going to move to strike

12    that testimony as an unnecessary narrative.  It's beyond the

13    scope of what the original question asked for.  Go ahead.

14    BY MR. ORESKOVICH:

15    Q.    We'll get into this in some detail, but let me just ask you

16    just for a moment just to respond succinctly to my questions and

17    we can object or we can avoid some of the objections that will

18    be made, okay?

19    A.    Yes, sir.

12:39PM 20    Q.    What I was really interested in finding out and you have

21    prepared an exhibit as I understand it of, illustrating various

22    aspects of discussions that you had with Mr. Durkin and Miss

23    Jangaard at various points.  Isn't that fair to say?

24    A.    Yes.

25    Q.    All right.  And you've also prepared a statement, have you

 1    not, that is I think Exhibit Number 1 in front of you there,

 2    that is a statement that -- is that a statement that was

 3    prepared or signed by you?

 4    A.    Yes.

 5    Q.    All right.  And does this statement concern any of the

 6    discussions that you had with Mr. Durkin and/or Miss Jangaard

 7    concerning whether or not there were initial baton strikes at

 8    the time stamp 18:26:14?

 9    A.    Yes.

12:40PM 10    Q.    And later at 18:26:15?

11    A.    Yes.

12    Q.    You have -- why did you prepare Exhibit Number 1?

13    A.    Exhibit Number 1 relates to a Rule 16 disclosure.

14    Q.    Um-hum.

15    A.    It makes statements about what my opinion was.

16    Q.    All right.  Let me stop you for a moment, because in front

17    of you is a Rule 16 disclosure.  I think it's marked as Exhibit

18    Number 2.

19    A.    Yes.

12:41PM 20    Q.    And is that the Rule 16 disclosure that you're referring

21    to?

22    A.    Yes.

23    Q.    All right.  So tell us, why does it, sir, that you did

24    statement number or Exhibit Number 1, your statement?

25    A.    Rule 16 sets out what my opinion is.

1   Q.   Um-hum.

2   A.   It's not what my opinion is, it was never my opinion, I

3   rejected almost all of the elements of the Rule 16 in our

4   discussions, um, and so, um, I wanted to insure -- I was

5   concerned that this document was being used in a manner that

6   would bring the administration of justice into disrepute if it

7   were not corrected.

8           And I was concerned that somebody, that this was being

9   used by the Court in a way that was not factual.  And I thought

12:42PM 10  it was my responsibility to insure that the record was set

11  correctly.

12  Q.   All right.

13          The Rule 16 document, was that a document that was

14  prepared by the U.S. Attorney's Office?

15  A.   Yes.

16  Q.   Actually signed I think by Mr. Durkin; is that correct?

17  A.   Yes.

18  Q.   And when you say, "used by the Court," were you concerned

19  that someone would rely upon what was contained in the Rule 16

12:42PM 20  document prepared by Mr. Durkin?

21  A.   That was my concern.

22  Q.   And were you concerned, sir, that the Rule 16 document

23  misrepresented what your opinions were?

24  A.   Well, not only misrepresented my opinions, but I fought

25  very hard against what is credited to me and I did not accept

 1    it, I rejected it, and yet it was purported to be my opinion.

 2              So it wasn't just a misrepresentation, it was, um, it

 3    was a manufacture.  And that was what my concern was.

 4    Q.   Okay.  When you say you fought hard against it, would it be

 5    fair to say that you had a number of different conversations

 6    with Mr. Durkin and Miss Jangaard, where she was involved, where

 7    you rendered opinions that were contrary, that was ultimately

 8    set forth in the Rule 16 disclosure?

 9              MR. DURKIN:  I'm going to object to the form of the

12:43PM 10    question.  Go ahead.

11              THE WITNESS:  That is correct.

12    BY MR. ORESKOVICH:

13    Q.   You have prepared an exhibit and it's Exhibit Number 7.  I

14    don't know if that's in front of you at the moment, but there's

15    a DVD.  That's an exhibit that you prepared; is that correct,

16    sir?

17    A.   Yes.

18    Q.   And an exhibit that you prepared at your own initiative.

19    In other words, I didn't ask you for that, correct?

12:43PM 20    A.   Correct.

21    Q.   All right.

22              Indicating or illustrating various points in the Zip

23    Trip video where you had discussions with Mr. Durkin and Miss

24    Jangaard --

25    A.   Yes.

1   Q.   -- correct?  And where your opinions are different than

2   what's set forth in the Rule 16 disclosure, correct, sir?

3   A.   That's correct.

4   Q.   All right.

5        I'm not necessarily going to go through all of it, but

6   what I want to do is to direct your attention to various

7   portions of it, if we might, sir.  Okay?

8   A.   Yes, sir.

9   Q.   You had made some reference to discussions, first of all,

12:44PM 10  about a comment about artifacts, okay.  And is there a portion

11  in the DVD that you discussed with Mr. Durkin and with Miss

12  Jangaard -- let's strike that question.  I'm going try this a

13  different way, okay.

14       If I understood your testimony, what you stated was,

15  in this initial meeting with Mr. Durkin and Miss Jangaard, Mr.

16  Durkin showed you the video and in various places suggested to

17  you there were either the baton in motion or baton strikes by

18  Officer Thompson, correct?

19  A.   Correct.

12:45PM 20  Q.   All right.  And if I understand what you told us, what you

21  said is that at least some of the areas were actual artifacts,

22  correct?

23  A.   Yes.

24  Q.   And other areas where Mr. Durkin suggested there were baton

25  strikes, in your opinion the video evidence did not support that

1  conclusion, correct, sir?

2  A.    Correct.

3  Q.    All right.  If you can rely upon exhibit 7, so we can get

4  as part of the record, first of all, those areas that you

5  discussed with Mr. Durkin and Miss Jangaard, that were actual

6  artifacts, please.

7  A.    (Video played.)

8          In exhibit 7 there are a number of slides.  Slides are

9  identified in the bottom left hand corner for the record.

12:46PM 10  Q.    Um-hum.

11  A.    And I'm at slide 57.

12  Q.    All right.

13  A.    The time is 18:26:11 on the time stamp on camera one.

14          I'll move -- and Officer Thompson is at the west end

15  of the north aisle, moving southbound.

16  Q.    Um-hum.

17  A.    Move forward to slide 59.  I've identified a dark area in

18  front of Officer Thompson's face that Mr. Durkin identified as a

19  baton.

12:46PM 20          I'll move forward a number of slides to slide 64.  The

21  time is 18:26:13.  Where Mr. Durkin suggested that that's the

22  baton.  And I've isolated it with a red circle and an arrow.

23  Q.    Um-hum.

24  A.    Go forward to slide 67.  18:26:14.  It's a dark area in

25  front of Officer Thompson that Mr. Durkin asserted was a baton.

1          Move forward one more image to 18:26:15.  To another

2     dark area that Mr. Durkin asserted was a baton.

3          I explained that each of these dark areas were

4     artifacts, they're not batons.  Artifacts are very, very common

5     features of compressed digital video.

6          This is, um, simply the edge of a block of pixels and

7     the blocks run from top to bottom, and from left to right, but

8     there's a line of blocks.  And where there's a light area and a

9     dark area of contrast, compression all, frequently produces

12:48PM 10    these kinds of artifacts.

11    Q.   Um-hum.

12    A.   So as an example, I provided, I went in different areas of

13    the video to show similar features to, that are also artifacts,

14    that also look like the same artifacts that I pointed to.

15         So going forward a number of slides, an individual

16    enters before the incident at 18:25:02.  And there's a lot of

17    compression, so it's difficult to get very much detail.  This is

18    slide 73.

19         As I move forward to slide 77, the background, which

12:48PM 20    is the dark window, intersects at the edge of a block where the

21    person light face is, so there's an area of contrast.  And I've

22    highlighted that area as an artifact.

23    Q.   Um-hum.

24    A.   That is similar to the images with Officer Zehm (sic).

25         As I move forward a number of slides, to slide 82, um,

 1  when the person is then silhouetted by the back window again

 2  there's a contrast between the two, that artifact appears.  The

 3  next image the same artifact appears.  And then further on at

 4  18:25:07, when another individual is walking toward the window,

 5  there's an artifact that is very similar and in the exact

 6  location as the artifact at 18:26:15 that Mr. Durkin was,

 7  asserted was the baton over Officer Thompson's right shoulder.

 8  Q.    Now what you, you have an exhibit, in exhibit 7 you have

 9  both slides, captures of slides and then you have information

12:50PM 10  from the Rule 16 disclosure that you've taken out of it,

11  correct?

12  A.    Correct.

13  Q.    And we have got lines with red circles.  If we play this

14  back for the Court, will it play the same way?

15  A.    Exactly the same.

16  Q.    Thank you.  All right.

17          And I, just so that I'm clear in this regard, did you

18  go through with Miss, with Mr. Durkin and Miss Jangaard at that

19  first meeting when you were demonstrating artifacts and

12:50PM 20  demonstrating other portions of the video where artifacts, did

21  you go through these slides that you're showing us here?

22  A.    I went through -- I don't know if I went through the slide

23  of the individual entering --

24  Q.    Yeah.

25  A.    -- before that.  There were other areas where that artifact

1  was manifest.  So somewhere in there I showed examples of the

2  same artifacts.

3          When the other officers were moving around after the

4  incident, these artifacts show up all the time.

5          So whenever anybody walks past that back window and

6  there's a contrast between either a light piece of clothing or a

7  light face, these artifacts are manifested.

8  Q.   All right.  I'm going to ask you to back up in your exhibit

9  7, because there was one, I think it's 18:26:14 where there was

12:51PM 10  an artifact and what has sometimes been described as a hand in

11  the air.  There you go. (Indicating).

12          So if we were to look at the computer screen it would

13  be at number 68 in the lower left hand corner?

14  A.   Yes.

15  Q.   All right.

16  A.   And I have just, this is page 68, the top inset image I

17  have the time 18:26:15, it's actually 18:26:14.

18  Q.   All right.

19  A.   So I can correct that or we can just correct it for the

12:51PM 20  record.  The bottom of that image has the correct time stamp

21  18:26:14.

22  Q.   Um-hum.

23  A.   And you've asked me about the light object --

24  Q.   Yeah.

25  A.   -- in the window.

1    Q.    Yeah.  Let me stop you for a moment.

2              In your meeting with Miss Jangaard and Mr. Durkin on

3    March 8th of 2007, did you discuss this slide that is at page 68

4    of exhibit 7?

5    A.    Yes.

6    Q.    All right.  And in particular there is a light object over

7    the head of Mr. Thompson that you have a red arrow to.  Do you

8    see that?

9    A.    Yes.

12:52PM 10   Q.    Did Mr. Durkin suggest to you or tell you that in his

11   interpretation of the video that this white area over the head

12   of Mr. Thompson was Officer Thompson's hand?

13   A.    Yes.

14   Q.    All right.

15             Did he tell you that it was Mr. Thompson's hand with

16   the baton raised up over his head?

17   A.    Yes.

18             MR. DURKIN:  I'm just going to object to the form.  Go

19   ahead.

12:52PM 20   BY MR. ORESKOVICH:

21   Q.    What, if anything, did you discuss with Mr. Durkin and Miss

22   Jangaard in this meeting concerning whether or not page 68, the

23   slide on page 68, represented Officer Thompson's hand?

24   A.    Um, I said that that was a headlight of a vehicle in the

25   background.  We can see the vehicle moving from the south to the

1  north on the main roadway.  And we can see the vehicle moving

2  and we can see it happens to take that position and then in the

3  next image is continues to move on down the roadway.  But that

4  was a headlight of a vehicle, it was not a hand.

5  Q.    All right.  And you mentioned in the slide on page 68 at

6  the top, you've got Rule 16 A, page three, line 13.

7          And the information that you have there, did that come

8  out of the Rule 16 disclosure?

9  A.    Yes.

12:53PM 10  Q.    And in particular it states, "The Zip Trip security video

11  shows that Zehm began to back away after he first turned to face

12  Officer Thompson, who continued to move quickly toward Zehm as

13  Thompson held his baton above his head."  Correct, sir?

14  A.    Yes.

15  Q.    Now, the Rule 16 disclosure is dated September 22, 2009.

16  Do you see that in Exhibit Number 2?

17  A.    Yes.

18  Q.    All right.  And in your meeting with Mr. Durkin and Miss

19  Jangaard, as early as March 8th of 2007, would it be fair to say

12:54PM 20  that you had rejected that as your opinion?

21  A.    Strongly.

22  Q.    Okay.

23          When you say "strongly," tell the Court what the tenor

24  of these discussions were between your self and Mr. Durkin on

25  this date.

1   A.   Yeah, it was very uncomfortable.  Mr. Durkin was

2   aggressive, loud, um, and very insistent.  Mr. Durkin did not

3   appear interested in my opinion.

4   Q.   So would I be correct in understanding, in Exhibit Number

5   or page 68 of your report, what you were trying to explain to

6   Mr. Durkin is that's not Mr. Thompson's hand up in the air and

7   that's not his baton, correct?

8   A.   Correct.

9   Q.   Did Mr. Durkin continue to press and try to get you to

12:55PM 10   change your opinion in that regard?

11   A.   I felt as if that was, um, his intent, yes.

12   Q.   All right.  And he didn't seek out your opinion that that

13   wasn't Mr. Thompson's hand and baton over his head, correct?

14        MR. DURKIN:  Object to the form of the question and

15   also object to the foundation of descriptions of AUSA Durkin's

16   demeanor.  Go ahead.

17        THE WITNESS:  He didn't seek it out, he rejected it.

18   BY MR. ORESKOVICH:

19   Q.   All right.

12:56PM 20        This was evidence that you had from your analysis of

21   the video, right, that would indicate that Mr. Thompson did not

22   have his hand up in the air and a baton over his head in that

23   slide at 18:26:14.  Correct, sir?

24   A.   I want to be clear that my reaction to the assertion that

25   that's a hand is that, no, that's not a hand, it's a headlight.

1   It's absolutely no way that -- there's no changing that.  It is

2   a headlight.

3   Q.   I got it.  Okay.

4   A.   So to answer your question, I can't say that he is not

5   swinging a baton, there's no image of a baton in this video at

6   this image.

7   Q.   Um-hum.

8   A.   And my evidence to Mr. Durkin was, the video's limited.  It

9   cannot state that there was a baton or wasn't a baton in his

12:56PM 10   hand.  But what he pointed out to as a baton is not there.

11         If it was behind the post, I couldn't comment on that.

12   Q.   Um-hum.

13   A.   Um, and I don't mean to deviate from your question, I think

14   that answers the question, I just want to make sure that -- I'm

15   not saying he didn't have a baton in his hand, I believe he did

16   have a baton in his hand.

17   Q.   Right.  Um-hum.

18   A.   But this image does not show it.

19   Q.   Um-hum.  Right.

12:57PM 20         And that would have been your opinion, your expert

21   opinion, based upon your forensic video analysis.

22   A.   Correct.

23   Q.   If you can go forward, you had mentioned to us that Mr.

24   Durkin had shown you places where he believed that the, that a

25   baton strike occurred to the head of Mr. Zehm.

 1   A.   Yes.

 2   Q.   Do you have that anywhere located in your report in exhibit

 3   7?

 4   A.   Yes.

 5   Q.   Could you go to that place, please.

 6        (Witness complies.)

 7   A.   Slide 98 takes us back to that same image again.

 8   Q.   Yes.

 9   A.   The following image at 99, slide 99, also at 18:26:14 --

12:58PM 10   Q.   Um-hum.

11   A.   -- is, um, where Mr. Durkin said the video shows Officer

12   Thompson striking Mr. Zehm in the head right here (indicating).

13   Q.   Um-hum.  And you said what to him?  What was your opinion

14   at the time?

15   A.   Um, I was surprised by that statement.  Um, I had looked at

16   the video very carefully and I was, um, obviously would have

17   made note of a baton strike to the head.

18   Q.   Um-hum.

19   A.   I examined the video with him and I asked him to show me

12:58PM 20   where the baton is.  Um, and he -- my recollection is he

21   indicated in that area.

22   Q.   Um-hum.

23   A.   But I, but I don't recall him specifically pointing out an

24   object saying that that's the baton.  Um, I explained that we

25   only see the officer from about his shoulders down or shoulders

1   up.

2   Q.   Um-hum.

3   A.   We only see Mr. Zehm from the shoulders up.  There is no

4   image of a baton here.  Um, and there's no apparent reaction.

5   Like we don't see Mr. Zehm falling to the ground.  We only have

6   a single image.

7         So my concern was a statement that, here is where he

8   gets hit in the head, would have to come from another witness.

9   And I said that, I said, the video cannot support that.

12:59PM 10   Q.   Um-hum.

11   A.   It doesn't mean it didn't happen, it's just not in the

12   video.

13   Q.   All right.  And in fact you have on slide or page 99, the

14   Rule 16 portion that you take objection to; is that correct,

15   sir?

16   A.   Yes.

17   Q.   Take exception to.  And it say, "Immediately after the Zip

18   Trip security video shows Thompson appearing to strike Zehm with

19   his baton for the first time."  Do you see that?

12:59PM 20   A.   Yes.

21   Q.   Now first of all, had you discussed that with Mr. Durkin as

22   to whether or not there was any evidence, video evidence of a

23   baton strike prior to 18:26:14?

24   A.   No.

25   Q.   All right.

1     It was your opinion that there was not, is that fair

2  to say?

3  A.   Yes, they were too far apart.

4  Q.   All right.  And then this says, "That dispatch broadcasted

5  that the complainant was not sure that Zehm had taken any of her

6  money.  This dispatch occurred before Zehm (sic) strikes Zehm a

7  second time with another overhand, up and down baton strike."

8  Correct, sir?

9  A.   Where Thompson strikes Zehm a second time, yes.

01:00PM 10  Q.   I'm sorry.  All right.

11     And did you discuss that with Mr. Durkin and Miss

12  Jangaard, that very same concept, as to whether or not there was

13  a baton strike, a second baton strike at, as evidenced on page

14  99, in your March meeting of 2007?

15  A.   Yes.  Extensively.

16  Q.   All right.  When you say "extensively," tell the Court what

17  this extensive conversation was.

18  A.   In going through the discussions about motion blur, there's

19  only two images of the baton at this moment or these five or six

01:01PM 20  images.

21  Q.   Um-hum.

22  A.   Neither of them demonstrate motion blur.  And I explained

23  technically what motion blur is and what it does.

24  Q.   Let me stop you there.

25     You explained to them in the March 2007 meeting what

1  motion blur was?

2  A.    In that meeting and in a subsequent meeting, yes.

3  Q.    All right.

4        And so that our Court when he hears this deposition

5  can understand this, what's the significance of -- what is

6  motion blur and what's the significance in this analysis?

7  A.    If something is in motion and I mean by fast motion, like

8  consistent with a swinging motion of a baton.

9  Q.    Um-hum.

01:01PM 10  A.    When the camera samples an image, it samples the image and

11  it takes time to sample that image.  If the object is moving

12  faster than the sample, that object will be in blur.

13  Q.    Um-hum.

14  A.    There are many instances, I think seven at least, six or

15  seven, where Officer Thompson is in front of camera two, some

16  time after this, where the motion blur is evident, very clear,

17  the baton appears to be in multiple positions in a single image

18  because it's moving quickly.

19  Q.    Um-hum.

01:02PM 20  A.    Can't say necessarily which direction it's moving, but it's

21  moving quickly.  So that indicates that the motion of the baton

22  is fast and consistent with a swinging motion.

23        In the two images that we're getting to here, the

24  baton has no motion blur at all.  Which would tend to indicate

25  that the baton is not being swung.  Or, if it is being swung,

1   that the baton at the moment of the recording is at the end of a

2   swinging motion and the beginning of another swinging motion

3   where the baton would appear to be not in motion.

4   Q.   Um-hum.

5   A.   So from a -- we're limited by the video and this was my

6   point.  We can't infer something that the video can't tell us.

7   All we can say is that this is where the baton is at this moment

8   in time.

9          And one was in front of Officer Thompson at a 45

01:03PM 10   degree angle.  A couple of images later the baton was clearly

11   over his head, although we couldn't see the officer, and

12   parallel to the ground.

13   Q.   Um-hum.

14   A.   Can't say anything more about the video.  And I was clear

15   about that.

16   Q.   All right.

17          So would I be correct in understanding that as to the

18   video evidence at this point in time does not support, your

19   opinion was it did not support an opinion that there was a

01:03PM 20   second baton strike.

21   A.   My point about producing this was that it says there were

22   two baton strikes.

23   Q.   Yeah.

24   A.   One when Officer Thompson, by timing, was 12 or so feet way

25   from Mr. Zehm, because the assertion in the part six there or

1  the Rule 16, was that he struck him before the broadcast.

2  Q.    Um-hum.

3  A.    When the broadcast starts, he is about 12 feet away.

4  Q.    Yeah.

5  A.    10 to 12, 14 feet away.  And that, after the broadcast, he

6  then struck him a second time.  Um, and of course that was not

7  my evidence and isn't my evidence.

8       My report says that the officer is in approximately

9  this position during the broadcast.

01:04PM 10  Q.    Um-hum.

11  A.    The broadcast starts, um, at, um, 18:26:12, lasts about

12  four seconds, and ends at 18:26:16.  So it occurred during the

13  time that Mr. Durkin alleges the two baton striking events

14  occurred.

15  Q.    Um-hum.

16  A.    So the part 16 is not consistent with the video.

17  Q.    Was it consistent with the opinions that you offered to Mr.

18  Durkin and Miss Jangaard in March of 2007?

19  A.    No.

01:05PM 20  Q.    When you were having this discussion with Mr. Durkin about

21  these very issues, these two alleged baton strikes, can you tell

22  us what, was that a heated discussion?

23  A.    Um, I tried to be as calm as I could.

24  Q.    Um-hum.

25  A.    Well, I was calm.  But I was assertive to my position.

1      Um, Mr. Durkin was clearly aggressive with his

2   position and was, appeared frustrated that I did not see it his

3   way.

4   Q.   Um-hum.

5   A.   The discussions were uncomfortable, something I had never

6   experienced.  I've done thousands of cases, I have not

7   experienced this kind of aggression when we're talking about my

8   professional opinion.

9      Um, and at one point I told Mr. Durkin that, I have

01:06PM 10   been doing this a long time and video is what it is.  Um, and,

11   um, I'm not going to change my opinion.

12   Q.   In the course of the meeting that occurred in March of

13   2007, were questions asked of you as to whether or not the

14   position of the baton or the interpretation of the video could

15   be consistent with a baton strike?

16   A.   Yes.

17   Q.   All right.

18      I jumped around a little bit and I want to make sure

19   later when the Court reviews this deposition transcript.  Can we

01:06PM 20   go to that section of the report that we would be talking about.

21      (Witness complies.)

22   A.   Um, we can -- image 98 --

23   Q.   Okay.

24   A.   -- is the area.

25   Q.   All right.

1          What was the question asked to you about whether or

2    not it was consistent with a baton strike.  Whether what was

3    consistent with a baton strike?

4    A.    We eventually got there.  And I'm not sure if that was the

5    first meeting or the second meeting.

6    Q.    Okay.  Let me just clarify this.

7          There was one meeting that occurred in March of 2007.

8    Was there yet a second meeting that occurred on August the 3rd

9    of 2007, I think.

01:07PM 10   A.    Yes.

11   Q.    Okay.

12          And when you say, "we eventually got there," what are

13   you describing, please?

14   A.    At one point I think that I got the impression that Mr.

15   Durkin was going to give up on, um, um, on the idea that that

16   was a hand in the window.

17   Q.    Um-hum.

18   A.    That that was a baton in his hand.  And clearly I wasn't

19   going to change my opinion in regards to the identification of

01:08PM 20   those objects.

21          So I wanted him to understand what the video can

22   support.  And in going from image 98 to image 99, the video can

23   support that Officer Thompson, as he moved forward, moved down

24   lower slightly in the image.  Slightly.

25   Q.    Um-hum.

1    A.    And I couldn't really measure it at that time or I wasn't

2    asked to measure it.

3          Um, and that, you know, it could be consistent with a

4    swinging motion of a baton.  So in other words, if he's in one

5    position, moves forward and he's lower, it could be because he

6    has swung a baton.

7    Q.    Um-hum.

8    A.    And I said, now this could be consistent with many things.

9    It could be consistent with him getting down into an, I'm going

01:08PM 10   to tackle him position; could be consistent with, you know, I'm

11   ducking from something; could be consistent with many things,

12   one of which could be the swinging motion of a baton.

13         And I absolutely conceded that, because it's quite

14   appropriate to say, is it possible, is that consistent with that

15   motion.  And I agreed.

16   Q.    That it was consistent with the motion, but it was your

17   opinion that at least with respect to that, that the video

18   evidence didn't support the conclusion that there was a baton

19   strike at that point, correct?

01:09PM 20   A.    It could -- the video could not be used to form an opinion

21   that that was a baton strike, just that it's a possibility.

22   Q.    All right.  And that it was a possibility that it was a

23   baton strike, but a possibility that Officer Thompson, as he

24   ducked down, was ducking down because of other things as well,

25   correct?

1   A.    Right.  Well I want to be clear.  I put forward, if you

2   were to put to me these possibilities --

3   Q.    Yeah.

4   A.    -- and I listed a few, I would agree with all of them.

5   That the video could say, yeah, it's supportable of that.

6         If the, if something else were asserted that is not

7   consistent with the video, I would say, no, the video doesn't

8   support that.

9   Q.    Um-hum.

01:10PM 10   A.    The video doesn't support an overhand swinging motion of a

11   baton that strikes Mr. Zehm.  We don't see a baton, we don't see

12   motion, we don't see a reaction from Mr. Zehm at this time.

13         So the video can not be used to prove that assertion.

14   But what the video can be used to suggest is that that might be

15   a swinging motion and this is the officer's motion at that time.

16   And I say, it could be.

17         And that was the agreement that we worked that if he

18   asked me the question, if that, specifically, if he asked me the

19   question, is that consistent with a swinging motion of a baton,

01:10PM 20   I would agree with that, it could be.

21   Q.    When you say, "that was the agreement that we had," let me

22   see if I get this straight.

23         You had, you're not sure if this occurred in the March

24   discussion or a later one in August of 2007.  Correct?

25         MR. DURKIN:  Object to the form of the question.  Go

1    ahead.

2              THE WITNESS:  I believe this is the second meeting.

3    BY MR. ORESKOVICH:

4    Q.   All right.  And at that point in time how long had you

5    spent discussing with Mr. Durkin whether or not you would

6    support his opinions that, for instance, as they're set on --

7    let me say this differently.

8              As I interpret what you're saying to me in both these

9    meetings, Mr. Durkin was trying to convince that you there were

01:11PM 10   baton strikes at 18:14 and 15 and you said, that's not my

11   opinion, and you spent two different meetings discussing that at

12   length, correct?

13             MR. DURKIN:  Object to the form and foundation.  Go

14   ahead.

15             THE WITNESS:  That's exactly correct.

16   BY MR. ORESKOVICH:

17   Q.   All right.

18   A.   And the first meeting was one where I was there as a

19   courtesy visit.

01:11PM 20   Q.   Right.

21   A.   The City asked me to go.

22   Q.   Right.

23   A.   So I'm not, they're not my client, I'm just simply saying,

24   here is the support for my report.

25   Q.   Yeah.

A.    So we did discuss this.

The second meeting, after a period of time in that second meeting, I was released by the City and at that point accepted the request to assist the FBI.

At that point I believe is when this discussion came up, because now I'm doing my best to assist them to accurately interpret the video, with the belief that they're accepting my assistance.

Q.    Um-hum.

01:12PM    You were retained as an expert by the FBI in the August 2007 meeting, correct, sir?

A.    Yes.

Q.    All right.  And did you form some agreement with Mr. Durkin that, although it wasn't your opinion that a baton, that the video evidence supported, you could opine that a baton strike occurred at that point, if he asked you a question, whether or not this dipping motion, for lack of a better term, of Officer Thompson, was consistent with a baton strike, you would say yes?

MR. DURKIN:  Object to the form.  Go ahead.

01:12PM    THE WITNESS:  My expectation was that the question would be asked is, that dipping motion --

BY MR. ORESKOVICH:

Q.    Um-hum.

A.    -- is consistent with many things, including a baton strike, correct?  And I would agree, yes.

```
 1   Q.   All right.
 2             And there were things that it could be consistent with
 3   that were not a baton strike whatsoever, correct?
 4   A.   Sure.
 5   Q.   Ducking was one that you had stated, correct?
 6   A.   Yes.
 7   Q.   What other examples did you give Mr. Durkin -- and was Miss
 8   Jangaard present in the August meeting?  She was, wasn't she?
 9   A.   Yes.
01:13PM 10  Q.   All right.
11             What other examples of things that it could be
12   consistent with, other than a baton strike?
13   A.   I believe that we discussed, I described a position of
14   going to a tackle or --
15   Q.   Um-hum.
16   A.   -- a crouching position, for whatever purpose.
17   Q.   Um-hum.
18   A.   I don't recall giving other directions.  Like other, um,
19   examples.  But I am certain that I recall getting into a
01:13PM 20  defensive or an attack posture, where somebody would crouch
21   down.
22   Q.   Um-hum.
23   A.   And then I conceded, of course, it could obviously also be
24   the swinging motion of a baton or of an arm, because we don't
25   see a baton.
```

1    Q.    Right.

2          MR. ORESKOVICH:  Do we need to stop now?  We need to

3    change tapes apparently, so we need to take a break.

4          THE VIDEOGRAPHER:  This will conclude tape number one.

5    The time is now 1:14 p.m.

6          (Break taken.)

7          THE VIDEOGRAPHER:  This is the continued videotaped

8    deposition of Grant Fredericks and tape number two.  The date is

9    March 2, 2012.  The time is 1:27 p.m.

01:28PM 10        MR. ORESKOVICH:  All right.

11   BY MR. ORESKOVICH:

12   Q.    Let's -- can we just continue?  All right.  Thank you.  I

13   have a few more questions about what we have on page 99.

14          The portion that you have in red, the last sentence

15   says, "This dispatch occurred before Thompson strikes Zehm a

16   second time with another overhand, up and down, baton strike."

17   Do you see what I'm referring to?

18   A.    Yes.

19   Q.    That came out of the Rule 16 disclosure; is that correct?

01:28PM 20   A.    Yes.

21   Q.    All right.  And tell us what discussion that you had with

22   Mr. Durkin and Miss Jangaard concerning an overhand, up and down

23   baton strike, please.

24   A.    Um, I rejected that.  That's not my evidence.

25   Q.    You say, "that's not my evidence," is that not your

1   opinion?

2   A.   Correct.

3   Q.   All right.

4        And was this in the meeting of March 8th of 2007?

5   A.   It was in both.

6   Q.   Okay.

7        How long, if you can tell me, in these meetings, the

8   second meeting that you had in August of 2007, how long did that

9   last?

01:29PM 10   A.   This discussion or the meeting?

11   Q.   The meeting and total first.

12   A.   The first meeting -- I have a record of it.

13   Q.   Um-hum.

14   A.   Because I was paid for the meeting.  But my recollection is

15   it was over an hour, perhaps two hours.  Um, I could be more

16   specific if I looked at my record.

17   Q.   All right.

18        And then in the meeting, the second meeting, how much

19   time was spent discussing this issue of two different baton

01:29PM 20   strikes and whether there's an overhand, up and down baton

21   strike?

22   A.   In the second meeting?

23   Q.   Yes.

24   A.   Um, some time, I believe it was the second meeting, where I

25   offered to do a reenactment.

1    Q.    Um-hum.

2    A.    Um, where I asked Mr. Durkin to stand up and take the

3    position of Mr. Zehm and I took the position of Officer

4    Thompson, and I demonstrated what the video shows the baton

5    position to be in.

6    Q.    Um-hum.

7    A.    And that we cannot infer motion from that.  So all we can

8    say is that, here's the baton.  A number of things could be

9    happening.  Officer Thompson may be swinging it.

01:30PM 10    Q.    Um-hum.

11    A.    But as I said, that swinging motion would have to be at the

12    kind of apex of the motion, if that's the correct word, where

13    the baton is back and as it's about to go forward, where it's

14    not in a swinging motion, because we would see motion blur.

15    Q.    Um-hum.

16    A.    So I said, it may be that he's swinging at him.  The video

17    doesn't, we can't use the video to say that and therefore that

18    is not my opinion.  My opinion is simply, that's the baton and

19    it's in the air.

01:30PM 20    Q.    All right.

21          So you talked about it orally in two different

22    meetings and you demonstrated it in this meeting in August of

23    2007.  Is that correct?

24    A.    That's correct.

25    Q.    To Mr. Durkin and Miss Jangaard?

1   A.    That's correct.

2   Q.    Do you think you could have been any more clear in any of

3   these meetings that you rejected the statements that's

4   attributed to you, for instance, on page 99 of your exhibit 7?

5   A.    Could not have been more clear.

6   Q.    Did you have some discussion with Mr. Durkin and Miss

7   Jangaard in any of the meetings in March or August of 2007,

8   concerning whether or not Otto Zehm held a bottle, a Pepsi

9   bottle up?

01:31PM 10   A.    Yes.

11   Q.    And does your exhibit 7 demonstrate that anywhere?

12   A.    No.

13   Q.    Okay.  Can you by your recollection tell us -- can I have

14   the stills?  Tell us, while we're getting an exhibit, what it is

15   that you're talking about, please.

16   A.    In my initial report I articulated where the baton, where

17   the bottle is in the images.

18   Q.    Yeah.

19   A.    Over his head at 18:26:15, slide 101, in the exhibit 7.

01:32PM 20   Q.    Um-hum.

21   A.    You can see, and I'll point for you, I'll point at the,

22   roughly the center of the image where Mr. Zehm is seen between

23   an up and down roof joint post --

24   Q.    Um-hum.

25   A.    -- and a display.  I identified that as the, um, bottle and

1    Mr. Durkin asked me, how can you tell that's the bottle?  And my

2    impression was that he accepted my explanation that that was the

3    Pepsi bottle.  I didn't get an argument, I don't recall an

4    argument rejecting that.

5            And then what I don't have here, because I have ended

6    my exhibit 7 at the point where my disagreement with the part 16

7    or the Rule 16 concludes.

8    Q.    Um-hum.

9    A.    But if we had gone on further when Mr. Zehm is on the

01:33PM 10    ground, visible in two different camera views he is holding the

11    bottle, um, um, above his head.  Um, and he's holding it, as I'm

12    describing, by the top and by the bottom, with the right and the

13    left hand, and he's holding it in front of him.

14            And I had documents that demonstrated that in my, at

15    least a few reports, that showed that this is the Pepsi bottle.

16    Or the pop bottle, soda bottle.

17    Q.    Um-hum.

18    A.    Does that answer your question?

19    Q.    Does in part.  I understood from our earlier discussion

01:34PM 20    that the government had talked to you about the portion of your

21    report that pertained to the pop bottle and tried to persuade

22    you to take that out of there.  Am I right or wrong about that?

23    A.    I was directed to remove the, um, um, the notations that I

24    had made that that's the Pepsi bottle.

25    Q.    Um-hum.

A.    I had other demonstrative exhibits that were produced in a

PDF form that made, that supported my initial report and my

supplementary report, that identified certain activity.  And I

was directed to remove the Pepsi bottle discussion from that.

Q.    All right.

      And in particular would that include the Pepsi bottle

discussion with respect to that bottle that you have shown to me

at page 101 of exhibit 7, 18:26:15?

A.    My recollection was it was further down when Mr. Zehm was

on his back on the ground.

Q.    Um-hum.

A.    That's what -- I was just told, remove the Pepsi bottle

from that, I wasn't told why.  I don't recall whether it

included at the center of image, the one we're looking at, at

18:26:15.

Q.    Was there some dispute between you and the government,

either Mr. Durkin or Miss Jangaard, on whether or not the video

evidence itself supported the conclusion that Mr. Zehm was

holding a Pepsi bottle?

      MR. DURKIN:  Let me object to the form, but go ahead.

      THE WITNESS:  Mr. Durkin challenged it, but appeared,

my recollection is he accepted, once I pointed it out, he didn't

reject it any further.

BY MR. ORESKOVICH:

Q.    Did anyone give an explanation to you as to why they wanted

1  those references where you pointed out the Pepsi bottle taken

2  out of the report?

3  A.    No.

4        MR. DURKIN:  Just so we're clear, what report are you

5  talking about?  Are you talking about your supplemental report?

6  Because they're in your original report, right?

7        THE WITNESS:  Yes.

8        MR. DURKIN:  Okay.

9        THE WITNESS:  Um, I produced a number of demonstrative

01:36PM 10  exhibits.  Many demonstrative exhibits.  Um, among them were

11  references to the soda bottle.

12        And I was asked to change that report to remove that.

13  Um, I didn't feel comfortable removing that because I thought

14  that that was probably an issue that would assist.

15        I spoke to, um, um, Special Agent Jangaard about why

16  it was to be removed, she told me that Mr. Durkin wanted it

17  removed.  I recall us going back and forth a little bit and

18  eventually she told me, "Just leave it in."  Um, that's my

19  recollection.  And it was left in.

01:37PM 20  Q.    When you say, "I have prepared a number of demonstrative

21  exhibits," I've gotten a little bit confused now.

22        So what I want to do is see if we can track this a

23  little bit better.  You did an original report that we have

24  marked I think already as Exhibit Number 3.  Correct?

25  A.    Yes.

1   Q.    All right.  And then you did a supplemental report at the

2   request or at the direction of the government, did you not,

3   that's been marked as exhibit 4?

4   A.    Yes.

5   Q.    And that occurred, the supplemental report occurred after

6   your August of 2007 meeting; correct, sir?

7   A.    Yes.

8   Q.    And where I'm trying to understand is the discussion as to

9   which report it was where the original instruction to you was to

01:37PM 10   remove the references to the Pepsi bottle.

11  A.    I produced, um, a large number of exhibits for the

12  government.  Um, and it's among those exhibits.  Um, and I think

13  one is actually labeled, um, Pepsi bottle.

14  Q.    Um-hum.

15  A.    And that should be in a package that you've got, but it's

16  among the exhibits and I believe it details the Pepsi bottle.

17          I have a recollection of annotations pointing out the

18  Pepsi bottle, um, and I think they still are in the package

19  somewhere.

01:38PM 20   Q.    All right.

21  A.    And I can, there is an e-mail communication regarding the

22  removal of this, I believe.

23  Q.    There was?

24  A.    There is.  And it's in the package.

25  Q.    What do you mean it's in the package?

1  A.   I was directed to provide a copy of my full record --

2  Q.   Oh, I see.

3  A.   -- for this proceeding.

4  Q.   Yeah.

5  A.   Including all of the e-mails, all e-mails, all documents,

6  so I've done that.

7  Q.   All right.

8       Was it your, in these first two meetings, August, or

9  March of 2007 and August of 2007, was it your understanding or

01:39PM 10  your impression, I guess is a better question, that Mr. Durkin

11  was trying to get you to change your opinion with whether or not

12  the video evidence supported a conclusion of baton strikes at

13  18:26:14, 15 and 16?

14       MR. DURKIN:  Object to the form and foundation.  Go

15  ahead.

16       THE WITNESS:  Yes.

17  BY MR. ORESKOVICH:

18  Q.   And would I be correct in understanding, sir, you have

19  never changed that opinion; is that correct?

01:40PM 20  A.   That's correct.

21  Q.   And you've so communicated that to the government?

22  A.   Yes.

23  Q.   How many different times do you think you've told them that

24  it is not my opinion that the video evidence supports a baton

25  strike at 18:26:14?

1    A.    It's not contained in any of my reports.

2    Q.    Yeah.

3    A.    It's not contained in any of my exhibit that I was asked to

4    produce.  It was part of two comprehensive and heated

5    discussions.  Um, the Grand Jury does not -- during the Grand

6    Jury testimony Mr. Durkin did not put to me, "Is this an image

7    of Officer Thompson hitting Mr. Zehm with a baton?"  I would

8    have said no.  He asked, "Is it consistent with it?"  I agreed.

9    Because that was our agreement.

01:41PM 10          I could not have been more clear, short of producing a

11   document that says that I reject all of this, um, I couldn't

12   have been more clear.

13   Q.    You referenced your Grand Jury testimony and I had that

14   marked there as Exhibit Number 6.  A transcript of it.  Would

15   you look at that.

16   A.    (Witness complies.)

17   Q.    Is that the Grand Jury testimony you were referencing?

18   A.    Yes.

19   Q.    And as I understand your prior testimony, after, at some

01:42PM 20   point in time after the August 2007 meeting, an agreement was

21   formed with Mr. Durkin that if he, although you weren't changing

22   your opinion, if he asked a question as to whether or not the

23   motion was consistent with a baton strike, you would answer that

24   question yes; is that correct, sir?

25   A.    Well, given our agreement I think it was a fair --

1    Q.    Yeah.

2    A.    -- a fair agreement.  It was a fair question.  That if, um,

3    if he's asserting that this is a baton strike --

4    Q.    Um-hum.

5    A.    -- and by baton strike I don't mean just swinging a baton,

6    he's asserting that the baton was swung and hit Mr. Zehm.  I was

7    clear that I would not support that.

8    Q.    Um-hum.

9    A.    Not that it didn't happen, but the video can't say that.

01:42PM 10   So I don't want to obstruct, if that's what occurred and

11   somebody else sees that and can testify to that --

12   Q.    Um-hum.

13   A.    -- I don't want to limit the value of the video.

14   Q.    Um-hum.

15   A.    So um, the motion where Officer Thompson is down slightly

16   in the image, we can't discount that as possibly a baton strike.

17            So the agreement was, and he put it to me, are you

18   saying it's consistent, I said, yes, exactly.  I said it is.  I

19   believe was my response in the Grand Jury.  So he asked me the

01:43PM 20   question, is this image consistent with a motion --

21   Q.    Um-hum.

22   A.    -- of an up and down baton strike.  My answer was yes, it

23   is.  Because that was our agreement.

24            And very clearly he knew when he asked me the question

25   and I knew when he asked the question that he wasn't asking me

1  if this was the connection of a baton.

2  Q.    Um-hum.

3  A.    Um, and I didn't have too much of a problem with that

4  question.

5  Q.    Um-hum.

6        All I'm getting to is, for a period of time, as I

7  understand it, for two different meetings he tried to persuade

8  you to change your opinion, correct?

9  A.    I felt that pressure, yes.

01:43PM 10  Q.    All right.  And when that didn't occur, he formed an

11  agreement with you that if a question was phrased a certain way

12  as to whether or not this motion was consistent with a baton

13  strike, you would have said yes, right?

14        MR. DURKIN:  Object to the form.  I think it

15  mischaracterizes the testimony, but go ahead.

16        THE WITNESS:  Yeah, our agreement was not baton

17  strike, our agreement was the motion of a baton.

18  BY MR. ORESKOVICH:

19  Q.    All right.

01:44PM 20  A.    A baton motion was our agreement.

21  Q.    All right.

22        And that was your agreement, although your opinion

23  evidence was that the video evidence itself did not support the

24  conclusion that a baton strike occurred.

25  A.    You know, let's define what the term "baton strike" means.

1    Q.    Um-hum.

2    A.    Does a baton strike mean the swinging and connecting with a

3    baton or does it just mean the swinging motion, a striking

4    motion.

5    Q.    Yeah.

6    A.    My interpretation of that was that it was just simply the

7    striking motion --

8    Q.    Um-hum.

9    A.    -- of the baton.  And I didn't have a problem with that

01:45PM 10   question if it were phrased that way, because my opinion is that

11   the video is consistent with a swinging motion of a baton.  It's

12   also consistent with many other things.  But the video can be

13   used to say that that motion is consistent with that.  That was

14   my evidence.  And I support that evidence.

15   Q.    That it was consistent with a baton strike, but also could

16   be consistent with other things, correct?

17   A.    I was very clear it could be consistent with a number of

18   other things.

19   Q.    And those questions weren't asked for you in the Grand Jury

01:45PM 20   testimony?

21   A.    No.  What it was not consistent with was a connection of a

22   baton.  And a visible baton in the image.  It was not consistent

23   with that.

24   Q.    Right.

25         MR. DURKIN:  I'm going to move to strike, but --

 1  nonresponsive.  There's no question before him.

 2

 3  BY MR. ORESKOVICH:

 4  Q.    Was it consistent with a baton strike?

 5  A.    What is your definition of strike?  And I don't mean to be

 6  --

 7  Q.    Connecting.

 8  A.    No, it's not consistent with that.  Thank you.

 9  Q.    You prepared a supplemental report and it was Exhibit

01:46PM 10  Number 4, correct, sir?

11  A.    Yes.

12  Q.    Why was that report prepared?

13  A.    Um, Mr. Durkin explained to me that my initial report

14  contained observations that he felt that I wasn't, um,

15  qualified.  And more so he said he had somebody better

16  qualified.

17  Q.    Um-hum.

18  A.    A Doctor Gill, who was going to get into issues related to

19  human factors.  And that's not an uncommon request.

01:47PM 20          So he asked if I would produce another report that

21  removed issues of use of force and human factors that was not my

22  area of expertise.  And so I agreed to do that.

23  Q.    Yeah.  Your area of expertise is in forensic video

24  interpretation however, correct?

25  A.    It is, correct, yes.

1    Q.    And what you were prepared to testify to or not testify to

2    was based upon your expertise in forensic video interpretation,

3    correct, sir?

4    A.    That's correct.

5    Q.    At some point in time did you learn that the defense had an

6    expert by the name of Mike Schott?

7    A.    Yes.

8    Q.    All right.

9    A.    Two years later.

01:47PM 10  Q.    Yeah.  You actually went to Yakima, didn't you, on October

11   13th, 2011?

12   A.    Yes.

13   Q.    All right.  And that was during Mr. Thompson's trial, sir,

14   is that correct?

15   A.    That's correct.

16   Q.    All right.  And um, before that, before you had gone to

17   Olympia or I'm sorry, Yakima, on October 13th, 2011, had you

18   been provided with a copy of a report by Mr. Schott?

19   A.    Yes.

01:48PM 20  Q.    All right.  Who provided you with a copy of the report?

21   A.    It was provided to me by e-mail or by mail, I believe, by

22   Miss Jangaard.

23   Q.    Okay.

24         And did you have discussions with either Miss Jangaard

25   or Mr. Durkin concerning any of the conclusions that were

 1   contained in Mr. Schott's report?

 2   A.   I did.

 3   Q.   With which, was it Mr. Durkin or Miss Jangaard or do you

 4   know?

 5   A.   I believe it was with Miss Jangaard.

 6   Q.   All right.

 7   A.   And Mr. Durkin might have been there, I think my comments

 8   were directed toward Miss Jangaard.  I don't know if Mr. Durkin

 9   was there for certain, but he might have been.

01:49PM 10   Q.   All right.  Was this an in-person meeting or a telephonic

 11   meeting?

 12   A.   In person.

 13   Q.   And where did the meeting take place?

 14   A.   Um, in the U.S. Attorney's Office here in this building.

 15   Q.   And what was discussed concerning Mr. Schott's report, if

 16   you can recall?

 17   A.   Um, very little.  I mentioned that I had reviewed the

 18   report, um, I mentioned that he's got a lot right.

 19   Q.   Um-hum.

01:49PM 20   A.   I referenced, um, the artifact in the window.  And I

 21   referenced two images that appear to have been pulled out of an

 22   animation that relate to the baton strike, the alleged baton

 23   swinging at 18:26:14 that didn't occur.

 24   Q.   Um-hum.

 25   A.   The animation shows a baton there and it shows something

1    that is not in the video.  So, um, it's a work of art, you know,

2    was how I see it.  Um, we had a discussion about Mr. Schott and

3    how I know him.  And I explained that I only know him briefly

4    from talking to other analysts in the field on other cases.

5            Mr. Schott does not attend, he's not part of our

6    organization, I think he's an independent video analyst.  He

7    hasn't been trained by any organization that I'm aware of.  He

8    has testified against a few analysts I know, and I explained

9    that to Mr. Durkin.

01:50PM 10   Q.    Um-hum.

11   A.    He asked who.  I provided him with two names of analysts

12   who know Mr. Schott better than I do and could, they could

13   assist him in, um, evaluating his work.

14   Q.    Um-hum.

15   A.    Or his experience, his, his work on other cases.

16   Q.    Um-hum.

17   A.    And the discussion didn't really go into any other detail

18   about his report.  Um, at some point there was a, I asked, do

19   you want me to do anything with his report?  Usually I write

01:51PM 20   rebuttals or do an examination.  And I was told not to bother.

21   Q.    Um-hum.  And this is before you went to Yakima; is that

22   correct, sir?

23   A.    About a month before then.

24   Q.    Okay.

25           When you went to Yakima on October 13th of 2011, were

1  you scheduled to leave the country the following day?

2  A.   Um, when I had talked to Mr. Durkin about a month before,

3  at that time I was on standby for a trial.

4  Q.   Um-hum.

5  A.   And that I thought it was likely I would be leaving that

6  weekend, certainly, I said, don't count on me to be available

7  the following week.

8  Q.   Um-hum.

9  A.   But when we met on, in Yakima, I said I told him that that

01:52PM 10  had been cancelled and that I was available, I'm not travelling.

11  We did talk about that.

12  Q.   You were available to testify on the 14th or later if you

13  needed to?

14  A.   Yes.

15  Q.   All right.  And what discussion did you have with Mr.

16  Durkin about whether to testify, whether you were going to be

17  testifying in Yakima on the 14th?

18  A.   Um, I was directed to meet Mr. Durkin at the prosecutor's

19  office at 5 p.m. the day before I was to testify.

01:52PM 20       I checked into the hotel across the street.  Um, I

21  walked, I walked across the street to the office and I waited

22  for about 15 minutes, saw Mr. Durkin enter through another

23  doorway, um, and I waited for about another half hour, Mr.

24  Durkin came out, so I had been there about 45 minutes.

25       Um, we had a very pleasant conversation, small talk

1  for about 15 minutes at least.  And then he told me that the

2  reason he was late was he notified the judge that he wasn't

3  going to be calling you.

4  Q.   Was not going to be calling you?

5  A.   Yes.

6  Q.   Um-hum.

7  A.   And it was, you know, a very, um, very friendly

8  conversation.

9  Q.   Yeah.

01:53PM 10  A.   Um, and I said, yeah, I'm not surprised, I didn't think I

11  was going to be helpful to your case.  And he smiled and he

12  said, and he shook his head and he said, probably not.

13  Q.   In fact, didn't you say to him, my testimony would have

14  been helpful to the defense?

15  A.   No, I didn't say that.

16  Q.   All right.  Just wouldn't have been helpful to his case.

17  A.   Correct.  And after that, um, a bit more small talk and he

18  said, um, you know, we talked about the trip to the UK that's

19  not occurring because it's actually supposed to be occurring

01:53PM 20  next month now.  Um, and um, he said, please submit your bill

21  and thanks for your assistance and I checked out of the hotel

22  and went home.

23  Q.   Your statement, which was exhibit 1, why did you come

24  forward with that, sir?

25  A.   Um, well as I said, I was concerned, um, of a potential

1    miscarriage of justice.  If, um, I think that if, I felt that if

2    the Court believed that this was my evidence, if the defense

3    believed that this was my evidence, my opinion, or if any other

4    expert relied on this to form their opinion, that, um, there

5    would be a miscarriage of justice.

6              And I sought legal advice to insure that I wasn't

7    reading something in there that wasn't there.  And um, I did my

8    own research.  Um, and it appeared to me that, um, the

9    assertions in, in this Rule 16 document were important to the

01:56PM 10   trial.  And um, I was very concerned that this document was used

11   to influence the Court.  I felt it was my responsibility to

12   insure that didn't happen.

13   Q.  When did you first see the Rule 16 document?

14   A.  September, 2009.

15   Q.  Okay.

16             That was some two years after you first started

17   meeting with the government; is that fair to say?

18   A.  That's correct.

19   Q.  All right.

01:56PM 20            Did you discuss with them at that point in time the

21   fact that the Rule 16 document did not accurately set forth your

22   opinions, in your mind?

23   A.  I didn't.

24   Q.  Why not?

25   A.  I was confused regarding its use, number one.  I know that

1    I had not -- first of all, I did not participate in the

2    production of the report, of the Rule 16 document.

3    Q.    Um-hum.

4    A.    No exhibits I produced supported this.  I anticipated, um,

5    a deposition, a deposition before trial, if I were to testify.

6    I anticipated, um, testifying at trial likely and I wouldn't

7    adopt this.

8            I had made a number of efforts to, um, insure that Mr.

9    Durkin understood my opinion and um, I didn't think there was

01:57PM 10   anything more I could do.  And so to, once again, complain about

11   more evidence, another opinion, I didn't think would have any

12   impact.

13   Q.    I may have jumped around a little bit.

14           In terms of your document, your video document here,

15   exhibit number 7, I went through bits and pieces of this.

16           Have we covered all of the areas where you disagree

17   with the representation in the Rule 16 document, Exhibit Number

18   2?

19   A.    I don't think so.

01:58PM 20   Q.    All right.

21   A.    I think the first image of Officer Thompson entering on

22   slide 40 at 18:26:09, um, articulates an opinion that I don't

23   hold.  Um, on the Rule 16, page three, line nine, which

24   describes how Officer Thompson entered, it states that he, um,

25   pulled out the baton and held it in a position over his right

         1    shoulder and then quickly traveled the length of the north

         2    aisle.

         3          And that's not my evidence.  It is not consistent with

         4    the video.

         5          And I've described in the exhibit 7 from line 40,

         6    slide 40, through to slide 55, I outlined my observations, which

         7    reports address those observations and the inconsistency between

         8    all of my work and my opinion and the statement in the part 16

         9    or Rule 16.

01:59PM 10    Q.   Your statement, we marked it as exhibit 1.  Do you affirm

        11    that that's an accurate statement still to this day?

        12    A.   Yes.

        13    Q.   You have before you Exhibit Number 5, which is a 302 report

        14    dated March 8, 2007.

        15          Do you see that, sir?

        16    A.   Yes.

        17    Q.   And this was one of the dates where you spoke with Mr.

        18    Durkin and Miss Jangaard concerning a number of different

        19    possibilities that the images could be consistent with, correct,

02:00PM 20    sir?

        21    A.   Correct.

        22    Q.   And this was one of the dates where you continued to

        23    maintain your opinion as you, opinions, as you set forth today,

        24    concerning what the video does or does not show with respect to

        25    baton swings or strike, correct, sir?

1    A.    That's correct.

2    Q.    And with respect to what occurred in that meeting on March

3    8th of 2007, if the report here, if the conclusion were drawn

4    from the report that you had actually changed your opinion from

5    what you said in your original report concerning baton strikes,

6    the absence of baton strikes at 18:14 or 15, if the conclusion

7    was that you had changed your opinion, that was incorrect based

8    upon what you were telling the government; isn't that fair to

9    say?

02:01PM 10          MR. DURKIN:  I'm going to object to form.  Go ahead.

11          THE WITNESS:  Not only is it incorrect --

12   BY MR. ORESKOVICH:

13   Q.    Yes.

14   A.    -- I produced, um, dozens of exhibits afterwards.

15   Q.    Um-hum.

16   A.    None of which relate to, none of which state that or agree

17   to that.

18          So I did not change my mind.  And I never formed an

19   opinion that contradicts what I've been presenting here today.

02:02PM 20   Q.    I need to get my arms around just a bit.

21          When you say, "a number of exhibits," and I'll

22   represent to you we got exhibits, photographs that go forever.

23   And I'm not sure whether I do or do not have the exhibits that

24   you're referring to.

25          So would they be contained in the file that you have

 1  brought here today?

 2  A.    Yes.

 3  Q.    Okay.  Now at one point in time did you prepare a

 4  demonstrative exhibit for the government, and I may misstate the

 5  title of it, that had motions one through 13.  Do you know what

 6  I'm referring to?

 7  A.    I think it's called Baton Motions.

 8  Q.    There you go.  And did you entitle it Baton Motions?

 9  A.    I believe I did.

02:03PM 10  Q.    All right.

11            And did you, with respect to the exhibit itself,

12  that's one you turned over to the government?

13  A.    Yes.

14  Q.    And did the exhibit show any baton motions at 18:26:14?

15  A.    That was labeled baton motion number one.

16  Q.    All right.

17  A.    I should probably -- can you give me a moment to be clear

18  on that?

19  Q.    Yeah.

02:03PM 20  A.    I just want to clarify.  The answer would be no.

21  Q.    All right.

22  A.    The first baton motion is at 18:26:15.

23  Q.    Um-hum.

24  A.    And it simply is an image of a baton.

25  Q.    Oh.

1  A.    And in motion only because it's in the officer's hand and

2  the officer is in motion.  But there's no motion blur.  And I

3  was very careful about that description.

4  Q.    All right.  And when would the exhibit have shown any

5  striking motion by --

6  A.    At 18:26:37.

7          MR. DURKIN:  And just for the record, striking meaning

8  impact, so that we have clarity on this discussion?

9          THE WITNESS:  Thank you.  And by striking, my opinion

02:04PM 10  is that this is a striking motion, a motion with the baton down

11  toward Mr. Zehm.

12  BY MR. ORESKOVICH:

13  Q.    Um-hum.

14  A.    And I can't say whether or not contact was made.

15  Q.    Um-hum.

16  A.    But I think it's quite likely.

17  Q.    Um-hum.

18  A.    And that would have been motion number three and motion

19  number four, I believe.

02:05PM 20  Q.    I think we're just about done, let me just take a minute.

21          (Pause.)

22          I want to just make sure we clarify any issues with

23  respect to any alleged improprieties.

24          Explain to us, when you were first hired, you were

25  hired by Mr. Driscoll and paid for by the City Police; is that

1   accurate.

2   A.    The agreement went back and forth between different

3   departments within the City.

4   Q.    Yeah.

5   A.    I believe it was Mr. Trepeddi's office, whoever

6   Mr. Trepeddi works, who ended up authorizing the payment.  I

7   don't recall where the payment came from.

8   Q.    Okay.  And did you have some contact at some point in time

9   with the City Attorney's Office that Mr. Durkin took issue with?

02:06PM 10   A.    Um, well, on two occasions.

11   Q.    Yeah.

12   A.    The second meeting, um, Mr. Durkin met me at the door, um,

13   well when I was inside the room, um, and the first, um,

14   communication was, you're to have no more contact with your

15   client, he said the City, you're now working for the FBI.  Um,

16   and I thought that was odd.

17   Q.    Um-hum.

18   A.    And that obviously wasn't going to happen.  Um, Mr. Durkin,

19   um, was very insistent, very directive as if I had no choice,

02:07PM 20   that I was now the FBI's expert, I'm to have no more contact

21   with the City.

22        And I explained to him that I've been doing this for a

23   long time and that's not how it works.

24        Eventually I invited him to call my client and have

25   that discussion with the client and I stepped outside and --

1   have we don't this before?  Have we already talked about this?

2   Q.    Not on the record.

3   A.    Okay.  Um, I suggested, after a bit of a discussion, um,

4   that he should call my client.  Um, and I offered to step

5   outside.  And I did.

6         And Miss Jangaard came with me and we, I think we sat

7   together for about 45 minutes.  And I could hear some very loud

8   discussions in the conference room, we were quite close.

9         After probably 45 minutes I was called back in and to

02:08PM 10   my surprise, um, I think it was Mr. Caven (sic).

11   Q.    Craven?

12   A.    Craven.  Thank you.  Um, told me that they have had a

13   discussion, that, um, the City, they're satisfied with the work

14   that I've done, which I had completed six months earlier.

15   Q.    Um-hum.

16   A.    And that the City doesn't require my services any more and

17   I'm free to assist the FBI.

18   Q.    Um-hum.

19   A.    I was surprised, but quite happy to assist the FBI.  And we

02:08PM 20   hung up the phone and I turned to them and I said, how can I

21   help you?  Um, so that was that, that discussion.

22         Um, and if you could answer your or ask your question

23   again I think, I don't want to --

24         MR. DURKIN:  Let me -- excuse me.  Let me insert an

25   objection.

1    I'm going to move to strike, nonresponsive, there's no
2  question before him, he had a lengthy narrative.  Go ahead.
3
4  BY MR. ORESKOVICH:
5  Q.  When we were interviewing you earlier this morning there
6  was one point in time where I understood you to tell me that Mr.
7  Durkin threatened you to take you before a Grand Jury, that's my
8  term, and that's the area that I want to inquire about and if
9  I'm using improper language you correct me.
02:09PM 10  A.  Um-hum.
11  Q.  Was there a time where you had a heated or a disagreement
12  with Mr. Durkin where he threatened to take you before the Grand
13  Jury?
14          MR. DURKIN:  Object to form.  Go ahead.
15          THE WITNESS:  Um, I was, um, very calm and quiet about
16  it.  Mr. Durkin --
17  BY MR. ORESKOVICH:
18  Q.  Yeah.
19  A.  -- um, was forceful about it.  He insisted that I not have
02:09PM 20  any contact with the City any more, that I work only for the
21  FBI.
22          And I explained in that process, it doesn't work that
23  way.  And he said, if I have to, I'll pull you before the Grand
24  Jury.  And I said, well, if you need to do that, go ahead; but
25  I've been doing this -- that's when we talked about, I've been

1    doing this a long time and I know the process.

2              And some time after he, um, said he was going to pull

3    me in front Grand Jury if I didn't cooperate, which I was fully

4    there to cooperate, I suggested he makes the phone call.

5    Q.    All right.  So this occurred prior to the time that he made

6    the phone call to Mr. Craven?

7    A.    Yes.

8    Q.    All right.

9              I think that's -- in your original report, at some

02:10PM 10    point in time in the report you had some reference to Mr. Zehm

11    kicking at Mr. Thompson, is that fair to say?

12    A.    My report very specifically said Mr. Zehm was kicking

13    upward toward Officer Thompson.  Not kicking Officer Thompson.

14    Q.    All right.

15              And did you have any discussion with the government at

16    any point in time as to whether or not that should be taken out

17    of any of your reports?

18    A.    I was directed specifically to remove that from my report.

19    Q.    And who directed you to remove it from the report?

02:11PM 20    A.    Um, Mr. Durkin.

21    Q.    All right.  And was there a meeting that you had, not only

22    with Mr. Durkin concerning that issue, but also a Victor

23    Boutros?

24    A.    Yes.  Subsequent to that.

25    Q.    Mr. Boutros was a co-counsel with Mr. Durkin in the

 1   prosecution of this case?

 2   A.   That's my understanding.

 3   Q.   And did Mr. Boutros have any discussions with you about

 4   removing the comment about Mr. Zehm kicking in the direction of

 5   Mr. Thompson?

 6   A.   Um, that had already been done.

 7   Q.   Um-hum.

 8   A.   And he asked me how I would handle that in

 9   cross-examination.

02:11PM 10   Q.   Um-hum.

11   A.   How I would handle the fact that, um, I removed that from

12   the subsequent document.

13   Q.   Um-hum.

14   A.   And I explained, you know, fairly easily, I'm not a human

15   factors expert, that my evidence was that he was kicking upward,

16   and that I can't state that it was actually an intentional

17   kicking motion.  And that I was directed to remove it.  And I

18   thought that was a pretty straightforward answer.

19   Q.   Um-hum.

02:12PM 20        MR. ORESKOVICH:  That's all I have.  Thank you.

21        THE VIDEOGRAPHER:  Should we change the tape here?

22        MR. DURKIN:  Sure, why don't we do that.  Why don't we

23   start back up at 2:30.

24        THE VIDEOGRAPHER:  This will conclude tape number 2.

25   The time is 2:12 p.m.

1              **(Break taken.)**

2              **THE VIDEOGRAPHER:  This is the continued videotaped**

3    **deposition of Grant Fredericks and tape number three.  The date**

4    **is March 2, 2012.  The time is now 2:32 p.m.**

5

6                        **EXAMINATION**

7

8    **BY MR. DURKIN:**

9    **Q.   Okay.  All right, Mr. Fredericks, we have had the pleasure**

02:33PM 10   **of meeting before, correct?**

11   **A.   Yes.**

12   **Q.   Okay.**

13              **How many times have you had your deposition taken?**

14   **A.   Um, 12, 15 times.**

15   **Q.   Okay.**

16              **And you previously indicated that you had testified in**

17   **a courtroom as a law enforcement officer, as I recall your**

18   **statement you described approximately a hundred times?**

19   **A.   As law enforcement officer.**

02:33PM 20   **Q.   Yes.**

21   **A.   Many hundreds of times.**

22   **Q.   Hundreds of times.  Okay.**

23              **And then as a forensic video analyst approximately how**

24   **many times?**

25   **A.   A hundred.**

1    Q.    Okay.

2          And in your prior, approximately 15 depositions that

3    you participated in, was it explained to you that you're under

4    oath just like you would be in a courtroom?

5    A.    Yes.

6    Q.    Okay.

7          And you understand the requirements of providing

8    testimony under oath?

9    A.    I do.

02:34PM 10   Q.    Okay.

11          Supposed to be your most truthful and accurate

12   testimony; is that correct?

13   A.    Correct.

14   Q.    Okay.

15          And this is just like testifying in front of the judge

16   at a hearing or in front of a jury, you understand that?

17   A.    I understand that.

18   Q.    Okay.

19          And your testimony here today can be used for a number

02:34PM 20   of purpose; do you understand that?

21   A.    I do.

22   Q.    Okay.

23          Because of that and because you are sworn in under

24   oath and because you are required to give your most truthful and

25   accurate response you are entitled to understand the question

1  that is posed to you, okay?

2  A.    Yes.

3  Q.    Okay.

4        And if for any reason you don't understand my

5  question, please tell me and I'll be happy to rephrase that

6  question.

7  A.    Thank you.

8  Q.    If you answer the question, can we presume that you

9  understand the question?

02:35PM 10  A.    Yes.

11  Q.    Okay.

12        And has all your testimony today so far been truthful

13  accurate and complete as you understand it?

14  A.    Yes.

15  Q.    Okay.  And are you on any medications that would in any way

16  affect your ability to accurately recall events?

17  A.    No.

18  Q.    Okay.  Is there any reason you're not feeling well today or

19  unable to provide accurate testimony?

02:35PM 20  A.    No.

21  Q.    What did you do to prepare for your testimony here today?

22  A.    I, um, prepared the exhibit 7 by going through the Rule

23  16 --

24  Q.    Okay.

25  A.    -- document.

1    Q.    And when did you start preparing that exhibit?

2    A.    Within the past week.

3    Q.    Okay.

4          And was that exhibit previously provided to your

5    counsel or to Mr. Oreskovich?

6    A.    Um, I think two days ago I provided it to them.

7    Q.    To Mr. Oreskovich and your counsel too?

8    A.    Not to Mr. Oreskovich, pardon me, to Mr. Wetzel only.

9    Q.    Okay.  All right.

02:36PM 10         What else did you do to prepare for your testimony

11   here today?

12   A.    I have reviewed, over the past few months, my written

13   reports, um, my e-mail communication --

14   Q.    Okay.

15   A.    -- and a number of the exhibits that I produced for the

16   government.

17   Q.    All right.  So you performed a file review.

18   A.    I did.

19   Q.    All right.

02:36PM 20         What else did you do in anticipation of your testimony

21   here today?

22   A.    Since the time that I was notified of the deposition?  I

23   think that what I've described is what I've done.

24   Q.    Okay.

25         Was there other work that you did in anticipation of

1   having to appear in court relative to the issue that you brought

2   here today or have testified upon today?

3   A.   No.

4   Q.   Okay.

5        Who did you meet with in anticipation of your

6   testimony here today?

7   A.   In anticipation of the testimony, nobody, apart from Mr.

8   Wetzel, this morning at 7 o'clock.

9   Q.   Okay.  Did you meet with anybody to prepare for your

02:37PM 10   testimony?

11   A.   No.

12   Q.   All right.

13        Is there anything else that you reviewed -- well, let

14   me back up.

15        Have you reviewed any other items in preparation for

16   your testimony here today?

17   A.   In preparation for this testimony?  No.

18   Q.   Okay.  You're qualifying it and I want to understand why

19   you're qualifying it.

02:37PM 20   A.   Because I want to be sure you're asking in preparation for

21   this.  There are a lot of documents that I reviewed over the

22   past five years.

23   Q.   Okay.

24   A.   Which all help me --

25   Q.   Sure, I understand.

1    A.   -- with my memory.

2    Q.   Let's start with from November 2nd, which was the date of

3    the jury's verdict, until today, in terms of preparing either

4    the complaint that you filed, or excuse me, the concern that you

5    lodged with the Court, or in anticipation of testimony today.

6    A.   Yes.

7    Q.   I want to get a good understanding of what the universe of

8    information is that you reviewed and have relied upon to present

9    here today.

02:38PM 10    A.   Okay.  I understand your question.  Thank you.

11         Um, um, after the conviction, I reviewed my documents.

12    I reviewed the Rule 16.  Um, I, um, read, um, some news accounts

13    of the conviction.  And I did some research, um, based on my

14    concern about the Rule 16, um, statements.

15    Q.   Okay.

16         Your research.  When you say "research," describe that

17    for me.

18    A.   In the Spokesman Review.

19    Q.   Okay.

02:39PM 20    A.   Just to see some kind of history.

21    Q.   So you went through media reports.

22    A.   Correct, yeah.

23    Q.   Okay.  Anything else besides just reviewing media reports?

24    A.   Yes.  And I didn't really review the media reports, I was

25    aware that there was some documents filed by Department of

 1    Justice that the media, um, was displaying.  Including my

 2    reports.

 3              Um, and I was unaware of any of this up until the end

 4    of November, early December.

 5    Q.   "Any of this," what are you talking about?

 6    A.   Any of the fact that the media had access to all this

 7    information.

 8    Q.   Okay.

 9    A.   These are official reports filed to the Court.  I located a

02:40PM 10    report, um, from the Department of Justice that outlined to the

11    Court, to the judge, I believe, um, its case, um, its

12    experiences with witnesses, including me.

13              And the report from the Department of Justice appeared

14    to state, to allege, that I had been providing evidence to the

15    defense --

16    Q.   Okay.

17    A.   -- that I had produced for the government.

18    Q.   And is that report that you're talking about, let's be more

19    specific of what that is, do you have a recollection of what

02:40PM 20    that was?

21    A.   I believe it was a report that was signed by you, Mr.

22    Durkin.

23    Q.   Okay.

24              Was it called a proffer relative to attorney conflicts

25    and other pretrial motions?

1   A.    It sounds familiar, but it was a very lengthy document that

2   had a lot of detail.

3   Q.    Okay.

4   A.    I didn't read the entire document.

5   Q.    Okay.

6   A.    I did word searches for my name.

7   Q.    Sure.

8   A.    And that's when I discovered that the Court had been led to

9   believe, inaccurately, that I had provided evidence to the

02:41PM 10   defense after I was hired by the Department of Justice.  That

11   led, built my concern.

12   Q.    Okay.  Let's talk about that specific issue.

13         Well, let me go back and revisit.  Is the signed

14   statement, also called the declaration in your examination here

15   today, dated March, or excuse me, December 16th, 2011, is that

16   truthful and accurate?

17   A.    Yes.

18   Q.    Okay.

19         Okay.  Let's -- and in that signed statement, although

02:41PM 20   Mr. Oreskovich repeatedly had talked to you about a meeting on,

21   in March, can you tell me where in your signed statement you say

22   that there's a meeting in March where you met with Miss Jangaard

23   and myself and had these discussions that you've been talking

24   about all day.

25   A.    On page four, paragraph three.

1  Q.   Okay.  Okay.

2         But in -- I'm talking about the discussions.  Can you

3  point out where else in your report, your signed statement,

4  declaration, that you reference all of these conversations that

5  you have described for Mr. Oreskovich today?

6  A.   As I explained to Mr. Oreskovich, I didn't take notes,

7  because that's not my practice.

8         MR. DURKIN:  I'm going to move to strike.

9  BY MR. DURKIN:

02:42PM 10  Q.   Do you understand my question?  My question is --

11  A.   Probably not.

12  Q.   -- is where else in your signed statement that you said was

13  truthful and accurate do you reference conversations that you've

14  been talking about with Mr. Oreskovich today that you, that

15  occurred, allegedly occurred in March of 2007?

16  A.   I didn't include that in this, in that document.

17  Q.   Okay.

18         Now in March of -- let's talk about you providing

19  information to the defense.

02:43PM 20         You understand who Rocky Trepeddi is.

21  A.   Yes.

22  Q.   Okay.

23         Can you describe for me your understanding of him.

24  A.   He's a City attorney.

25  Q.   Okay.

1              And you've had dealings with him and interaction with

2    him.

3    A.    Very few, but, yes.

4    Q.    Okay.

5    A.    Initially.

6    Q.    Okay.  And he represents the City of Spokane.

7    A.    Correct.

8    Q.    He represents the City Police Department?

9    A.    That's my understanding.

02:43PM 10   Q.    He represents the individual officers who have been alleged

11   to have engaged in misconduct in one form or another relative to

12   the Otto Zehm matter.

13   A.    Well, I don't know if that's the case, I know he represents

14   the City and the police department, as such would be --

15   Q.    Representing the officers.

16   A.    Okay.  I'll accept that.

17   Q.    Okay.  That was your understanding.  Particularly in March

18   of 2007.

19   A.    No.

02:44PM 20   Q.    It wasn't your understanding?

21   A.    No, I don't believe I had -- oh, in March of 2007.

22   Q.    Yes.

23   A.    My, um, um, well, I don't know what my understanding was

24   who Mr. Trepeddi was.  He was certainly, he was simply the

25   person who I was to send my checks, my invoices to.

1  Q.    Okay.

2  A.    Um, it, I know he's a lawyer for the City, and I know that,

3  um, his job is, um, as a City lawyer, to assess liability and do

4  all those things.

5  Q.    Okay.

6  A.    I don't believe I dealt with him when I did my initial

7  report.  I think that came afterwards.

8  Q.    Okay.

9  A.    To answer your question directly, um, you know, I don't

02:44PM 10  know what his specific function is, but if it's anything like

11  other cities I've worked for he's, his duty is to assess

12  liability.  I'm not sure if that's accurate.

13  Q.    Okay.

14          So that you knew that the person who was responsible

15  for assessing liability and defending the City and the City's

16  interest, correct?

17  A.    Yes, absolutely, yes.

18  Q.    You knew in March of 2007 that was his role.

19          MR. ORESKOVICH:  I'm going to object to this as being

02:45PM 20  asked and answered.

21  BY MR. DURKIN:

22  Q.    Go ahead.

23  A.    I think so.  Yeah, I believe that I was aware of that.

24  Q.    And you knew that he worked with the Division of Risk

25  Management.

1    A.    Yes.

2    Q.    Because you knew in March of 2007 that your bill had been

3    paid by the Division of Risk Management.

4    A.    I'm not sure who paid the bill.  Um, initially I was told

5    that the City Police Department, because it's an investigation,

6    they would be paying for it, Trepeddi would authorize it or it

7    was being shared.

8          I don't know who came up with the money.  I initially

9    at the end, at the end of the report I was turned over to

02:45PM 10   Mr. Trepeddi for payment.  So I think I had three or four

11   dealings with him.

12   Q.    Okay.  And when you met with Miss Jangaard and I --

13   A.    Yes.

14   Q.    -- back in March of 2007, you were asked whether or not

15   there was an ongoing SPD investigation which you were

16   participating in.  Do you recall that?

17   A.    No, I don't recall that, but I was involved in an SPD

18   investigation in the Zehm matter.

19   Q.    Okay.  And you were asked whether or not there was anything

02:46PM 20   further to be done for them.  Do you recall that?

21   A.    Um, something like that, um-hum.

22   Q.    Okay.

23          And do you recall telling us that there was nothing

24   further, you had no further engagement with them?

25   A.    That's not correct.  I was there at their request.

1    Q.    I'm talking about the SPD.

2    A.    Well I don't know.

3    Q.    Okay.

4    A.    You know, to me it's all one thing.

5              MR. DURKIN:  I'm going to move to strike.

6

7    BY MR. DURKIN:

8    Q.    You know, I get to ask the questions and you get to provide

9    the answers.  That's the arrangement here.  And if you want an

02:47PM 10   opportunity for further explanation, you can provide that when

11   Mr. Oreskovich examines you, okay?

12   A.    I understand.

13   Q.    Okay.  And you've been through this drill 250 times at

14   least.

15   A.    Yes.

16             MR. ORESKOVICH:  Well --

17   BY MR. DURKIN:

18   Q.    Okay.  Did you disclose to Special Agent Jangaard and

19   myself in March of 2007 that you had a continuing relationship

02:47PM 20   with the City Attorney's Office?

21   A.    Of course.  They were my client.

22   Q.    Okay.  You disclosed that to Special Agent Jangaard and I

23   when you met with us.

24   A.    Yes, absolutely.  I said that I was here at the request of

25   the City.

  1  Q.    Okay.

  2  A.    That was --

  3  Q.    And did you --

  4  A.    -- abundantly clear.

  5  Q.    Let me ask the question.

  6          And did you disclose to the FBI, DOJ, and my office

  7  that the work that we had requested that you perform was going

  8  to be disclosed to the City Attorney's Office?

  9  A.    Yes, in writing, I have the e-mails that you all were --

02:47PM 10  um --

 11  Q.    At the time --

 12  A.    -- copied on, yes.

 13  Q.    -- at the time that the request was made, not at the time

 14  that the work was completed and you provided the work to

 15  everybody, at the time the request was made, did you tell us

 16  that you were going to provide copies of whatever you were doing

 17  for the Department of Justice to the City Attorney's Office?

 18  A.    Absolutely.

 19  Q.    Okay.

02:48PM 20  A.    And that's supported in the e-mails and the invoices.

 21  Q.    Okay.

 22          And then in August of 2007, were you not confronted

 23  about providing that information without the U.S. Attorney's

 24  Office's knowledge and without the FBI's prior knowledge?

 25  A.    Absolutely not.

1   Q.   You weren't.

2   A.   No.

3   Q.   Okay.

4        You talked about this conference call that was held at

5   the U.S. Attorney's Office in August of 2007.

6   A.   Yes.

7   Q.   Between the U.S. Attorney's Office and the City Attorney's

8   Office.  Do you recall that?

9   A.   Yes.

02:48PM 10   Q.   Okay.

11        Aside from Special Agent Jangaard and myself, who else

12   was present for that conference call?

13   A.   I'm not certain.

14   Q.   Well, tell me what you do recall.

15   A.   Um, I recall the three of us.  Um, at some point the other

16   attorney from Washington, D.C. was in the meeting, on at least

17   two occasions, I don't recall which of the meetings.

18   Q.   Okay.  So you call Victor Boutros, the attorney from

19   Washington, D.C., being present for the March 2007 and the

02:49PM 20   August 2007 meetings?

21   A.   I don't recall him in the March meeting, he may have been

22   there in the August meeting, I don't recall.

23        I think that -- I recall meeting him on at least two

24   occasions.

25   Q.   And you recall he may have been present for this conference

1  call in August of 2007.

2  A.    May have been.

3  Q.    Okay.

4        Let's go back now to, since we haven't finished, what

5  other materials did you review from November 2nd to the present?

6  A.    I think I've stated, my reports, um, a number of the

7  documents that I produced for your office.

8  Q.    Okay.  Meaning the exhibits?

9  A.    Yes.

02:50PM 10  Q.    Okay.

11  A.    My e-mails.  My invoices.

12  Q.    Okay.

13  A.    And I don't recall anything else.

14  Q.    Okay.

15        Who all did you talk to about your concern?

16  A.    Mr. Wetzel.

17  Q.    Who else?

18  A.    My wife.

19  Q.    Okay.  Who else?

02:50PM 20  A.    Um, I have an attorney, um, in Canada I spoke with.

21  Q.    Okay.  Where in Canada?

22  A.    Alberta.

23  Q.    Okay.  His name, her name?

24  A.    Jonathan Hak.

25  Q.    Who else?

1    A.    I had a conversation with um, um, Mr. McGinnis, at the FBI,

2    when he confronted me about this a couple weeks ago, after --

3    Q.    Okay.  Who else?

4    A.    Um, Mr. George Reese.

5    Q.    Who?

6    A.    George Reese.

7    Q.    Who is that?

8    A.    He's the person that you asked me about who knew Mr.

9    Schott.

02:51PM 10    Q.    You mean at the -- is he out of California, is he with

11    LEVA?

12    A.    Yeah, he's a peer that I often seek his advice.

13    Q.    Okay.  Who else?

14    A.    He has, he has standing in a, um, an expert witness, um,

15    group, so I thought he would have good advice for me.  I believe

16    that's it.

17    Q.    Okay.  That's all the people that you talked to?

18    A.    Yes.  Um, um, I reached out to another attorney here in

19    town before I talked to Mr. Wetzel.

02:51PM 20    Q.    Who was that?

21    A.    I don't recall.

22    Q.    Okay.

23    A.    I contacted a law firm, spoke to an attorney briefly, the

24    attorney said that they wouldn't be able to assist because, um,

25    they were your friend and, um, it wouldn't be appropriate, um,

1    so I moved on.

2    Q.    Okay.  Now earlier this morning you were asked how it was

3    that you came to see Mr. Wetzel.  And you said, well I did some

4    research; and then you said, well I might have got some

5    additional information.

6            Did you refresh your recollection as to that

7    additional information?

8    A.    No, I think I just found Mr. Wetzel and --

9    Q.    Okay.  You indicated maybe your attorney would have had

02:52PM 10   some information that might refresh your recollection.

11   A.    He did not.

12   Q.    Okay.  Did you check with him?

13   A.    Um-hum.

14   Q.    Okay.

15   A.    I asked if he remembered and he didn't know.

16   Q.    So you were just fortunate enough to pick Mr. Wetzel out of

17   the, to get a very fine attorney out of, just out of the dark.

18   A.    I agree.

19   Q.    Okay.

02:53PM 20           Anybody else that you talked to -- either directly or

21   indirectly -- with, relative to your concerns?  Let me back up.

22           Have we covered everybody that you talked with

23   directly?

24   A.    Um, my employees.  No, obviously, because they have been

25   involved in helping to assist in producing exhibits, so they're

1    aware of this.

2    Q.    Okay.    Sure.

3           And as I recall you have some employees that work at

4    the Spokane Police Department.    Have used, maybe contractors

5    that work at the Spokane Police Department?

6    A.    Oh, on one occasion several years ago Mike Lavelle came in

7    and did a few hours worth of work for me on a case.    And Mike

8    Lavelle is a civilian who works in the Training Division for the

9    Spokane Police.

02:53PM 10    Q.    Okay.

11   A.    And I haven't talked to Mike in years and certainly never

12   talked to him about this case.

13   Q.    Okay.

14          Anybody else with the Spokane Police Department that

15   you have done work for or work has done work for you?

16   A.    No.

17   Q.    Okay.

18          Have you spoken directly or indirectly with anybody

19   else, other than the people that you've already described?

02:54PM 20    A.    No.

21   Q.    Okay.    And who are your current employees?

22   A.    Um, um, I've got two employee.    One's my son, Andrew

23   Fredericks, and Larry Compton.

24   Q.    Okay.    Mr. Compton's a former fellow law enforcement

25   officer?

1   A.   He's a former peace officer from New York, yes.

2   Q.   Okay.  That's a law enforcement officer, would you agree?

3   A.   Um, I don't know.  It's a -- peace officers are different

4   from like police officers, in my understanding.

5   Q.   Okay.

6   A.   They handle documents, they don't go out and arrest people.

7   Q.   All right.  Okay.

8        Now you have previously provided testimony that the

9   mechanism for getting you involved in this case was a phone call

02:55PM 10   from Jack Driscoll; is that correct?

11   A.   Yes.

12   Q.   Okay.

13        That was the first time you had had contact on this

14   case relative to the Otto Zehm incident.

15   A.   No, I received a phone call from the media after it

16   happened.

17   Q.   Okay.

18   A.   I didn't return the media's call.  I spoke with, um, the

19   only person I knew from the Spokane Police at the time, um, I'm

02:55PM 20   sure you'll help refresh my memory.  He's a video analyst at

21   Spokane Police, he's been in a couple of my classes.

22   Q.   John McGregor?

23   A.   Thank you.  John McGregor, yes.  I spoke with John about

24   it.

25   Q.   Okay.

1   A.   And it was basically left at that.

2           His partner, I was aware that his partner was a video

3   analyst who had just died and they were, um, I think John was

4   otherwise occupied.

5           Um, and then several weeks later, I think, or some

6   time later, Mr. Driscoll contacted me and I don't know if he was

7   aware that I knew Mr. McGregor or not.

8   Q.   Okay.

9           So this phone call you had with Mr. McGregor, at least

02:56PM 10   the way that you're describing it, and you correct me if I'm

11   wrong, is you're describing it as he called you?

12  A.   No, I called him.

13  Q.   Okay.  You called him.

14  A.   After I got a call from the media.  I didn't return the

15  media's call, I don't like getting involved in, in responding to

16  the media on cases.

17  Q.   Okay.

18  A.   Um, and I called John at that time.

19  Q.   Okay.

02:56PM 20  A.   And I believe that's in my reports.

21  Q.   Okay.

22          And John had recently had a colleague of his pass away

23  and so he was otherwise occupied as opposed to dealing with the

24  case.

25  A.   That's my recollection -- well, it's my recollection is

1    around that time period, yeah.

2    Q.    Okay.

3          Now as I understand, we'll call it exhibit 1, your

4    statement, signed statement, and it's not signed under oath but

5    you've represented that that's all truthful and accurate; is

6    that right?

7    A.    That's correct.

8    Q.    Okay.

9          That was expressing concerns with a Rule 16 "summary"

02:57PM 10    that my office, specifically that I prepared, correct?

11    A.    That's my understanding.

12    Q.    Okay.  And your concern, as I understand the way it was

13    articulated earlier, was, one, it did not reflect your actual

14    testimony or opinions.

15    A.    Correct.

16    Q.    And two, you had a concern that it had been shared and

17    relied upon by other experts or the Court or the defense.

18    A.    Correct.

19    Q.    Okay.  Is that an accurate description?

02:58PM 20    A.    Yes.

21    Q.    Anything more to add to that generally?

22    A.    No, I think that's it.

23    Q.    And you were provided earlier today, during questioning by

24    Special Agent Jangaard, with dates of reports that were prepared

25    by other experts; do you recall that?

1  A.    Yes.

2  Q.    And those all well preceded the September 22nd, 2009,

3  summary that I prepared.

4  A.    You know, the dates that I was provided for a report from

5  them is, precedes the Rule 16.  I don't know what other evidence

6  they produced after that.  Um, my concern still stands in that

7  regard.

8  Q.    Okay.

9        And you're not familiar with the disclosures that were

02:58PM 10  made in this case --

11  A.    I am not.

12  Q.    -- obviously.

13  A.    No, sir.

14  Q.    Okay.

15        So if I told you that your first report was disclosed

16  to the defense, that would cover all of the concerns that you

17  expressed relative to the Rule 16 summary, wouldn't it?

18  A.    No.

19  Q.    Okay.  What would it not cover?

02:58PM 20  A.    The first report doesn't, um, doesn't say this.

21  Q.    I know.  It contradicts it.  What I'm saying is that if

22  they were given that report, which is much more detailed than a

23  summary, you would agree with me, correct?

24  A.    Um, this specifically goes --

25        MR. DURKIN:  I'm going move to strike.

1  BY MR. DURKIN:

2  Q.   Do you agree with me?

3            MR. ORESKOVICH:  No, wait, wait, just a --

4            MR. DURKIN:  Hold on.  Let me make my questions.

5            MR. ORESKOVICH:  Hold on --

6            MR. DURKIN:  I'm withdrawing the question anyway, I'm

7  going to rephrase the question.

8            MR. ORESKOVICH:  Okay.

9  BY MR. DURKIN:

02:59PM 10  Q.   You would agree with me that a summary is not a specific

11  detailed report, for instance, anything close to what Exhibit

12  Number 7 is that you prepared for discussion here today.

13  A.   It's not my belief that this is a summary, Mr. Durkin.

14  Q.   What does the title of the document say?  The Rule 16 --

15  A.   Statement of Grant Fredericks Video Analyst.

16  Q.   No, I'm talking about --

17  A.   I'm sorry.  I'm looking at the wrong document.  Excuse me.

18  Verbatim Report of Proceedings -- that's the wrong one.  Excuse

19  me.  Let me get to the right one here.

03:00PM 20            What exhibit are we talking about here?  Exhibit 2?

21            MR. ORESKOVICH:  Exhibit Number 2.

22            THE WITNESS:  Thank you.  United States Addendum to

23  Notice of Expert Witness and Summary of Opinions.

24  BY MR. DURKIN:

25  Q.   Okay.  So you agree with me that's a summary.

1  A.    Well, that's what it says it is.  I don't agree that's what

2  it is, but that's what it says it is.

3  Q.    Okay.

4        Do you know what Rule 16 provides?

5  A.    Um, I'm not very familiar with Rule 16, um, apart from it

6  being a disclosure document that I've normally referred to it or

7  heard it referred to as a "will say."

8        My understanding is this is a presentation of what you

9  expect my evidence to be and what my opinion is.

03:01PM 10  Q.    Okay.

11        If that was the case -- well let me back up.

12        You agree that it's described as a summary, correct?

13  A.    It says summary, yes.

14  Q.    Okay.

15        You would agree with me that it's not anything close

16  to the detail of the reports that you prepared.

17  A.    It provides detail about unrelated issues.

18  Q.    Okay.

19        You would agree with me that it doesn't provide the

03:01PM 20  detail of the testimony which was approximately an hour in front

21  Grand Jury that you provided, correct?

22  A.    Again it focuses on different issues.

23  Q.    Okay.

24        Are you saying that the summary focuses on different

25  issues or it just, some points focus on different issues within

1   those detailed reports?

2   A.    The reports do not deal with the issues in the Rule 16.

3   Q.    How about the Grand Jury testimony?

4   A.    It doesn't deal with the same issues specifically, not all

5   the same issues.  Some of them, they're referenced.  What's

6   different from providing inaccurate detail in a summary

7   document, about, um, another document that doesn't touch on

8   those issues and to say that it's the same thing.  It's not.

9   Q.    Okay.

03:02PM 10        Would you agree with me that if you were providing

11  testimony you would be providing testimony based on the detailed

12  report you provided as opposed to a summary?

13  A.    Um, I would be providing testimony, the foundation of which

14  would be my reports and my exhibits, but I would be providing

15  testimony on any questions put to me.

16  Q.    Okay.

17        And they would be certainly longer than the

18  approximately two pages provided in the summary; would you

19  agree?

03:02PM 20  A.    Mr. Durkin, absolutely.  If I provided testimony, I don't

21  think this would have been a problem.

22  Q.    Okay.  All right.

23        MR. ORESKOVICH:  You say "this," sir, are you

24  referring to the Rule 16?  What exhibit?

25        THE WITNESS:  Rule, I'm sorry, exhibit 2, Rule 16, had

1  I provided testimony, I would not be here today because I

2  wouldn't have the concerns that, I'm sure that this would have

3  been dealt with, these issues, any miscommunication, any

4  misinterpretation of my opinion, would have been excised from my

5  testimony.

6

7  BY MR. DURKIN:

8  Q.   Okay.

9         And you previously testified that a copy of this

03:03PM 10  summary was provided to you by my office, correct?

11  A.   Yes.

12  Q.   And approximately in September of 2009.

13  A.   Yes.

14  Q.   Okay.

15         And on page four, Mr. Fredericks, I'll direct your

16  attention to the last paragraph.  It says, "United States and

17  Mr. Fredericks reserve the right to supplement, modify, or

18  change his findings or opinions as more information becomes

19  available in this case and discovery progresses."  Are you

03:04PM 20  looking at exhibit 2, page four?

21  A.   Yeah.  Line four?

22  Q.   Yes.

23  A.   Yes.

24  Q.   Okay.  You read that.

25  A.   Yes.

1    Q.    Okay.

2          Now you previously provided testimony in response to

3    Mr. Oreskovich's questions that you felt that it was a constant

4    friction, if you will, between what you expected your testimony

5    to be or what you felt your opinions were, and what the theory

6    or the discussions that the United States Attorney's Office had

7    with you, specifically you were talking about me, correct?

8    A.    Yes.  Yes, sir.

9    Q.    Okay.

03:04PM 10          And you were given an opportunity to write a

11   supplemental report, correct?

12   A.    Yes.

13   Q.    That was requested from you.  Yes?

14   A.    Yes.

15   Q.    Okay.  And did I have any control over what you wrote in

16   that report?

17   A.    Yes, you did.

18   Q.    Okay.  Relative to what?

19   A.    You directed me to remove content, to eliminate content,

03:05PM 20   and to focus my report more specifically on Officer Thompson and

21   not on the other issues.

22   Q.    Okay.  Now, this was a supplemental report, correct?

23   A.    Correct, sir.

24   Q.    Okay.

25          And so in terms of your supplement, the issues that

1  you claimed I told you to remove, they were already in your

2  prior report, correct?

3  A.    That I claim?  That you did tell me to remove, yes.  They

4  were in the report.

5  Q.    They were in your prior report, correct?

6  A.    Correct.

7  Q.    Okay.

8  A.    Yes.

9  Q.    So if they're in a prior report, and I'm asking for a

03:05PM 10  supplemental report, why would they be re-included in the

11  supplemental report?

12  A.    I was just following your direction.

13  Q.    Okay.

14  A.    I don't know what the purpose of it was, except --

15  Q.    Okay.

16  A.    -- to, you explained it to me, was to allow another

17  expert --

18  Q.    Okay.

19  A.    -- a human factors person, to deal with issues of kicking,

03:05PM 20  um, and whatever other issues were in there.

21  Q.    And you agreed with that.

22  A.    I, I certainly understood the logic behind it.

23  Q.    Okay.  You agreed with it.  You agreed to do that.

24  A.    I agreed to do it, yes, at your direction, of course.

25  Q.    Okay.

1          And in fact, um, you were deferring to Doctor Richard

2    Gill, correct?

3    A.    Correct.

4    Q.    Who is an expert in human factors.

5    A.    It's my understanding.

6    Q.    Okay.  He's an expert in photogrammetrics.

7    A.    I don't know.

8    Q.    Okay.  You're not an expert in human factors, correct?

9    A.    I am not.

03:06PM 10    Q.    You you're not an expert in biomechanics.

11    A.    I am not.

12    Q.    You're not an expert in photogrammetrics.

13    A.    Um, part of it I am, yes.

14    Q.    Okay.

15    A.    But not -- photogrammetry has many different, um --

16    Q.    Disciplines across the board.

17    A.    Yes.  Yes.  So when you say, you're not an expert in

18    photogrammetry, that's incorrect.

19    Q.    Okay.

03:06PM 20          But you're not an expert or somebody whose been

21    trained and has a, as part of their engineering degree, in

22    photogrammetrics?

23    A.    Correct, I am not.

24    Q.    Okay.

25          Now, let's go back and talk about this, according to

1   you, it was the August 7th, August 3rd meeting, correct?  Where

2   we had all these significant discussions according to exhibit 1?

3   A.    I believe that was the date, yes.

4   Q.    Okay.  You had previously been requested to prepare stills

5   of each of the frames of the videotape, correct?

6   A.    Yes.

7   Q.    And when we met with you, "we" meaning Special Agent Lisa

8   Jangaard and I, we took your initial report and we compared it

9   to the video that we had at the time, the Open Eye proprietary

03:07PM 10  video, and we went through it and we pointed out to you

11  locations where the baton can be seen in the first minute and 13

12  seconds of Officer Thompson's engagement with Mr. Zehm, correct?

13          MR. ORESKOVICH:  Just a moment.  Before you answer

14  that question.  I want to lodge an objection.  To the extent of

15  counsel testifying as to what he did and asking questions about

16  it.  Go ahead and answer.

17  BY MR. DURKIN:

18  Q.    Go ahead, Mr. Fredericks.

19  A.    Um, we looked at the image at 18:26:15 and 18:26:16.

03:08PM 20  Q.    We also looked at images where you say is the first viewing

21  where you can see Officer Thompson deliver a baton strike that

22  appears to impact Mr. Zehm.  Two additional strikes that, in

23  front of the kiosk.

24  A.    Those are all in my report, yes.

25  Q.    Okay.  In your second report.  They're not in your first

1    report, are they?

2    A.    Yeah, they're in my first report.  Page nine.

3    Q.    Okay.

4          I'm going to hand you what's been marked as

5    government's exhibit number 2.  And there's an Observation

6    Summary.

7          (Handing document to counsel.)

8          MR. ORESKOVICH:  Thank you.

9    BY MR. DURKIN:

03:09PM 10   Q.    And in that Observation Summary, based on your review of

11   the videotape, Officer Thompson does not use his baton on Zehm

12   until approximately 1 minute 13 seconds after the engagement.

13   Is that correct?

14   A.    That's correct.

15   Q.    Okay.  That would be inaccurate, correct?

16   A.    As I said --

17   Q.    It's a simple question, Mr. Fredericks.  That would be an

18   inaccurate description.

19   A.    Please repeat your question.  So I understand it.

03:09PM 20   Q.    The Observation Summary saying that you did not observe the

21   videotape evidence of Officer Thompson using his baton during

22   his engagement with Mr. Zehm during the first minute and 13

23   seconds.

24   A.    It is, um, articulated on page nine that I believe --

25   Q.    That's not my question.

1    A.    -- I believe that the contact was made with the baton.  Um,

2    there are earlier images of a baton.  I didn't recall, and we

3    discussed this at the time, at 18:26:37 and 18:26:38, those,

4    there were two swinging motions that are not in my report, six

5    months after I completed my report, at the time I didn't recall

6    and don't recall to this day whether I observed those, noted

7    them, but they were not -- um, those, those images as I said,

8    um, don't show contact.  They show the baton in a swinging

9    motion.

03:10PM 10       So at the time I did not recall whether or not I saw

11   them six months later, they're not in my report, my report deals

12   with contact with the baton.

13   Q.    And it actually deals with use of the baton, doesn't it?

14   A.    It deals with the use leading up to it under, on camera

15   two.

16   Q.    Okay.

17        My question back to you again, sir, is, a description

18   that the baton was not used during Officer Thompson's engagement

19   with Mr. Zehm during the first minute -- you keep it, please --

03:11PM 20   13 seconds is an inaccurate description.

21   A.    I agree that it's inaccurate.

22   Q.    Okay.

23        And that's one of the things we talked about with you

24   in, when we met with you, isn't it?

25   A.    Absolutely.  And at the time I said I don't recall whether

1  I saw those or not and that I don't see contact.  And my goal

2  was to articulate contact.  So if use of the baton, um --

3  Q.   Wasn't your goal -- let me back up.

4  A.   Well --

5          MR. ORESKOVICH:  Just a moment.  Let him finish his

6  answer.

7          MR. DURKIN:  Well I'm going move to strike the

8  remainder of it.

9          MR. ORESKOVICH:  Well, let him finish it though,

03:12PM 10  please, so we have it in the record.

11          MR. DURKIN:  I'll move to strike.  Go ahead.

12          THE WITNESS:  If use of the baton means pulling it

13  out, holding it a certain way and moving around corners, then he

14  used it, you know, within the first few steps of him coming in.

15          If use of a baton means connecting with the baton,

16  then that didn't, my report is correct.

17          If use of the baton means possible, swinging or

18  possible swinging, then it's inaccurate.

19  BY MR. DURKIN:

03:13PM 20  Q.   Where is that, where is that distinction articulated in

21  your report?

22  A.   Which distinction?

23  Q.   The one you just described.

24  A.   Sir, no, I don't know what the distinction of use is

25  depending upon how you are using the word "use."

1  Q.    Well I'm asking you.  I mean you're saying he did not use

2  it.

3  A.    No, no.  I -- perhaps I'm not being clear enough and --

4  Q.    Well I think you are.

5  A.    -- I apologize.

6  Q.    I think you are.  I'm just saying -- well let's back up.

7  You've already acknowledged that it was inaccurate, correct?

8  A.    Depends on your use of the term "use."

9  Q.    Okay.

03:13PM 10  A.    He used the baton the minute he pulled it out of his duty

11  belt.

12  Q.    Okay.

13  A.    Then it would be incorrect, my assessment would be

14  incorrect, because the baton was in use as a preventative

15  weapon, it was in use as a visual force tool.  So that was yes,

16  use.

17        If use means contact, then my report is accurate.

18        MR. DURKIN:  Okay.  I'm going to move to strike, but

19  your answer stands.

03:14PM 20  BY MR. DURKIN:

21  Q.    Now, your testimony, according to your statement, according

22  to your Grand Jury testimony, is that indeed there was a baton

23  strike with likely impact to Mr. Zehm at 18:26:37.  Correct?

24  A.    No.

25  Q.    That's not your testimony?

1    A.    No.

2    Q.    That's not your prior testimony to Mr. Oreskovich a little

3    bit ago?

4    A.    I'm sorry, give me the time again.  I thought you said a

5    different time.

6    Q.    18:26:37.

7    A.    18, yes, 18:26:37 there is a motion of a baton that may

8    have been a strike, we don't, I can't say whether or not contact

9    was made.

03:14PM 10   Q.    Okay.  You --

11   A.    Immediately following that, 18:26:38, there's another

12   motion of the baton, appears to be a striking motion, I can't

13   say whether or not there was contact.

14   Q.    Okay.

15   A.    Thank you.

16   Q.    And I recall your earlier testimony as saying impact was

17   likely.

18   A.    Um, I would, um, I would agree with that.

19   Q.    Okay.

03:15PM 20   A.    Yes.

21   Q.    Okay.  And that wasn't contained in your first report

22   either, was it?

23   A.    No, because it wouldn't be my opinion that contact was

24   made, as opposed to my report on page nine, my opinion was

25   contact was made.

1    Q.    But that wasn't until the center aisle at 18:27, excuse me,

2    18:25.

3    A.    I think it was 18:27:29.

4    Q.    Okay.  If we're using the Zip Trip time.

5    A.    Yes.

6    Q.    Two minutes and three seconds difference, correct?

7    A.    Yes.  From my report, just to be clear, I was attempting to

8    use the standard time from the police dispatch.

9    Q.    Right.

03:15PM 10    A.    But it's easier to use the Zip Trip time.

11    Q.    Absolutely.

12            So my point is, once again, your prior testimony just

13    shortly, moments ago, that at 18:26:37 and 38 there was a baton

14    strike likely resulting in impact, that was not described in

15    your first report, was it?

16    A.    No, sir, see --

17    Q.    That's -- it's a simple yes or no question, Mr. Fredericks.

18    A.    The answer is no, because you are saying there was a baton

19    strike.  And I'm saying there's a baton swinging motion.

03:16PM 20    Q.    Okay.

21    A.    That's the difference and I hope we can appreciate --

22    Q.    Well and that's part of the problem I think here --

23            MR. ORESKOVICH:  Just, just a moment.

24            MR. DURKIN:  Hold on.  Let me ask a question.

25            MR. ORESKOVICH:  Hang on.  I think you got to allow

 1    him to finish his answer and then you can question, move to

 2    strike, do whatever you want.  But cutting him off, I'm going to

 3    object to as being inappropriate.

 4            MR. DURKIN:  I will move to strike.

 5    BY MR. DURKIN:

 6    Q.   I took down notes earlier, and you provided a couple of

 7    responses to Mr. Oreskovich.

 8            Baton strike, to you, was the equivalent of a baton

 9    swing.

03:17PM 10   A.   Our agreement --

11    Q.   No, no, I'm not talking about our agreement.  I'm talking

12    about baton strike as it was used.  That term.

13    A.   Where?

14    Q.   In your report, in your Grand Jury testimony, is the

15    swinging of a baton.

16    A.   Yeah.  Yes.  Because there's only one place that I would

17    say it is my opinion Officer Thompson connected with a strike to

18    the body with a baton.

19            So any other place we use baton strike we are

03:17PM 20   referring to a striking motion or a motion of the baton.

21    Swinging motion.

22            So there's one area where I will agree that strike

23    means contact.  And --

24    Q.   Maybe I'm wrong, I thought I heard you say that there were

25    three areas.  One on page nine of your first report, then the

1    other two 18:26:37 and 38.

2    A.    No, I said that's not my opinion, it's possible, but it's

3    not my opinion.

4    Q.    Okay.  You said it was likely, is that --

5    A.    In fact, I agree that it was likely.

6    Q.    Okay.

7    A.    But that is different from, it is my opinion there was.

8    Q.    Okay.  Well, let's, maybe we're --

9    A.    And this is after my concerns.  I'm not dealing with, in my

03:18PM 10   part 16, it doesn't deal, or the Rule 16, doesn't deal with all

11   of this.

12   Q.    I understand.  I'm not talking about your, specifically

13   your concerns, I'm talking about when we first met and the

14   inaccuracies in that first report that you had.  Do you

15   understand?

16   A.    Well I understand what your position is on that, yes.

17   Q.    Well it's not my position, that's what I'm questioning you

18   on, okay?

19          At the time that you met with Special Agent Jangaard

03:18PM 20   and myself, we also went through other areas and we asked you to

21   describe areas, for instance, where you determined Zehm had

22   kicked at Mr. Thompson.  And you agreed, as you testified here

23   today, you couldn't conclude that he kicked at Mr. Thompson.

24   A.    No, my report says he kicked upward toward Officer

25   Thompson.

1  Q.   Okay.

2        You also said that he had had his arm extended in a

3  punching manner.  And we asked you to take us through the stills

4  to show us where that had occurred.  Do you recall that?

5  A.   No.  Can you refresh my memory?  Whereabouts?

6  Q.   One moment, please.  Okay.  I'll come back to it.

7        Mr. Fredericks, would you agree that you clearly infer

8  in your first report that Mr. Thompson does not use his baton in

9  his struggle with Mr. Zehm for the first minute and 13 seconds?

03:20PM 10  A.   I agree.

11  Q.   And that's an inaccurate description.

12  A.   Um, I would agree if, if use means using the baton in a

13  swinging motion, then, yes, it is inaccurate.  It missed those

14  first two or didn't include those first two.

15  Q.   Okay.

16  A.   I'm sorry, the --

17  Q.   And the summary didn't include the second two either, did

18  it?

19  A.   I'm sorry?

03:20PM 20  Q.   The Summary Observation didn't include the second two

21  either, did it?

22  A.   No, no, no.  I'm talking about the first two being --

23  Q.   37 and 38?

24  A.   18:37, 18:38.

25  Q.   Okay.

1  A.    The summary did not include when I said that he did not use

2  his baton.  If use means in a swinging motion, it is not

3  included in my report.

4  Q.    Okay.

5  A.    If -- and therefore it would be inaccurate if you want to

6  infer that I meant any time he used his baton as a potential

7  weapon.

8  Q.    Okay.

9  A.    Apart from holding it overhead being a use of force weapon,

03:21PM 10  but not applying it.  So it's terminology, um, but those first

11  two motions that I can see on the video at 18:26:37 and 18:26:38

12  are not included in my initial report.

13  Q.    Okay.

14        If we peer reviewed that first report with someone,

15  would they be critical of the evaluation that you performed and

16  the assessment?

17        MR. ORESKOVICH:  Objection.  Hang on.  Objection to

18  the question as calling for speculation.  You may answer.

19        THE WITNESS:  I don't know.

03:22PM 20  BY MR. DURKIN:

21  Q.    You don't know?  Now, you've had an opportunity to review

22  the FBI 302 that Special Agent Jangaard prepared, correct?

23  A.    Exhibit 5?

24  Q.    Yes.

25  A.    Yes.

```
 1   Q.   Okay.  Is that accurate?

 2   A.   No.

 3   Q.   Okay.  What parts are not accurate?

 4   A.   I don't know what it means by, "Mr. Fredericks has not

 5   testified on behalf of a plaintiff in a criminal matter, a

 6   criminal proceedings."  I don't know what that means.

 7   Q.   Okay.

 8        Have you ever testified against a law enforcement

 9   officer before --

10   A.   Yes.

11   Q.   -- this case?

12   A.   Yes.  Um-hum.

13   Q.   In a criminal proceeding?

14   A.   Um, yeah, before this case, yes.

15   Q.   Okay.

16        Actually provided testimony at the time of trial

17   against a law enforcement officer.

18   A.   Yes.

19   Q.   Okay.  What case was that?

20   A.   Seattle case.

21   Q.   That was actually a trial?

22   A.   Yes, it was at trial.  It was a, um, a drug case where the

23   officer's credibility --

24   Q.   The one where Patterson, the Director of the Office of

25   Professional Accountability for the City of Seattle Police
```

1  Department prepared a report following the case and the

2  complaint?

3  A.    I don't know.  Patterson?

4  Q.    Do you recall meeting with the Director of the Office of

5  Professional Accountability for the Seattle Police Department?

6  A.    No.  I met with an investigator about two weeks ago from

7  Seattle, when I taught my class in Quantico, who was part of

8  that panel.  Who said he had fully agreed with me on that case.

9  Is that who you're referring to?  Is that, I don't think that's

03:24PM 10  Patterson though.

11  Q.    Okay.

12        Okay.  Was -- let me back up.

13        Did you take any notes from these meetings?

14  A.    No.

15  Q.    Okay.

16        And when you prepared your stills, as part of your

17  process do you prepare notes, observation notes on the material?

18  A.    If they're annotated into the stills, yes.

19  Q.    Okay.  And at the time you processed these stills, did you

03:24PM 20  make notes?

21  A.    On some of the exhibits that I provided, I provided

22  annotated observations.

23  Q.    Okay.

24        I'm talking about during the course.  I mean, I read a

25  number of, a number of things prepared by LEVA, proper

 1   acquisition of digital evidence.  Proper, um, best practices for

 2   establishing the securing and evaluation of digital evidence.

 3   A.   Best practice is for the acquisition, yes.

 4   Q.   Okay.

 5   A.   I didn't do any acquisition of video evidence in this case.

 6   Q.   Okay.  But it talks about how to handle the evidence, how

 7   to process it; and it also talks about when one is processing

 8   that evidence and the preparation of notes, correct?

 9   A.   Um, very likely, you know, we deal with, when you go to a

03:25PM 10   crime scene and you recover data, you got to take photographs

11   and notes, yes, that's what that document deals with.

12   Q.   Okay.

13        Anything -- what else in terms of that you take issue

14   with relative to Special Agent Jangaard's preparation of that

15   FBI 302 dated from the March 8th, 2007 meeting?

16        (Witness reviewed 302.)

17        (Witness reviewed exhibit 3.)

18   A.   The fourth paragraph.

19   Q.   Page one, two?

03:27PM 20   A.   Page two.  Fourth paragraph.

21        I provided an observation summary, again to your

22   observation that a summary is not a full detail, that states,

23   um, that the moment officer one attempted to arrest Zehm, Zehm

24   removed a 32 ounce soda bottle from the shelf and held it with

25   his right hand above his head as he backed away.

1        Um, and, and it's detailed in my reports as to the

2   exact circumstances and timing, and it's summarized here.  You

3   took issue with the specificity of the sentence.  And that's,

4   um, I think, just kind of mischaracterized a bit in here.  So --

5   Q.   So slightly mischaracterized?

6   A.   Yeah.

7   Q.   Okay.

8        So you're telling me that the summary isn't matching

9   up to the detail in the report, correct?

03:28PM 10   A.   A summary's a summary, yeah.

11   Q.   So, like mine, a Rule 16 summary is a summary and it

12   doesn't quite match up to the detail with your other opinions,

13   correct?

14   A.   The difference between your summary is that it's completely

15   inaccurate and fabricated.

16   Q.   Okay.

17   A.   This is a summary of fact.

18   Q.   Okay.

19   A.   That's the difference between a summary, Mr. Durkin, and a

03:28PM 20   report.

21   Q.   Okay.

22        And in terms of, you would agree with me that your own

23   summary was inaccurate back in September of 2006, the one that

24   was provided to the Spokane Police Department.

25   A.   No.

1    Q.    On page 17.

2    A.    No, it's a summary of details that are articulated in the

3    same document and referenced in that document.

4    Q.    Okay.

5          So you take issue with paragraph four on page two.

6    What else, if anything?

7    A.    Um, paragraph three.  Um, my report details that Mr. Zehm

8    looked north toward a police vehicle and, um, again an issue is

9    raised and I agreed to change my initial or my supplemental

03:30PM 10   report to say he looked north and the police vehicle was coming

11   from the north.

12   Q.    Okay.

13         The inference to be drawn that, from your prior

14   report, that Zehm looked and saw the vehicle.

15   A.    Well that wasn't my intent.  He looked north toward the

16   vehicle, um, it wasn't my intent to say that he, it wasn't my

17   opinion that he saw the vehicle.

18   Q.    Okay.

19   A.    Um, it's a --

03:30PM 20   Q.    So is paragraph three inaccurate or is it accurate?

21   A.    Um, just odd.  It's accurate.  It's odd.  And I -- and to,

22   to be specific --

23   Q.    Okay.

24   A.    -- I have no problem with saying, he looked north and the

25   police vehicle was in the north.  And I don't have a problem

 1   with that.

 2   Q.    Okay.

 3   A.    I just thought it was odd that it was a point in here.

 4   Q.    All right.  I'm looking for inaccuracies.

 5   A.    Okay.

 6   Q.    Material inaccuracies.

 7   A.    The next paragraph, five.

 8         My report says that Mr. Zehm was kicking up at the

 9   officer with both feet while he lay on the ground on his back.

03:31PM 10        And then it says, "When asked to show the specific

11   video frames depicting this activity, Fredericks was unable to

12   do that at the time of the interview."  And I just don't accept

13   that.

14   Q.    You don't accept that or you don't recall it?

15   A.    I don't accept it.

16   Q.    Why don't you accept it?

17   A.    It's in my report.  And the image of him of his feet in the

18   air are in my report.

19   Q.    Okay.

03:31PM 20   A.    On that very page where that sentence is.

21   Q.    But you described it earlier as kicking in the direction,

22   not at the officer.  And your report says kicking at the

23   officer.

24   A.    Let me look at it, please.  Okay.  Well, again, that's the

25   summary.

1  Q.   Okay.

2  A.   Okay.  That's --

3  Q.   Well, so let's talk about that then.

4       Because you said that the summary doesn't match up

5  with the detail, but the summary's misleading and inaccurate.

6       The report you prepared, you represented to the Court

7  in your statement was complete and thorough, this first report.

8       MR. ORESKOVICH:  I'm going to object to the nature of

9  that question as being --

03:32PM 10  BY MR. DURKIN:

11  Q.   Is that an accurate description?

12       MR. ORESKOVICH:  Wait a second, Mr. Durkin.  All

13  right.  Are you done with your question?

14       MR. DURKIN:  I am.

15       MR. ORESKOVICH:  All right.  Now let me state my

16  objection.

17       It's a compound question and mischaracterizes the

18  testimony.  You may answer.

19       MR. DURKIN:  Go --

03:32PM 20       THE WITNESS:  The source of the comment is page eight.

21  Where it says --

22       MR. DURKIN:  I'm going to move to strike.  That's not

23  my question.

24       THE WITNESS:  I didn't -- okay.  I -- would you please

25  repeat your question.

BY MR. DURKIN:

Q.   You represented to the judge in this case in your statement
and declaration, that you've said was accurate, that you did a
complete and thorough report for the Spokane Police Department
in September of 2006.  Right?

A.   Yes.  Yes.

Q.   And these reports are important, are they not?

A.   They are.

Q.   They're given to law enforcement officers as part of their
investigation, correct?

A.   That's correct.

Q.   And ultimately ends up in the hands of a prosecutor,
doesn't it?

A.   That's correct.

Q.   Okay.

     And so charging determinations, one way or the other,
turn upon the accuracy of the information contained in this
report, correct?

A.   Yes.

Q.   Including the summary.

A.   Yes.

Q.   Okay.  Okay.

     MR. DURKIN:  I think we are ready to change a tape.
We'll take a break.

     THE VIDEOGRAPHER:  This will conclude tape number 3.

 1    The time is now 3:33 p.m.

 2              (Break taken.)

 3              THE VIDEOGRAPHER:  This is the continued videotape

 4    deposition of Grant Fredericks and tape number four.  The date

 5    is March 2, 2012.  The time is now 3:42 p.m.

 6

 7    BY MR. DURKIN:

 8    Q.   Okay.  Mr. Fredericks we've been talking about the 302

 9    report that Special Agent Jangaard prepared.  We were talking

03:42PM 10    about paragraphs that you took issue with in terms of material

11    accuracy.  And we're on page two.

12              Anything further?  And let me confirm:  You've seen

13    this before, correct?

14    A.   Yes.

15    Q.   Yes?

16    A.   Yes.

17              (Witness reviewed document.)

18    Q.   Now you're on page three.  I know you were questioned

19    earlier by Mr. Oreskovich relative to that and you had indicated

03:43PM 20    that had been accurate.

21              MR. ORESKOVICH:  I'm going to object to that as being

22    an incorrect representation.  You may answer.

23              MR. DURKIN:  Or let me rephrase.

24    BY MR. DURKIN:

25    Q.   That you wouldn't take issue with the description provided

1    by Special Agent Jangaard.

2    A.    Please let me review it, so I can be --

3    Q.    Go ahead.

4    A.    -- be clear with the answer.

5              (Witness reviewed document.)

6              First sentence on the second paragraph I disagreed

7    with and continue to disagree with.

8    Q.    On page three?

9    A.    Yeah.  Yes.

03:44PM 10   Q.    That second paragraph?

11   A.    Yeah.  First sentence, second paragraph, yes.

12   Q.    Okay.  Anything else?

13   A.    I do not agree that they were consistent with a baton

14   strike.  I agree they were consistent with a swinging motion.

15   Q.    Well --

16   A.    They could be --

17   Q.    Okay.

18   A.    Not they, one image at, um, 18:26:14 could be consistent

19   with a swinging motion.

03:45PM 20   Q.    Okay.  And as we talked about before, swinging motion,

21   baton strike?

22   A.    No, I don't agree with that.  I believe that your intent

23   with the word baton strike is to indicate contact.  I disagree

24   with that.

25             If you, if you will accept that baton strike doesn't

 1   mean contact, then I'll be fine with that.

 2   Q.   Well that's what we've been operating under ever since we,

 3   you and I had that dialog about a half hour ago.

 4   A.   Well, I just, I don't think that the wording is intuitive

 5   that way.  I think it leads the reader to believe that there was

 6   contact.

 7         And certainly I did not agree that he was using it in

 8   a forward striking motion, because I could not see a baton.

 9   Q.   Was he backing up at the time when the, when you saw the

03:46PM 10   motions?

11   A.   Was who backing up?

12   Q.   Officer Thompson.

13   A.   Um, no.

14   Q.   Was he standing still when you saw the motion?

15   A.   No.

16   Q.   He was moving forward, correct?

17   A.   He was moving forward, correct.

18   Q.   So would that be consistent with a forward moving motion,

19   with baton motion?

03:46PM 20   A.   I don't believe that's what this means.

21   Q.   Okay.

22   A.   So I disagree with what I believe the meaning of this to

23   be.

24   Q.   You're interpreting, as written by Special Agent Jangaard,

25   that a strike meant impact; is that what you're saying?

1  A.    Yes.  A forward that is consistent with a baton in a

2  forward motion, in a forward striking motion on at least two

3  occasions --

4  Q.    Okay.

5  A.    -- prior.  I disagree with that.

6  Q.    You disagree with, just so I get this clear, you're

7  disagreeing with the description of forward striking motion

8  because you feel that describes an impact.

9  A.    Um, I believe that this is misleading.

03:47PM 10  Q.    Okay.

11  A.    And I tried to be clear that my testimony was only that a

12  baton could not be seen, but that the, that one motion at

13  18:26:14 could be consistent with a swinging motion.

14  Q.    Okay.

15  A.    Okay.  But not the subsequent images that we have here.

16  Q.    All right.

17  A.    And in fact I was very specific that there's no evidence of

18  motion with the baton because there's no motion blur.  He could

19  just as easily be holding the baton as he's moving forward.

03:48PM 20  Q.    Okay.

21  A.    So I disagree with that.

22  Q.    Okay.  Well let's talk a little bit about that.

23          18:26:15.  Where you see the baton, as you described

24  it, vertical above his, Officer Thompson's head and parallel to

25  the floor, correct?

1    A.    One moment, please.  No.  That's at 18:26:16.

2    Q.    Excuse me.  18:26:16:1?

3    A.    2.

4    Q.    Okay.

5          MR. ORESKOVICH:  Could I stop for one second.  You

6    just moved this on the screen, and for the Court's reference to

7    follow this, would you just tell us what page number of exhibits

8    that is.

9          THE WITNESS:  I understand the question --

03:49PM 10          MR. DURKIN:  It's 128.

11          MR. ORESKOVICH:  All right.  Fair enough.  Just get it

12    on the record.

13    BY MR. DURKIN:

14    Q.    Okay.  There's -- did you believe there was a question

15    before you?

16    A.    I thought Mr. Oreskovich asked a question, but you answered

17    it, thank you.

18    Q.    Okay.  All right.

19          Specifically, 18:26:16, we see a baton at a raised

03:49PM 20    level, correct?

21    A.    Parallel to the floor.

22    Q.    Parallel to the floor, above the head.

23    A.    Correct.

24    Q.    Okay.

25          And we don't see it in the previous still, do we?

1    A.    Correct.

2    Q.    We see Officer Thompson in the previous still moving

3    forward, correct?  Continued motion from the prior stills.

4    A.    Yes.

5    Q.    Correct?

6    A.    Correct.

7    Q.    And then we see Officer Thompson move forward again from

8    that still, 18:26:16, forward, correct?

9    A.    Um, I would, yes, he disappears from view.  Moving forward.

03:49PM 10    Q.    Okay.  So does the baton.

11   A.    The baton is not in view.

12   Q.    Okay.  So it disappears from view.

13   A.    Disappears from view.

14   Q.    Okay.  All right.

15         And in all of this discussion, this discussion that we

16   have had today and this issue with the description of your

17   opinion and everything else, that's relative to what's captured

18   on the video, correct?

19   A.    Correct.

03:50PM 20    Q.    Okay.

21         It doesn't talk about the other evidence that is out

22   there, right?  For instance, witnesses?

23   A.    Absolutely.

24   Q.    Officer Thompson's own statement.

25   A.    Correct.

1   Q.   Okay.

2   A.   Yes.

3   Q.   And those would be evidence likewise, correct?

4   A.   Correct.

5   Q.   Okay.

6        And so if there was a statement by Officer Thompson

7   that he came in and engaged Mr. Zehm and that at approximately

8   18:26:14 he delivered his first baton strike, that motion that

9   you described would be consistent with that, with his own

03:50PM 10  description, correct?

11       MR. ORESKOVICH:  Objection, for a moment.  Let me just

12  state, I object to the nature of the question, the

13  characteristics of Thompson's statement, and the affect of.  It

14  you may answer.

15  BY MR. DURKIN:

16  Q.   Go ahead.

17  A.   We agreed --

18  Q.   No, no, no.  That's not my question.

19  A.   I believe it is your question.

03:51PM 20  Q.   Please read back the question.  Please read back the

21  question for me.  It's a simple yes or no question.

22            (Last question read back.)

23       MR. ORESKOVICH:  Same objection for the record.  Go

24  ahead.

25       THE WITNESS:  If Officer Thompson said he, he struck

1    with the baton at that time, the image at 18:26:14 would be

2    consistent with that, yes.

3    BY MR. DURKIN:

4    Q.    Okay.

5          And so all of this dialog we had about exculpatory

6    evidence, what you're describing then would not be exculpatory,

7    your concerns would not be exculpatory, would they, because they

8    have been confirmed by Officer Thompson himself.

9    A.    You know, my point is that's Officer Thompson's evidence

03:52PM 10   and it's not my evidence.  And you purported that to be my

11   evidence and that's what I'm trying to clear up.

12   Q.    Okay.

13         You would agree with me, because you have an

14   understanding of <u>Brady</u> evidence, correct?

15   A.    Correct, yes.

16   Q.    And that's exculpatory evidence, correct?

17   A.    Correct.

18   Q.    And then when in comparison with your concerns about the

19   officer's own statement and those concerns, because of the

03:52PM 20   officer's own statement, match up to the description provided in

21   the summary of the initial, or better yet your Grand Jury

22   testimony, occurring, a baton strike occurring at 18:26:14, that

23   would not be exculpatory evidence, would it?

24         MR. ORESKOVICH:  Objection to the nature of the

25   question as being compound, mischaracterization.

BY MR. DURKIN:

Q.    Answer the question then.

A.    You know, it is compound.  Could you please break it up for me.

Q.    Sure.  Okay.

      18:26:14.  You said there's movement consistent with a baton strike.

A.    I agree with that.

Q.    Okay.  And if the officer came in and said, hey, at 18:26:14 approximately I delivered my first baton strike.  That would be consistent, wouldn't it?

A.    Yes, sir.

Q.    That would not be exculpatory, would it?

A.    Correct.

Q.    Okay.

      18:26:16.  Officer says, I delivered a second baton strike before Mr. Zehm went to the floor.

A.    Um-hum.

Q.    And the forward motion, baton in hand, would be consistent with the officer's description that he delivered a second baton strike to Mr. Zehm, correct?

      MR. ORESKOVICH:  Same -- wait, just a moment.  Objection to the hypothetical.

      THE WITNESS:  It's not my evidence that that's a forward motion baton strike.  My evidence is that that's a

 1  baton.

 2  BY MR. DURKIN:

 3  Q.    That's a baton and the officer's moving forward.

 4  A.    Correct.

 5  Q.    Okay.

 6         And if the officer said, Yup, I used my baton, I

 7  delivered a second baton strike, that would be consistent with a

 8  baton strike.

 9         MR. ORESKOVICH:  Same objection.

03:53PM 10         THE WITNESS:  Yes.

11  BY MR. DURKIN:

12  Q.    And it would not be exculpatory, would it?

13  A.    I don't believe so.

14  Q.    Okay.  All right.

15         Going back to the 302, if we can quickly get through

16  that.  Anything else on page three?

17  A.    (Witness reviewed document.)

18  Q.    And I'm talking about material inaccuracies here.

19  A.    Well I just -- the end of paragraph three, you know, I

03:55PM 20  would not accept.  Um, the material inaccuracies, let me

21  continue here.

22  Q.    Okay.

23  A.    (Witness reviewed document.)

24  Q.    You dispute that you agreed back in March of 2007 that

25  those images showed a forward striking motion.

1   A.    Yes.  Yes.  I disagree with that.

2   Q.    You disagree that it shows that or you're disagreeing with

3   the description?

4   A.    I'm disagreeing with it saying that it now shows that it's

5   a forward motion.  Consistent -- I would agree the images are

6   consistent with baton motion.

7   Q.    Okay.  Forward baton motion.

8   A.    But -- no.  Baton in motion.  We only have a single image,

9   I don't know if it's going backwards or forwards and that was my

03:55PM 10  point.

11  Q.    Okay.

12  A.    The fact that the officer is moving in one direction isn't

13  the same thing.

14  Q.    Okay.

15  A.    And the rest is fine.

16  Q.    And the rest is fine?

17  A.    Yes, sir.

18  Q.    Okay.  All right.  All right.

19          In your statement that you've adopted now under oath,

03:56PM 20  you indicate, on pages one and two, with the description of the

21  SPD radio dispatch in terms of occurring either before

22  Thompson's first baton motion or between Thompson's first and

23  second baton motion.  Is that right?

24  A.    I didn't hear all of the question.

25  Q.    Okay.  Let me back up.  I think we can cut to the chase on

1    this one.

2    A.    Thank you.

3    Q.    You prepared a composite exhibit which provided the actual

4    time of the dispatch radio's broadcast, correct?

5    A.    Yes, sir.

6    Q.    And you had previously testified it started approximately

7    18:26:12 and finished approximately 18:26:16, correct?

8    A.    Yes.

9    Q.    Okay.  And the description of the summary is that the

03:57PM 10    second baton strike occurred after that broadcast began,

11    correct?

12    A.    That's what the, what it says, yes.

13    Q.    Okay.

14    A.    Yeah.

15    Q.    All right.  And that's accurate, isn't it.  The second

16    baton strike occurred after that broadcast began.

17    A.    That's not my evidence.  I don't see a second baton strike.

18    That's my point.

19    Q.    Okay.

03:57PM 20          So from what you're saying is that the 18:26:16, even

21    though it's a baton raised, is not consistent -- well let me

22    back up.

23          You're saying it's consistent with a baton strike,

24    you're just saying that the video doesn't show it actually as a

25    baton strike.

1    A.    The part 16 says, a second strike, a second time with

2    another overhand, up and down baton strike.   That's not my

3    evidence.   My evidence is that that baton is simply in the air.

4    Q.    Okay.

5    A.    So --

6    Q.    Well let's take you to your Grand Jury testimony.   Okay.

7    Do you have that in front of you?

8    A.    Yes.

9    Q.    Okay.   Let's go to page 26, lines 17 through 20.   Starting

03:58PM 10   with the question --

11   A.    I'm sorry, page?

12   Q.    Page 26.

13   A.    Yes.

14   Q.    Lines 17 through 20.   Starting with the question, "When the

15   operator, Miss Jensen" and you know who that is, right?   The

16   dispatcher?

17   A.    I understand that, yes.

18   Q.    "Indicated that the subjects were not uncertain as to the

19   taking of the money, that occurred on the time stamp, the

03:59PM 20   completion of that communication was approximately when?"

21         And you testified here today that it was 18:24 -- or

22   26, because we're doing the two minute, two, three second thing.

23   A.    Yes.   And I'm using the time from dispatch, not the time

24   that we've been referring to, yes.

25   Q.    Okay.

1          But the time we've been referring to is 18:26:16,

2     which she started talking at 12 and finished approximately at

3     16.

4     A.    Yes.

5     Q.    Okay.

6     A.    And -- yes.

7     Q.    All right.

8          And then you also testified as to when it concluded,

9     which you've already done today, correct?

03:59PM 10    A.    Yes, sir.

11    Q.    Okay.

12         All right.  And then I asked you further on, Grand

13    Jury, page 27, lines six through eight.  "And just so we're

14    clear, you testified that the above dispatch concluded

15    approximately 18:26:17, but or 16, correct?"

16    A.    16, yes.

17    Q.    Okay.

18    A.    16.

19    Q.    Okay.  And then going now to page 30, lines two through

04:00PM 20    three, you give the starting time, correct?

21    A.    Yes.

22    Q.    18:26:12.  All right.

23         Continuing on there, I'm looking now to page 30,

24    bottom portion of, I believe the section where it starts, where

25    the question is, we talk about, okay, and then the answer is, if

1  you would, please --

2              MR. ORESKOVICH:  Is there a page, please?

3              MR. DURKIN:  Yeah, page 30.

4              MR. ORESKOVICH:  And line, please.

5              MR. DURKIN:  4 through 22.  Let me grab it.

6              MR. ORESKOVICH:  Thank you.

7  BY MR. DURKIN:

8  Q.    Do you see that, starting at line 12?

9  A.    Yes.

04:01PM 10  Q.    Okay.  Can you read that for me?

11  A.    I'm sorry, line 24?

12  Q.    Page 30, line 12, beginning with the sentence -- well let's

13  go ahead and start with line nine.  Your answer.

14  A.    "And I'm moving forward again and the officer is moving

15  toward Mr. Zehm.  Mr. Zehm is now backing up into another aisle.

16  And the officer is moving forward.  Let's back up for a second.

17  As he moves forward we can't see his arm at this point.  We can

18  see his height.  Go to the next image and the officer is in a

19  downward motion, so he has changed height from one position to

04:02PM 20  another position.  And if we just look to the front of his head

21  there is a dark line.  I'll back it up there for a moment.  The

22  line goes away.  When we, um, come in here there is a dark

23  object that is -- something there is causing a line to occur, so

24  there's -- it's consistent with a baton.  We don't have enough

25  resolution to see it, but it's inside the building and it was

 1    consistent with a baton, um, on that side."

 2    Q.    And that's at approximately 18:26:14, correct?

 3          MR. ORESKOVICH:  I would object to that comment.  The

 4    record speaks for itself as to the timing.

 5    BY MR. DURKIN:

 6    Q.    Well it says 18:26:13, when he was moving forward.

 7    A.    No.  It's, I'm referring to 18:26:15.  The image at, of

 8    slide 123 on exhibit 7 is what I'm referring to.  I'm describing

 9    in my report I'm going backwards and forwards and I've described

04:03PM 10    this, this is after the officer has done the downward position.

11    Q.    Okay.

12          Let's continue on at page 31 then.  And I would ask

13    you there, when you're talking about how the officer's now lower

14    in the image, correct, which would be consistent with the images

15    beginning at 18:26:13 and 14, correct?

16          MR. ORESKOVICH:  Just a moment.  Just so I can catch

17    up with you, I'm asking where, please, line?

18          MR. DURKIN:  I'm starting at the top of page 31.

19          THE WITNESS:  Yes, and I'm going backwards in the

04:03PM 20    image, back and forwards, during the Grand Jury.  And I'm

21    referring to the image --

22    BY MR. DURKIN:

23    Q.    Right.

24    A.    -- at 18:26:14, which is depicted at slide 122.

25    Q.    Okay.

1    And then you were questioned.  "Mr. Fredericks, as a

2  trained officer and having experience in law enforcement have

3  you had the occasion to receive instruction on the use of a

4  baton?"  And your answer?

5  A.    "Yes."

6  Q.    "And have you had occasion to use your baton during law

7  enforcement career?"  Answer?

8  A.    "Yes."

9  Q.    "And is the movement that we're seeing here, as you

04:04PM 10  described, as you have described, is that consistent with the

11  movement of a forward overhand baton strike?"

12  A.    "It is."

13  Q.    Okay.

14    And that is inconsistent with the declaration you

15  provided to the Court, isn't it?

16  A.    No, this is the whole point of why we are here.  Is because

17  you and I had agreed that the term was going to be consistent

18  with, with a baton, with a swinging motion, not a baton, a

19  swinging motion.

04:04PM 20    And you've again asserted the word "overhand strike"

21  and the other consistencies were not brought up.

22    So I believe that this led to a misrepresentation,

23  perhaps, but certainly in the part in the Rule 16 it's

24  misrepresented.

25    We had agreed it was consistent with a swinging

1  motion.  And that's what I was agreeing to, to the Grand Jury.

2  Q.    But you were under oath, right?

3  A.    Absolutely, yes.

4  Q.    Provided accurate testimony.

5  A.    Yes.

6  Q.    Okay.  And you described it as forward motion baton strike,

7  correct?

8  A.    As long as baton strike doesn't mean contact, yes.

9  Q.    Okay.

04:05PM 10  A.    That's what we had agreed.  Did not agree to that being

11  interpreted into this document.

12  Q.    Okay.

13        And you're aware that the Grand Jury testimony was

14  provided to the defense as well?

15  A.    I have no knowledge of that.

16  Q.    Okay.  Would that further alleviate your concerns?

17        MR. ORESKOVICH:  Objection to the relevancy of that.

18        MR. DURKIN:  I think it goes -- go ahead.

19        THE WITNESS:  No, it doesn't alleviate my concern.

04:06PM 20  BY MR. DURKIN:

21  Q.    Okay.

22        Does the fact that Officer Thompson testified

23  consistent with the description provided, does that alleviate

24  your concern?

25        MR. ORESKOVICH:  I'm going to object to that

 1    hypothetical and characterization.

 2              THE WITNESS:  I don't know.

 3    BY MR. DURKIN:

 4    Q.    You don't know?

 5    A.    No.

 6    Q.    Okay.

 7    A.    I don't know what he testified to.

 8    Q.    Okay.  Well, he gave a statement as well, correct?

 9    A.    Um --

04:06PM 10   Q.    You're aware that he gave a statement describing his force

11    incident engagement with Mr. Zehm?

12    A.    I'm aware that he provided a statement at some point.  I

13    don't know what he was referring to, I don't know what he was

14    looking at at the time.  I don't know if he was relying on the

15    Rule 16 document --

16    Q.    Okay.

17    A.    -- to say this is what your expert will say.  I have no

18    idea what --

19    Q.    I'm talking about Officer Thompson.

04:07PM 20   A.    Yes.

21    Q.    Okay.

22              Continuing on from that on page 31 of your Grand Jury

23    testimony.  It says in the next sentence, continuing on.  "And

24    Mr. Zehm backs away."  Correct?

25    A.    Yes.

1   Q.   And then we talk about the line, the elevated line or

2   excuse me, the line at the 45-degree angle, correct?

3   A.   Um, at some point we do, yes.

4   Q.   Well, it's right there in that next paragraph, paragraph

5   21.

6   A.   Yes.

7   Q.   And that's the baton at 18:26:15, isn't it?

8   A.   It is.

9   Q.   Okay.  And so the prior testimony, does that refresh your

04:08PM 10   recollection, was about 18:26:13, 18:26:14?

11   A.   No, no, no, no.  If you look at this, I say, "Let me go

12   back a moment, let me go forward a second, and I'm going to --"

13   and then I -- if you recall -- I hit a button and my system sort

14   of shut down a little bit and I had to get back to where I was.

15         So we're back to, um, the downward motion and then we

16   move forward from that downward motion back to 18:26:15.

17   There's only one image where the baton is on a 45-degree angle.

18   Q.   You're right, there is.  And the first time we talk about

19   it is on page 31.  And we're talking about sequential

04:09PM 20   observations of the JPEGS, of the stills.

21   A.   Not sequential, I'm going backwards and forwards.  And I

22   even say to you to let me re-orient myself.

23   Q.   And don't you say, line 15, "And Mr. Zehm backs away and

24   I'm just going to go forward a second."

25   A.   Yes.

1    Q.   "And I'm going to -- whoops, sorry.  Now I'm going forward.

2    We can see the back of Mr. Zehm's head."  Correct?

3    A.   Yes.  And then --

4    Q.   And then, "I just want to orient myself."  And I go,

5    "Sure."

6         And then the next question is, "Yeah."  And your

7    answer to the next line, 21 through 25, actually through the

8    next page at line six, is that now we see the 45-degree angle.

9    And I'll go forward again.  And there's an object in the front

04:09PM 10   of Mr. Zehm.  This is his shoulder.  And then you describe the

11   soda bottle.

12   A.   I'm referring to the same.  I'm referring to -- I've gone

13   back, we have -- I've hit a but button, we have gone way off

14   course, I'm going backwards and forwards, we finally go back

15   into it, and I'm, we're referring to 18:26:15.  This is the only

16   image of the baton after 18:26:10 that I mention in any reports.

17   Q.   Okay.

18        Then why are we talking about 18:26:12 right before

19   that and then you describe -- and let's go back to the page at

04:10PM 20   the top of page 30.  Where we talk about 18:26:12, 18:26:13, and

21   then we get into the discussion about the movement consistent

22   with the baton.

23   A.   Correct.  Yes.

24   Q.   And then we go, after that, we move on, and then we talk

25   about 18:26:15 where there's a 45-degree angle.

 1          There's no discussion, would you agree with me, Mr.

 2    Fredericks, there's no discussion about a 45-degree angle in the

 3    dialog between your sworn testimony on page 30, starting at line

 4    12 through 22.

 5    A.    You know, I'm sorry, I don't follow you.  I think that, I

 6    thought --

 7    Q.    I did, I spoke way too fast on that one.  Let me rephrase

 8    it.

 9    A.    I thought that we had agreed, and I certainly agree, that

04:11PM 10    the image where Mr., Officer Thompson is at the post, where he's

 11    on the left-hand side of the post.  And I'm at a, I'm at that

 12    image right now, 18:26:14, slide 105.

 13          It's at that moment to the next image where there is

 14    that downward motion.  I do not see a baton, I didn't talk about

 15    a baton, I've never produced a baton image at that time.  The

 16    only baton is after that at 18:26:15.

 17          And we, and I say in the transcript, let me go back,

 18    let me go forward, let me go back.  Then I take us back and then

 19    I hit a wrong button, we get back to that point.

04:11PM 20    Q.    I'm going to direct your attention to the middle of page

 21    31.  You've already gone back and forth.

 22    A.    Yes.

 23    Q.    And we talked about how you're a trained officer and have

 24    been trained in the use of a baton.

 25          And then we talk about, right after the description

1   you previously provided, saying it was consistent with a baton

2   strike where you saw this image, you say, once again, "Question:

3   Is this movement consistent with the movement of a forward

4   overhand baton strike?"  And your answer is, "It is."  And

5   that's at 18:26:14.

6          MR. ORESKOVICH:  Well I would object to this as being,

7   one, asked and answered.  Second, argumentative.  And third, the

8   transcript speaks for itself.

9   BY MR. DURKIN:

04:12PM 10  Q.   Mr. Fredericks, please answer the question.

11  A.   Yes, and I agreed and we talked about it many times, I

12  absolutely agree that we agreed that I would say, yes, it is

13  consistent with a swinging motion.  And if you mean baton strike

14  not to suggest contact, yes, I agree with it, it could be

15  consistent with that.

16  Q.   Okay.

17  A.   And I hold firm to that, so it's consistent.

18  Q.   Okay.

19          And you would agree with me that that baton strike

04:13PM 20  occurs before dispatch concludes its broadcast, right?

21  A.   Before -- that baton swinging motion occurs during the

22  broadcast, yes.

23  Q.   Okay.  All right.

24          So it was after the broadcast began, didn't it?

25  That's the first baton strike.

1            MR. ORESKOVICH:  Objection.

2    BY MR. DURKIN:

3    Q.   That first motion is consistent --

4            MR. ORESKOVICH:  Argumentative.

5    BY MR. DURKIN:

6    Q.   Go ahead.  Answer, please.

7    A.   The first motion we've been discussing is in my report

8    articulated in an exact image, that is occurring during the

9    broadcast.

04:13PM 10    Q.   And the --

11    A.   Not before the broadcast.  Which is what this part 16

12    states.

13    Q.   The broadcast starts at 18:26:12.

14    A.   Correct.

15    Q.   The motion consistent with the baton strike's 18:26:14.

16    A.   Correct.

17    Q.   Okay.  And the broadcast is terminated at 18:26:16.

18    A.   Correct.

19    Q.   And approximately the same time we see the second baton

04:14PM 20    image in an elevated position above Officer Thompson's head as

21    he's moving in a forward direction.

22    A.   Correct.

23    Q.   Now you've done work for the Spokane Police Department

24    previously.

25    A.   No.

1    Q.    You have never done any prior training for them?

2    A.    Um, in, I think I was a police officer, um, and I came down

3    to Spokane and did a forensic video presentation, wasn't paid.

4    That was many years ago.

5    Q.    Okay.

6    A.    And if, and two Spokane police people had come to a course

7    that I taught, I think in Quantico.  And I don't recall doing

8    any of the work, doing any work for the Spokane Police

9    Department where they paid me, except for this case.  Certainly

04:16PM 10   no forensic work.

11   Q.    Okay.  Well, yeah, I mean, you've done other, as you

12   described, other work.

13   A.    No.  No, no, I, I was invited to the training academy to do

14   a presentation many, many years ago.

15   Q.    Okay.

16   A.    Um, by Mike Lavelle.  And it was a courtesy thing.  I flew

17   in, flew out.  I wasn't living in town, I was living in Canada.

18   Q.    Okay.

19   A.    And I've done hundreds of those around the country.

04:16PM 20          And then, as I said, two of their people came to a

21   course I taught in Quantico.

22          And if you present another case that I've done, I have

23   no recollection of it, but you can show me.

24   Q.    All right.

25          I'm going hand you what's been marked as Exhibit

1   Number 6.1.

2   A.    Um-hum.

3   Q.    Recognize that?

4   A.    Yes.

5   Q.    E-mail from John McGregor.

6   A.    Yes.

7   Q.    To you, Grant Fredericks.

8   A.    Yes.

9   Q.    Dated July 19th?

04:17PM 10  A.    Yes.

11   Q.    Prior to meeting with Jack Driscoll on July 22nd, 2006?

12   A.    Yes.

13   Q.    I want you to read that or have you read that before in

14   preparation for your testimony here today?

15   A.    No, I haven't read it before -- I'm familiar with this

16   e-mail and this is what I, um, described earlier.

17   Q.    Okay.

18   A.    (Witness reviewed document.)

19   Q.    And it says that, "The City's going to take you up on your

04:17PM 20  offer you made to me last week about analyzing the Zip Trip

21   video."

22   A.    Yeah.

23   Q.    That's inconsistent with the way you described it earlier,

24   isn't it?

25   A.    What I described earlier was that I got a call from the

1    media and I called John McGregor about it.

2    Q.    And then you got a call from Jack Driscoll.

3    A.    And I offered to assist John.  And I got no response from

4    John.

5          Then Jack Driscoll contacted me and I believe that was

6    before this.  So I believe that that's exactly what I described.

7    Q.    Okay.  Let me back up.

8          You said you're familiar with this e-mail.  That means

9    you reviewed it recently?

04:18PM 10   A.    No, no.  I recall, um, I recall this e-mail.

11   Q.    Okay.  And the next one, please, 6.2.  Are you familiar

12   with that e-mail?

13   A.    Yes, I believe I gave you all these.  I think this is in

14   the package that I provided to you.  But, yes, I am familiar

15   with this.

16   Q.    Okay.

17   A.    And this is contained in all the documentation that is in

18   those, in the files, and I provided this to you I think on our

19   second or third meeting.

04:19PM 20   Q.    Okay.

21          And then exhibit 6.3.  Recognize those e-mails?  Let

22   me get a date on the first one so we got a good reference in the

23   record, please.

24          6.2 is reflecting that Chief Odenthal is your contact

25   person for the retainer information, correct?

1    A.    Eventually he was one of the contacts, yes.

2    Q.    Okay.

3    A.    I never met him and I don't, I think I might have had a

4    couple of contacts, e-mail contacts with him.

5    Q.    Okay.

6          Mr. Fredericks, I think this will go quicker if you

7    just answer the questions that you can yes or no.  We have got a

8    time constraint and I'm trying to make this all along --

9    A.    I'm doing my best.

04:19PM 10   Q.    -- and I know you want to give all kinds of background

11   information, but to the extent that you can answer yes or no it

12   might expedite things.

13   A.    I'll do my best.

14         MR. ORESKOVICH:  I would object to the narrative.

15         MR. DURKIN:  And I'm going to move to strike the last

16   answer.

17         MR. ORESKOVICH:  I object to the narrative by counsel.

18   BY MR. DURKIN:

19   Q.    July 26, 2006, 6.3, you recognize that?

04:20PM 20   A.    Yes.

21   Q.    Okay.  And then next one, 6.4, it's a July 25th, 2006

22   e-mail from Mr. McGregor to you, correct?

23   A.    Yes.

24   Q.    Okay.

25         And the next one, please, 6.5.  It's an e-mail from

1    you to Terry Ferguson, July 25th, 2006, correct?  Looks like it

2    incorporates some of the other e-mails.

3    A.    And let me go back.  You've asked me to adopt 6.4, which

4    contains e-mails that I haven't seen before that I wasn't copied

5    on, so I am really referring to just those that I wrote.  Is

6    that fair?

7    Q.    Well, do you recall getting the other e-mails?

8    A.    No.

9    Q.    You don't recall these e-mails being part of what you

04:21PM 10   received?

11   A.    No.

12   Q.    For instance, going to page two you're at the bottom of a

13   string of e-mails that CC'd you in on it.

14   A.    Yeah, I don't recall that.

15   Q.    And it appears that was forwarded to you by Mr. McGregor on

16   page one.

17   A.    Certainly could have been, I just don't recall it.

18   Q.    Okay.

19   A.    Okay.  And I, I don't know if it was a copy and paste or

04:21PM 20   whether I was included in that or not, it certainly wasn't --

21   I'm not included, um, in the link to it, but I might have seen

22   it.

23   Q.    Okay.

24         Let's go to 6.5.  Recognize that?

25   A.    Yes.

1   Q.   Okay.

2        And then 6.6.  Take a moment to read that.

3   A.   I don't think I ever saw this.

4   Q.   Okay.

5        Is that consistent with your recollection of what

6   occurred in terms of the handling of your retainer and your

7   contact with Mr. Trepeddi?

8   A.   No.

9   Q.   It's not consistent?

04:23PM 10  A.   Well I -- I have no, um, knowledge of what's contained in

11  there.  I was bounced back and forth between at least three

12  different sources of payment and I don't know when that

13  occurred.

14  Q.   Okay.

15       As I recall you provided the SPD with an estimate of

16  your fee of $5,000; is that correct?

17  A.   Yes.  Based on my experience in dealing with this size of

18  case.

19  Q.   All right.

04:23PM 20       And your actual fee was much more than that, wasn't

21  it?

22  A.   To the City?

23  Q.   Yes.

24  A.   Um, after I met with you, which was an add on, it was about

25  5600.  Much more than that?  I don't --

1  Q.    Okay.

2  A.    $600.

3  Q.    Do you recall meeting with Special Agent Jangaard and I and

4  explaining that you had not been paid for an additional amount

5  that remained, that was in excess of the $5,000 of services you

6  had provided?

7  A.    Oh, um, do you have a, do you have a copy of the bills?

8  Which one are you talking to, talking about?

9  Q.    I'm asking if you have a recollection of that conversation.

04:24PM 10  A.    My recollection was it was the $5,000 invoice, the initial

11  one.

12  Q.    Okay.

13        The first time that we met do you have a recollection

14  of informing Agent Jangaard and myself that you actually

15  provided services in excess of the $5,000 that you were paid?

16  A.    Oh.  That I didn't bill for.  Because there was a little

17  bit more work, I had given them a quote, there was a bit more

18  work involved, I just didn't charge for it.  I think -- is that

19  what you're referring to?

04:24PM 20  Q.    That's part of what I'm referring to, yes.

21  A.    Yeah, I made a quote, I put more time into it than I

22  expected, and I just didn't bill them for it.

23  Q.    Okay.

24        Now as a forensic video analyst, would it be

25  appropriate for you at any time to be considering the liability

1  aspects of a matter while you were performing your purported

2  objective evaluation of the digital evidence?

3  A.   I don't understand your question.  My liability?

4  Q.   No, I'm talking about the person whose -- let me back up.

5        Are there any ethical standards for forensic analysts?

6  A.   Well, we have an ethics document, um, and, yes.

7  Q.   Okay.  Could you provide that to your counsel and provide

8  that to me, please.

9  A.   Sure.  You can download it from the LEVA web site, but I

04:25PM 10  can go look for it for you and download it.

11  Q.   I actually tried to download it and couldn't get to it.

12  A.   Okay.  Well, I'll try to find it.

13  Q.   Okay.

14        And does the ethical standards identify a requirement

15  that you remain scientifically objective?

16  A.   Yes.

17  Q.   Okay.

18        So it would be inappropriate at any time for a

19  forensic analyst to be discussing liability issues relative to a

04:26PM 20  project that they're working on during the course of a criminal

21  investigation.  By liability, I'm talking about civil liability.

22  A.   Oh, um, I don't think so necessarily, depending upon what

23  the conversation was.

24  Q.   Okay.

25  A.   And --

1   Q.   Would you --

2   A.   -- I don't believe that that ever occurred in this case,

3   but if somebody were to say to me, we're concerned about

4   exposure and liability, that wouldn't be my concern and it

5   wouldn't impact my work.

6   Q.   Okay.

7        Do you recall whether or not you offered an opinion on

8   liability in this case?

9   A.   No, that's not my area of expertise.

04:26PM 10   Q.   Okay.  Now, you've made Brady allegations, participated in

11   Brady allegations before, haven't you?

12   A.   Not that I recall.

13   Q.   Do you recall making an allegation that evidence was

14   submitted that was inaccurate as part of a motion for a new

15   trial?  Video evidence?

16   A.   You know, I -- I do, um, so many cases and sometimes I come

17   in after the fact, um, and I'm asked to look at issues.  And

18   often the issues are going to be, was the evidence altered or

19   changed.  I mean that really is a very common question.  And

04:27PM 20   that might be Brady, it's never anything I ever deal with.

21   Q.   You've never participated in, on seeking a new trial

22   relative to Brady allegations of tampered evidence?

23   A.   Not where I've been involved.  I mean, I might have been an

24   expert looking at video and making observations that the video

25   has been altered and changed.

1          I've testified in a case, um, it wasn't __Brady__, I think

2     it was pure fabrication of video by an analyst.  If we're

3     referring to a case in Ohio or Iowa, I think it was Iowa.  Is

4     that what we're referring to?

5     Q.    Well, I'm asking if you recall.

6          You recall this one.  Do you recall any others?

7     A.    No.

8     Q.    Okay.

9     A.    You know, I don't know.  I never alleged a __Brady__ violation.

04:28PM 10    Q.    Okay.

11    A.    It's not been something I've been involved in, to my

12    knowledge.

13    Q.    Okay.  Have you participated in allegations of alleging

14    prosecutorial misconduct before?

15    A.    I've not alleged prosecutorial misconduct.

16    Q.    Have you participated in assisting counsel in making

17    allegations of prosecutorial misconduct?

18    A.    Um, not to my knowledge that's been specific, no.  I

19    haven't been party to that.

04:29PM 20    Q.    You didn't submit a declaration in support of that?

21    A.    Mr. Durkin, you'll have to be more specific.

22    Q.    I'm asking if you recall, sir.

23    A.    No, I don't recall.

24    Q.    If you don't recall, just tell me you don't recall.

25    A.    Don't recall.

1  Q.  Do you recall using the term, "overhand strike,"

2  "consistent with overhand strike" in your grand jury testimony?

3  A.  I don't recall.

4  Q.  You don't recall?

5  A.  No.

6  Q.  You've had a chance to review your Grand Jury testimony

7  before you appeared here today.

8  A.  Yes.

9  Q.  Okay.

04:30PM 10        And would you, and if I stated to you that that term

11  was used, would you be contesting that?

12  A.  No.

13        MR. ORESKOVICH:  Objection.  Asked and answered to the

14  extent of his recollection.

15  BY MR. DURKIN:

16  Q.  Go ahead.

17  A.  I don't recall using it.

18  Q.  Okay.

19        Okay.  Going back now to actually, I think -- I think

04:31PM 20  moving forward for us to 26:16:02, please.  Okay.  Where we see

21  the baton in the, above the head, perpendicular, excuse me,

22  parallel position to the floor, correct?

23  A.  Yes, sir.

24  Q.  With a forward movement of Officer Thompson, correct?

25  A.  Correct.

1    Q.    Okay.

2          And you're aware, are you not, Mr. Fredericks, that

3    Mr. Zehm goes to the ground at approximately 18:26:16, that's

4    more fully revealed in camera number four, I believe.

5    A.    Um, I don't know the time, he goes to the ground shortly

6    after this.

7    Q.    Okay.

8          And so if Officer Thompson provided a statement and

9    provided testimony that after the second baton strike Mr. Zehm

04:32PM 10  went to the ground, that would be consistent with the

11   description of the summary provided, correct?

12         MR. ORESKOVICH:  I'm going to object to the

13   characterization of the officer's testimony.  You may answer.

14         THE WITNESS:  If the summary said Officer Thompson

15   said this, then it would be consistent.  This says I said this,

16   so it's not consistent.  It's not my evidence.

17   BY MR. DURKIN:

18   Q.    Okay.  It's not inconsistent with the video, correct?

19   A.    Um, it is completely inconsistent because you are saying

04:33PM 20  this is what the video says.  If this is what Officer Thompson

21   says it's different.

22         Now, if you're saying, if you're asking me if this

23   image here with a baton in a parallel position to the floor, um,

24   could be the preceding image to Officer Thompson's striking the

25   baton toward Mr. Zehm, yes, it could be.

1    Q.    And Mr. Zehm subsequently going to the ground shortly

2    thereafter.

3    A.    Mr. Zehm goes to the ground, yes.

4    Q.    Okay.

5          Now, Mr. Fredericks, is it, isn't it true that when we

6    met with you back in March of 2007, and we went through your

7    first report, and we pointed out all these inaccuracies in your

8    report and particularly your summary, that you actually wanted

9    to make changes and correct those inaccuracies.

04:34PM 10   A.    Um, no.

11   Q.    It's not true?

12   A.    No.  That's --

13   Q.    Okay.

14   A.    That's -- firstly, you've made a compound statement saying,

15   all these inaccuracies.  I don't agree.  My summary is a summary

16   of some very detailed observations.

17         The detailed observations are detailed observations.

18   The summary is the summary of those observations.

19         Um, it was your direction, not at this meeting but the

04:34PM 20   subsequent meeting, to, after you hired me, to write a

21   subsequent report.  I wrote no reports afterwards, except at

22   your direction after March.

23   Q.    Okay.

24         And do you recall that it was my request that you

25   actually file an amended report.  Do you recall that?

1  A.   After you hired me you asked me to redact information from

2  the report.

3  Q.   Okay.

4  A.   By providing a different report.  More narrowly focused and

5  removing the information.

6  Q.   And it was your suggestion that the request be made that it

7  be described as a supplemental report, correct?

8  A.   That would be consistent with the way I operate, yes.

9  Q.   Okay.

04:35PM 10       You didn't want the perception that you would be

11  amending your report, you wanted to provide a supplemental

12  report.

13  A.   I wanted to be quite clear what I was being directed to do.

14  So it was a supplemental report yes.

15  Q.   Okay.  Okay.

16  A.   And in it, I, at the very beginning, I stated that I was

17  asked to remove human factors issues.

18  Q.   Okay.  Which you agree with.

19  A.   I don't take issue with that.

04:36PM 20  Q.   Okay.

21       And in terms of this Pepsi bottle exhibit that you

22  prepared, the demonstrative exhibit you're referring to, that

23  was actually showing the hands of Mr. Zehm, wasn't it?

24  A.   It shows his hands on the bottle, yes.

25  Q.   Okay.  And that was Exhibit Number 8, that you provided?

1    A.    I don't know the number.

2    Q.    Okay.  And in terms of removing -- again this is -- and

3    let's back up.

4          These exhibits that you prepared, these are all actual

5    stills, correct --

6    A.    Yes.

7    Q.    -- from the video?

8    A.    All video is just simply a series of stills.  So, yes,

9    everything I would have produced is just a bunch of stills.

04:37PM 10   Q.    Okay.

11         And all of that had been produced to the defendant.

12         MR. ORESKOVICH:  Objection as to what the source of

13   the foundation of his knowledge is.

14   BY MR. DURKIN:

15   Q.    All right.

16   A.    I don't know.

17   Q.    All right.  And the request for removal was to remove, not

18   the bottle, but the pointing of the arrows, correct?

19   A.    Well it wasn't to remove any image.

04:37PM 20   Q.    Right.  It was just to remove --

21   A.    It was to remove the reference to the bottle.

22   Q.    The pointing arrow, correct?

23   A.    No, it was to remove the reference to the bottle.  So it

24   was to remove the annotations that direct the attention to that

25   being the bottle.

 1    Q.    Okay.

 2          Well, wasn't the purpose of the exhibit to show

 3    Mr. Zehm's hands on bottle?

 4    A.    Um, the exhibit that I produced?

 5    Q.    Yeah.

 6    A.    The exhibit that I produced was certainly to demonstrate or

 7    to make it clear that that's where the bottle was.

 8    Q.    In Mr. Zehm's hands.

 9    A.    Correct.  Yes.

04:38PM 10    Q.    Okay.  All right.

11          MR. DURKIN:  Yeah, I think I'm almost done.  Let me

12    take a look at my notes.

13          MR. ORESKOVICH:  For the record, I just passed you a

14    note from the videographer.  You've got five minutes left on the

15    tape.

16          MR. DURKIN:  Okay.  Why don't we change the tape, if

17    you don't mind.  Thank you.

18          THE VIDEOGRAPHER:  This will conclude tape number 4.

19    The time is 4:38 p.m.

04:38PM 20          (Break taken.)

21          THE VIDEOGRAPHER:  This is the continued videotape

22    deposition of Grant Fredericks and tape number 5.  The date is

23    March 2, 2012.  The time is 4:50 p.m.

24    BY MR. DURKIN:

25    Q.    Okay.

1          Mr. Fredericks, do you recall when we first met and we

2    took a look at the images contained on the Open Eye and then of

3    course on the laptop that you had, which was different from the

4    one you have now, isn't it?

5    A.    Oh, possibly.

6    Q.    Okay.  You had a green green function, a deconvolution

7    button?

8    A.    Um --

9    Q.    Do you recall that?

04:51PM 10   A.    No.  Say it again.

11   Q.    Okay.  You described it as a green green button.  It was a

12   deconvolution function.

13   A.    Oh, um, no, same -- what I showed before was an Avid

14   interface.

15   Q.    That's correct.

16   A.    Yes.  I have both.  Avid interface and still images, which

17   are two different things.  The Avid was --

18   Q.    Okay.

19   A.    -- to integrate the audio and all the video sources

04:52PM 20   together.  And to play in realtime.

21   Q.    At one point in our review you were able to press a button

22   that provided clarity in terms of viewing the image.

23   A.    It was more clear, yes.

24   Q.    Okay.  What was that function?

25   A.    Um, it was just a higher res function.

 1   Q.   Okay.

 2              And when we met, we talked about -- and the statement

 3   I recall you making was, "We all know what's happening in terms

 4   of baton strikes, but you just can't see them all on the video."

 5              MR. ORESKOVICH:  I'm going to object to that question

 6   as counsel testifying as a witness about an interview that --

 7              MR. DURKIN:  I'm asking --

 8              MR. ORESKOVICH:  Let me finish.

 9              MR. DURKIN:  Go ahead.

04:52PM 10           MR. ORESKOVICH:  A meeting that he took place in and I

11   think it's inappropriate to be questioning and testifying at the

12   same time.

13              MR. DURKIN:  It's asking a witness as to whether or

14   not --

15              MR. ORESKOVICH:  I'm not arguing, I'm just making my

16   objection.  Go ahead with your question.

17   BY MR. DURKIN:

18   Q.   Go ahead and answer the question, please.

19   A.   Yeah, and this is, I think, the fundamental problem.  I

04:53PM 20   don't know if you understand me when I say, I can only speak to

21   what the video images show, I can't comment about what you

22   believe is happening between the images or out of view of the

23   camera.  So I disagree --

24              MR. DURKIN:  I'm going to move to strike.

25              THE WITNESS:  -- I disagree with that.

BY MR. DURKIN:

Q.   Mr. Fredericks, that wasn't my question.  My question was simple and direct, it was a yes or no question.

          Do you recall making the statement, "We all know what's going on, the question is whether or not you can see it on the video."

A.   No.

Q.   Okay.  Fair enough.

          Now, you received a copy of --

A.   I'm sorry.  I said or you said that?

Q.   You said that.

A.   No.  No.

Q.   Okay.

          You were aware of this summary back in September of 2009.

A.   Correct.

Q.   Okay.  And you were so concerned about it and so offended by it, that you never brought it to the FBI's attention in 2009, correct?

A.   Correct.

Q.   You never brought it to my office's attention in 2009.

A.   Correct.

Q.   You never brought it to my attention in 2009.

A.   That's correct.

Q.   Same thing in 2010.  You didn't, you were so offended by

```
 1   it, so upset by it, so upset with the alleged inaccuracies that
 2   you didn't do anything about it in 2010 in terms of going to the
 3   FBI with your concerns.  Right?
 4   A.   Well, your characterization that I was so upset by it I
 5   don't think is accurate.
 6   Q.   Okay.
 7   A.   I didn't accept it, I was confused by it, it wasn't my
 8   evidence, and I wasn't going to support it.
 9   Q.   Okay.
10   A.   And I had done everything I could to try to dissuade you
11   from this and that didn't work, so I decided to leave it.
12            MR. DURKIN:  I'm going to move to strike the response
13   as nonresponsive.
14   BY MR. DURKIN:
15   Q.   My question is, sir, did you go to the FBI with your
16   concerns in 2010?
17   A.   No.
18   Q.   Did you go to the U.S. Attorney's Office in 2010 with your
19   concerns?
20   A.   No.
21   Q.   Did you come to me with your concerns in 2010?
22   A.   No.
23   Q.   In 2011 did you contact the FBI with your concerns?
24   A.   No.
25   Q.   U.S. Attorney's Office with your concerns?
```

1    A.    No.

2    Q.    Did you come to me with your concerns?

3    A.    No.

4    Q.    Okay.

5          And so you were so upset about this, that the only

6    time that you went to anybody about it, you waited until after

7    the jury returned with the verdict.  Is that right?

8    A.    I've never been so upset about this.  I've been concerned.

9    Q.    Okay.

04:55PM 10   A.    And when I realized that it had not been corrected --

11         MR. DURKIN:  I'm going to move to strike.  You said

12   you were concerned.  The rest of it is not responsive to my

13   question.

14         MR. ORESKOVICH:  Well, wait a minute.  We need to get

15   it on the record.  You can't tell the witness not to answer.  He

16   can answer, you can move to strike it, the judge can decide what

17   to do.  But not letting him finish I don't think is appropriate.

18   Go ahead and finish your answer, sir.

19         THE WITNESS:  When I realized that this was not going

04:55PM 20   to be corrected, that's when I decided to investigate whether I

21   should try to bring this to the Court's attention.

22         My expectation all along was that it was going to be

23   corrected.  So I never got upset about it, I just anticipated it

24   would be corrected.

25   BY MR. DURKIN:

1    Q.    Okay.

2          To follow-up on that.  In terms of having it

3    corrected, disclosed in your first report to defense counsel?

4    A.    No, that's not what I meant.

5    Q.    Disclosed in your second report to defense counsel?

6    A.    No, because they're, they don't deal with this.

7    Q.    Disclosed in your Grand Jury testimony to defense counsel?

8    A.    They don't deal with this.  So that would not be what I

9    intended when I said it would be corrected.

04:56PM 10   Q.    Okay.

11          MR. DURKIN:  That's all the questions I have right

12   now.

13

14                    FURTHER EXAMINATION

15

16   BY MR. ORESKOVICH:

17   Q.    Have there been any times that you've been felt threatened

18   or intimidated by anyone concerning your involvement in this

19   case, Mr. Fredericks?

04:57PM 20   A.    Yes.

21   Q.    Tell me when.

22   A.    About two weeks ago I was teaching my class at the FBI

23   National Academy, I was informed that the FBI office here in

24   Spokane had called and called the Unit Chief for the FBI

25   National Academy and made statements, I am told, that, um, I had

1    testified in this trial and that I had altered my testimony from

2    my Grand Jury testimony and that I'm now have made a complaint

3    that has caused, that may cause this whole thing to unravel.

4          Um, that information was given to my direct

5    supervisor, in Quantico, who was asked to investigate it.  I

6    thought that that was inappropriate and, um, I felt some

7    intimidation.

8    Q.   Approximately two weeks ago this occurred.  Do you recall

9    that it was approximately in that very same time period that we

04:58PM 10   were attempting, through Mr. Wetzel, and through the

11   United States Attorney, to schedule this interview and

12   deposition?

13   A.   Yes.

14   Q.   You have referred to some demonstrative exhibits and we

15   talked about them kind of in a vacuum because we didn't mark

16   them before the Court.

17          And I want you to do this, if you would, to produce

18   them.  All right.  You produce the file.  I would like those.  I

19   may or may not have them, I don't know, I'm not representing one

04:59PM 20   way or the other.

21   A.   Um-hum.

22   Q.   But --

23          MR. DURKIN:  Let's be specific about which ones,

24   please.

25          MR. ORESKOVICH:  Well I don't know which ones.

BY MR. ORESKOVICH:

Q.   Let me ask you about the demonstrative exhibits you
produced.  That's the whole point of this.  Is you produced a
number of demonstrative exhibits, as I understand it, for the
government.

A.   Yes.

Q.   Okay.  And is there a way to identify them for the record
as we talked about them today?

A.   Um, there are so many I don't think I could do it
thoroughly.

Q.   Yeah.  Okay.

A.   There's some that I have in mind.

Q.   Um-hum.

     We were talking about a demonstrative exhibit earlier
that had, and I'm going to mess this up again, but I want to say
motions or baton motions one through 15?

A.   Yes.

Q.   One through 10?

A.   1 through 13.

Q.   All right.

     Is there a file or a way that that demonstrative
exhibit is identified that you can produce that for us?

A.   Yes.  I brought two copies --

Q.   Yeah.

A.   -- of my file.

 1   Q.   Yes.

 2   A.   Each one are identical.

 3   Q.   Yeah.

 4   A.   And that file is included and it's called, I believe it's

 5   called Baton Motions.  And it's a PDF file.

 6   Q.   All right.

 7        You have talked about other demonstrative exhibits and

 8   I want to separate that out, because I understand you made a

 9   whole series of the stills of a certain portion of the Zip Trip

05:00PM 10   video.

11   A.   Yes.

12   Q.   Correct.

13        In my mind that might be a little bit different, those

14   are still images of a video.  But I'm really focusing for a

15   moment on demonstrative exhibits and just trying to get to that

16   a little bit.

17        What other demonstrative exhibits did you prepare for

18   the government?

19   A.   Um, I provided a file.

05:00PM 20   Q.   Yeah.

21        MR. DURKIN:  You know, I'm going to object to this in

22   terms of getting into work product.  If we have a specific one

23   that we talked about today that goes to the issues that are

24   involved, let's talk about those.  He's identified them, we

25   talked about them on the record, either before in the interview

1   or during the course of the deposition.

2           Let's identify those and we can talk about getting you

3   a copy of those separated out onto a separate disk or DVD and

4   getting those to you.

5   BY MR. ORESKOVICH:

6   Q.   What I'm trying to do is to do that, but because I don't

7   know what's contained in that file.  That's what I'm trying to

8   look at.  Not having the ability to know how to exactly ask this

9   question.

05:01PM 10          You referred to this in the course of your interview

11  and your deposition and all I'm trying to do is have you

12  identify for the record what you were talking about.

13  A.   One of the things I was talking about was I produced one

14  specifically that was labeled, Pepsi bottle.

15  Q.   Yes.

16  A.   That's contained in a file that's linked into a file with

17  probably almost a hundred other demonstrative exhibits --

18  Q.   Yes.

19  A.   -- that are searchable and linkable and they were intended

05:01PM 20  to assist in the Court to follow through the evidence.

21  Q.   Yeah.

22  A.   And some of them had annotations, I think, um, um, and

23  there were other files, but I don't recall, I can't recall

24  exactly, um, you know, what other files that I created.

25          There was this exhibit we talked about that, um,

1    Special Agent Jangaard agreed, just leave the reference to the

2    Pepsi bottle in there.  And there were pointers.  And I don't

3    remember what document that's in.  It's in the file somewhere.

4    Q.   All right.

5              MR. ORESKOVICH:  That's all I have.  Thank you, sir.

6              MR. DURKIN:  Let me take a look at my notes real

7    quick.

8              (Pause.)

9              MR. DURKIN:  That's all questions I have.  Thank you.

05:02PM 10          MR. ORESKOVICH:  Thank you, Mr. Fredericks.

11             THE VIDEOGRAPHER:  Thank you, Mr. Fredericks.  This

12   will conclude tape five of five in the videotape deposition.

13   The time is now 5:02 p.m.

14             (Whereupon Court was recessed at 5:07 p.m.)

15             (Signature is waived.)

16

17

18

19

20

21

22

23

24

25

1   **STATE OF WASHINGTON          )**

2                                **:    ss:   REPORTER'S CERTIFICATE**

3   **COUNTY OF SPOKANE           )**

4          I, Mark A. Snover, a notary public in and for the

5   State of Washington, do hereby certify:

6          That the foregoing deposition of

7   GRANT FREDERICKS was taken on the date and at the time and place

8   as shown on page 1 hereto;

9          That the witness was sworn upon his oath to tell the

10  truth, the whole truth and nothing but the truth and did

11  thereafter make answers as appear herein;

12         That the foregoing is a true and correct transcription

13  of my stenographic notes of the requested deposition transcribed

14  by me or under my direction;

15         That the witness' signature was waived.

16

17                         WITNESS my hand and seal this _____

18  day of _____, 2012.

19

20  _____
                         **MARK A. SNOVER, RPR/CSR**
21                       **CSR No.  SN-OV-EM-A396DM**
                         **Notary Public in and for the**
22                       **State of Washington, residing at**
                         **Spokane.**

23

24

25